FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

JAN 0 7 2002

CLERK

ALFRED BONE SHIRT, et al., )
)
    Plaintiffs, )
)
       v. ) Civil Action No. _CIV0l- 3032_
)
JOYCE HAZELTINE, et al., )
)
    Defendants. )
)

PLAINTIFFS' BRIEF IN SUPPORT OF THEIR
MOTION FOR A PRELIMINARY INJUNCTION
UNDER SECTION 5 OF THE VOTING RIGHTS ACT

    The plaintiffs submit this brief in support of their motion for a preliminary injunction prohibiting the defendants from implementing South Dakota's 2001 legislative redistricting plan in Shannon and Todd counties, and in all other counties which may be affected by this litigation, until the defendants have complied with the preclearance requirement of Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c.

I.  BACKGROUND

    Article III, Section 5 of the South Dakota Constitution requires the South Dakota Legislature to reapportion its membership "every ten years after 1991." The Legislature met for this purpose in a special session held in October 2001. The Legislature enacted

1

a redistricting plan on October 24, 2001, and the Governor signed it into law on November 1, 2001. See An Act to provide for the decennial redistricting of the State Legislature, ____ S.D. Laws ____. In the absence of an injunction, the State will officially begin implementing the 2001 legislative redistricting plan no later than January 1, 2002, which is the beginning of South Dakota's 2002 election cycle. See S.D.C.L. §§ 12-6-4.1 and 12-7-1.1.

Because Shannon and Todd counties in South Dakota are covered by Section 5 of the Voting Rights Act, see 28 C.F.R. Part 51 App. (List of Covered Jurisdictions), no "standard, practice, or procedure with respect to voting different from that in force and effect on . . . November 1, 1972" that affects those counties is enforceable unless and until it has been precleared in compliance with that Section. 42 U.S.C. § 1973c; Lopez v. Monterey County, 519 U.S. 9, 20 (1996) ("No new voting practice is enforceable unless the covered jurisdiction has succeeded in obtaining preclearance."). A covered jurisdiction may preclear a voting change in one of two ways: it may obtain a declaratory judgment in the United States District Court for the District of Columbia, or it may submit the change to the Attorney General of the United States for approval. See 42 U.S.C. § 1973c. If the Attorney

General approves the change, or fails to register an objection to the change within 60 days, the change is precleared.[1]  See id.

Using either preclearance method, the covered jurisdiction has the burden of proving that its proposed changed "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color [or membership in a language minority]" 42 U.S.C. § 1973c; Beer v. United States, 425 U.S. 130, 141 (1976); Richmond v. United States, 422 U.S. 358, 362 (1975).

As of this writing, the State has not sought to preclear the 2001 legislative redistricting plan as required by Section 5. Furthermore, according to the minutes of a November 28, 2001, meeting of the Executive Board of the Legislative Research Council, the State is "reluctan[t]" to do so.  See ex. A at 3 (Minutes).  In any event, because some delay is invariably associated with the preclearance process, it is virtually impossible that the State could obtain preclearance before the start of the election calendar should the State choose to seek it.

---

1.   Once a submission is made, the Attorney General may extend the preclearance period for an additional 60 days. See 28 C.F.R. § 51.37(c).

## II.  DISCUSSION

Compliance with the preclearance provisions of the Voting Rights Act is enforceable by the Attorney General and by private litigants in an action before a local three-judge district court. See 42 U.S.C. §§ 1973c and 1973j(d); Allen v. State Bd. of Elections, 393 U.S. 544, 555-58 (1969).  However, because Congress has reserved for consideration by the Attorney General or the District Court for the District of Columbia the duty to determine whether a change covered by the Voting Rights Act has the purpose or effect of "denying or abridging the right to vote on account of race or color," see 42 U.S.C. § 1973c, the role of the local three-judge court is limited.   See Allen, 393 U.S. at 555-56; Perkins v. Matthews, 400 U.S. 379, 383-85 (1971).  The only issues properly before a local three-judge court are "(i) whether a change was covered by § 5, (ii) if the change was covered, whether § 5's approval requirements were satisfied, and (iii) if the requirements were not satisfied, what remedy [is] appropriate."  City of Lockhart v. United States, 460 U.S. 125, 129 n.3 (1983).

### A.  South Dakota's Redistricting Plan is Covered by Section 5.

Section 5 applies in a covered jurisdiction to "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or

4

effect on . . . November 1, 1972." 42 U.S.C. § 1973c. A
Department of Justice regulation listing some examples of voting
changes covered by the Act includes "redistricting, annexation,
deannexation, incorporation, [and] reapportionment...." 28 C.F.R.
§ 51.13(e). Indeed, a redistricting plan is one of the
quintessential voting changes covered by the Act. See, e.g.,
United Jewish Organizations of Williamsburg, Inc. v. Carey, 430
U.S. 144 (1977).

The South Dakota Legislature itself has recognized the need to
preclear the new plan as it affects Shannon and Todd counties, both
of which are included in District 27. For example, the Legislative
Redistricting Committee attempted to preclear the configuration of
District 27 before the rest of the plan had been drawn and
considered by the Legislature as a whole. See ex. B at 2. The
Department of Justice refused to act upon the submission on the
ground that it had not yet been enacted into law and was thus
premature. See id.; see also 28 C.F.R. § 51.22 (regarding
premature submissions).

Furthermore, the mere fact that the boundaries of District 27
under the 2001 plan are the same as those under the 1991 plan does
not mean that the new plan is not subject to preclearance and
cannot be discriminatory. For example, the demographic composition
of District 27 has changed substantially. Native Americans were

5

87% of the total population and 82% of the voting-age population of District 27 under the 1991 plan, and the district as a whole was underpopulated by 4.1% -- making it one of the most underpopulated districts in the State.  Under the 2001 plan, Native Americans are 90% of the total population and 86% of the voting-age population of District 27, and the district as a whole is overpopulated by 4% -- making it one of the most overpopulated districts in the State.  In light of these changing demographics, the District 27 enacted in 2001 is plainly a "standard, practice, or procedure with respect to voting different from" the District 27 enacted in 1991 and is thus subject to preclearance.[2]

In addition, even if the 2001 plan were identical to the 1991 plan in both boundary lines and demographic composition, it would still be subject to the discriminatory purpose analysis required by Section 5.  In Texas v. United States, for example, the court held that a legislative redistricting plan, even if identical in all respects to the pre-existing plan, was still subject to preclearance because the two plans "differ in the way they were enacted."  785 F. Supp. 201, 206 (D.D.C. 1992).  According to the

---

2.   Although a local three-judge court has no jurisdiction to determine whether a voting change is discriminatory within the meaning of Section 5, the 2001 legislative redistricting plan is indeed discriminatory in that Native Americans in District 27 are more highly packed, or overconcentrated, in the new District 27 than they were in the District 27 enacted in 1991.

court, "We cannot conclude, as a matter of law, that the purposes behind S.B.1 . . . were nondiscriminatory simply because the attorney general determined that the purposes behind the . . . [prior] plan were not discriminatory." Id.  The plan at issue in this case and the prior plan similarly differ in the way they were enacted.  That difference requires the State of South Dakota to submit the plan for a discriminatory purpose analysis under Section 5.

There can be no doubt that the 2001 legislative redistricting plan enacted by the Legislature is subject to the preclearance requirement.

### B.   South Dakota's Redistricting Plan Has Not Been Precleared

As of this writing, South Dakota has made no attempt to preclear the 2001 legislative redistricting plan.  Indeed, the minutes cited above indicate that it has no intention of doing so. The question, however, is not whether the State has submitted the plan but whether the plan has been precleared.  Clearly, it has not.

### C.   The Appropriate Remedy is an Injunction

The proper remedy for noncompliance with Section 5 is clear:

No new voting practice is enforceable unless the covered jurisdiction has succeeded in obtaining preclearance. If a voting change subject to § 5 has not been precleared,

§ 5 plaintiffs are entitled to an injunction prohibiting
implementation of the change.

Lopez v. Monterey County, 519 U.S. at 20 (citations omitted);

accord Clark v. Roemer, 500 U.S. 646, 652-53 (1991); Allen v. State

Bd. of Elections, 393 U.S. 544, 572 (1969).  Failure to obtain

preclearance renders a voting change "unenforceable." Hathorn v.

Lovorn, 457 U.S. 255, 269 (1982).  Because South Dakota has not

obtained preclearance for the 2001 legislative redistricting plan,

the plaintiffs are entitled to an injunction prohibiting its

implementation in Shannon and Todd counties, and in all other

counties which may be affected by this litigation.

### III.  CONCLUSION

This Court should grant the plaintiff's motion for a
preliminary injunction.

Respectfully submitted,

BRYAN SELLS
LAUGHLIN McDONALD
NEIL BRADLEY
MEREDITH BELL
American Civil Liberties Union
    Foundation, Inc.
2725 Harris Tower
233 Peachtree Street
Atlanta, Georgia   30303
(404) 523-2721


PATRICK DUFFY
604 Mt. Rushmore Road
Rapid City, SD   57709-8027
(605) 342-1973

ATTORNEYS FOR THE PLAINTIFFS

EXHIBIT A


Minutes of the Executive Board

of the

Legislative Research Council


November 28, 2001



# MINUTES

## EXECUTIVE BOARD

**Three hundred second Meeting LCR 1**

**Wednesday State Capitol Building**

**November 28, 2001 Pierre, South Dakota**

<u>**Wednesday, November 28, 2001**</u>

The three hundred second meeting of the Legislative Research Council Executive Board was called to order by Chair Senator Arnold M. Brown at 8:37 a.m. (CT), November 28, 2001, in LCR 1 of the State Capitol, Pierre, South Dakota.

A quorum was determined with the following members answering the roll call: Senators Kenneth D. Albers, Don Brosz, Arnold M. Brown, Dennis Daugaard, H. Paul Dennert, Robert Duxbury, and Royal "Mac" McCracken; and Representatives Quinten Burg, Michael Derby, Scott Eccarius, Phyllis Heineman, Claire Konold, Gordon Pederson, and Orville Smidt. Representative Gerald Lange was unable to attend the meeting.

Staff members present included James Fry, Director; and Teri Retrum, Senior Legislative Secretary.

(**NOTE**: For sake of continuity, the following minutes are not necessarily in chronological order. Also, all referenced documents are on file with the Master Minutes.)

(**Clarification**: Voice votes that prevail with all members present voting "aye" will carry the disposition language "prevailed unanimously." Voice votes that prevail with a majority of all members present voting "aye" will carry the disposition language "prevailed." Voice votes that prevail without all members present voting "aye" will list those members casting "nay" votes if so requested by the dissenting voter.)

**Approval of Minutes**

**SENATOR ALBERS MOVED, SECONDED BY SENATOR MC CRACKEN, THAT THE MINUTES OF THE AUGUST 6, 2001, MEETING BE APPROVED AS PRINTED AND MAILED. MOTION PREVAILED UNANIMOUSLY ON A VOICE VOTE.**

### Approval of Agenda

Chair Brown stated that he would have some items to be added to the agenda for discussion purposes; however, he would present them as time permitted. The agenda was accepted with that caveat.

### Director's Report and Correspondence

**Legislative Research Council (LRC) Director James Fry** reviewed the FY 2002 financial statement for the period ending October 31, 2001 (Document #1). He reported that, due to the cancellation of several conferences, the budget has a few more dollars than expected. Mr. Fry said that, overall, the budget is in excellent shape and on track.

Mr. Fry reviewed the membership dues that the Legislature pays to national organizations as follows:

National Conference of State Legislatures (NCSL) $84,802

Council of State Governments (CSG) $67,352

Education Commission of the States (ECS) $15,134

Responding to **Senator Royal "Mac" McCracken**, Mr. Fry said that the $15,134 figure for membership in the ECS represents the Legislature's one-third share. He commented that the ECS has been quick to respond to requests from the Legislature and staff; however, there is a possibility that the information needed from the ECS also can be received from one of the other organizations. **Chair Arnold Brown** announced his intention to revisit the necessity and benefit of all memberships. He said that perhaps, after review, the Legislature will discern that the services are duplicated and that the Legislature can forego some of the memberships. Mr. Fry said that the dues are not paid until spring, so there is time to make a decision regarding the dues paid to those organizations. Responding to **Senator Kenneth Albers**, Mr. Fry said that membership in the Uniform Laws Commission (ULC) provides the Legislature access to uniform laws and allows the Legislature input into those uniform laws. **Representative Phyllis Heineman** posed the question: "Do we have a way of tracking requests made to and responses received from NCSL and CSG to see if the services of both are worth the expense?" Chair Brown said that the Legislature and staff have always received excellent service from each organization. He said the Legislature will not be making a decision regarding dues this year; however, Chair Brown said that he is interested in discussing the matter in the future. **Senator Robert Duxbury** commented that NCSL is the best-known of the organizations and is very beneficial to the Legislature and staff. Mr. Fry said that CSG deals with a broader spectrum of government and that NCSL, legislatively, is probably the stronger of the two organizations. **Senator Don Brosz** said that the Four-State Conference, with Wyoming inactive, is not well attended and expressed his opinion that those conferences relate to issues concerning South Dakota perhaps more

than those issues addressed at national conventions. Mr. Fry said that he made the decision not to send staff to the Four-State Conference this year because it was his understanding that the conference topics were geared more toward legislator's interests; however, Mr. Fry said that he would certainly follow any guidelines that the Executive Board would deem advisable. **Representative Orville Smidt** informed the Board that a resolution was passed at the Four-State Conference of State Legislatures to request CSG to revisit the state membership in the Four-State Conference and to perhaps add more states and two provinces in Canada.

### Doctor-of-the-Day Program

**REPRESENTATIVE KONOLD MOVED, SECONDED BY REPRESENTATIVE PEDERSON, THAT THE EXECUTIVE BOARD APPROVE THE DOCTOR-OF-THE-DAY PROGRAM FOR THE 2002 LEGISLATIVE SESSION. MOTION PREVAILED UNANIMOUSLY ON A VOICE VOTE.**

### Room User Fee

**SENATOR DENNERT MOVED, SECONDED BY REPRESENTATIVE PEDERSON, THAT THE EXECUTIVE BOARD WAIVE THE FEE FOR USE OF LEGISLATIVE COMMITTEE ROOMS DURING THE 2002 LEGISLATIVE SESSION. MOTION PREVAILED UNANIMOUSLY ON A VOICE VOTE.**

Mr. Fry said that "We the People" requested that the fee also be waived for use of the legislative conference rooms.

At the request of the Board, Mr. Fry provided information on the "We the People" Conference. Mr. Fry said that "We the People" is a group of high school students that studies the U.S. Constitution and the Bill of Rights. There is a textbook for the study, and the final activity is to take a test on the U.S. Constitution and to participate in a simulated congressional hearing. Ms. Joyce Hazeltine, Secretary of State, and personnel from the Attorney General's office serve as judges for the event.

**REPRESENTATIVE SMIDT MOVED, SECONDED BY REPRESENTATIVE KONOLD, THAT THE EXECUTIVE BOARD WAIVE THE FEE FOR USE OF LEGISLATIVE COMMITTEE ROOMS FOR "WE THE PEOPLE." MOTION PREVAILED UNANIMOUSLY ON A VOICE VOTE.**

Continuing with the director's report, Mr. Fry briefly discussed the reluctance to submit the state's redistricting plan to the United States Department of Justice. He said that the department turned down a prior request from the interim Legislative Redistricting Committee for preclearance of the committee's configuration of Shannon, Todd, and Bennett Counties, stating that the department would not act on the issue until the plan was voted on by the Legislature as a whole. Mr. Fry said that the Legislature maintained the configuration of Shannon, Todd, and Bennett Counties, which was the preference of most individuals involved. He said that the Legislature passed the redistricting plan, and the Governor signed the bill. He said that it is LRC staff's opinion that if the American Civil Liberties Union or the Department of Justice has any issues with the plan, those entities can address them.

Mr. Fry also informed the Board that the LRC staff has provided redistricting assistance to eleven counties to date. He said that it has gone very well, and the counties have been appreciative of the assistance.

At this time, Chair Brown asked Senator Brosz to report on a meeting he attended regarding dental care in South Dakota. Senator Brosz reported that the meeting was held at the Wahpeton Science School in Wahpeton, North Dakota. He said that the meeting addressed the dwindling numbers of dentists and dental professionals in North Dakota and South Dakota. Senator Brosz informed the Board that the University of Minnesota Dental School has proposed that portable dental clinics be established and staffed by advanced dental students, hygienists, and assistants—Senator Brosz said that this opportunity was viewed very favorably by the dental profession. He said that costs could be minimized if the states would participate and maintain the portable clinics, rather than the University of Minnesota maintaining the sites. Senator Brosz said that the goal of the University is to assist North Dakota and South Dakota in taking care of clientele and recruiting those who want to enter the profession to practice in the two states. Chair Brown suggested that the chairs of the Senate and House Health and Human Services Committees monitor this proposed program.

### Other Requests

Senator Paul Symens addressed the Board regarding a Wind Energy Conference held in Pierre. He told the Board that **Mr. Randy Udall** spoke about all sources of energy across the United States. Although he was unable to attend Mr. Udall's presentation, Senator Symens said that Mr. Udall's remarks received very positive comments from those in attendance. Senator Symens asked the Board to consider inviting Mr. Udall to speak, perhaps in a seminar format, to Legislators on one of the first couple of days of the 2002 Legislative Session. **Representative Quinten Burg** said that he did hear Mr. Udall speak and stated: "Mr. Udall showed us the broad picture regarding energy throughout the world." Senator Brosz asked about Mr. Udall's expertise in energy matters and his speaking fee. Chair Brown said that the issue is very timely and said that he believes it would be a good idea to hear Mr. Udall. Chair Brown asked Board members whether they wanted to impose a cap on how much it was willing to spend to acquire the speaking services of Mr. Udall. **Representative Claire Konold** said that he checked Mr. Udall's Web site and, in his opinion, Mr. Udall is biased toward wind energy; and stated: "To me, this is a proposal for wind energy." **Senator Dennis Daugaard** expressed support for Representative Konold's comments. Chair Brown stated: "I was going to support it if it was on all energy and not geared toward one source." **Senator Michael Derby** expressed favor for trying to acquire Mr. Udall to speak on wind energy. He said that he does not have much exposure to the topic, and he would like to learn more about it. **Representative Phyllis Heineman** suggested that perhaps the Board needs to review and develop a standard policy for acquiring speakers.

**SENATOR DERBY MOVED THAT THE BOARD BUDGET UP TO ONE THOUSAND DOLLARS, WITH ANY REMAINDER TO BE PROVIDED BY PRIVATE SPONSORS, TO RETAIN MR. RANDY UDALL TO SPEAK TO THE LEGISLATURE ABOUT ENERGY SOURCES.**

Chair Brown declared the motion failed due to lack of a second.

**SENATOR DENNERT MOVED, SECONDED BY SENATOR DUXBURY, THAT THE BOARD BUDGET UP TO TWO THOUSAND DOLLARS TO RETAIN MR. RANDY UDALL TO SPEAK TO THE LEGISLATURE ABOUT WIND ENERGY ON JANUARY 8 OR 9, 2002. MOTION FAILED ON A ROLL CALL VOTE WITH 6 VOTING AYE, 8 VOTING NAY, AND 1 EXCUSED. Those voting AYE: Albers, Dennert, Duxbury, Burg, Derby, and Brown. Those voting NAY: Brosz, Daugaard, McCracken, Eccarius, Heineman, Konold, Pederson, and Smidt. Those EXCUSED: Lange.**

### Reports of Interim Committees

(Document #2 is a compilation of the draft final reports for the Legislature's 2001 interim committees listed below.)

Appropriations Committee—Dale Bertsch, Chief of Fiscal Analysis and Budget Analysis, addressed the Board regarding expenditure authority grants, and Reed Holwegner, Senior Fiscal Analyst, addressed the Board regarding adjustment training centers, community mental health centers, and the state's salary structure.

Senator Brosz asked how the figures presented concerning the adjustment training centers compare with the figures given to the Appropriations Committee at the end of session. Senator Brosz commented on the dissatisfaction expressed to him by individuals from one of the Adjustment Training Centers on how the center was treated in the numbers. Mr. Holwegner responded that the Appropriations Committee and staff were not provided those figures.

Senator Dennert stated that the Appropriations Committee was considering allocating more money to the Adjustment Training Centers but was led to believe that they had plenty of money.

Code Commission—Doug Decker, Code Counsel, reported that the Code Commission identified Volumes 5, 10B, and 12B to be reprinted for the upcoming year. He also said that the publishing contract for the South Dakota Code will expire on June 30, 2002, and the Commission is currently reviewing the process to either renew the publishing contract for the South Dakota Code or open the contract to bids from other publishers.

Government Operations and Audit Committee—Annie Mertz, Senior Fiscal Analyst, reported on the corrections issues assigned to the committee, and Rich Hornak, Legislative Audit, reviewed the process relating to the operations and fiscal affairs of state government.

Ms. Mertz responded to Board questions concerning the report from the Juvenile Corrections Monitor. She said that the monitor is required by law to provide an annual report of his activities.

After brief discussion, **REPRESENTATIVE SMIDT MOVED, SECONDED BY REPRESENTATIVE KONOLD, TO REQUEST THE JUVENILE CORRECTIONS MONITOR TO PROVIDE A MONTHLY REPORT ON THE NUMBERS OF COMPLAINTS**

**RECEIVED. THE MOTION PREVAILED UNANIMOUSLY ON A VOICE VOTE.**

Legislative Redistricting Committee—Reuben D. Bezpaletz, Chief Analyst/Research and Legal Services, reported that he was well satisfied with the AutoBound technology purchased to assist the Legislature and staff in redistricting. From a legal standpoint, Mr. Bezpaletz said that in his opinion the Legislature is in a better position to withstand a court challenge to its redistricting plan than ten years ago.

The Executive Board adjourned at 10:17 a.m. and reconvened at 1:40 p.m.

Upon consensus of the Board, Chair Brown directed staff to send a letter to the family expressing condolences upon the death of Dr. Hilton Briggs, former President of South Dakota State University.

### Report of Investment Council Subcommittee

### And

### Consideration of Investment Officer's Salary Bonus

Mr. Rich Lauer, Chair, Investment Council, and Mr. Steve Myers, State Investment Officer, presented the Council's Annual Report (Document #3). Mr. Myers said that the Investment Council experienced a −2.88% negative return for FY 2001; however, the investment performance generated an additional 125 million dollars. Mr. Myers commended the superior performance of the investment team. He said that South Dakota ranks in the top one percent in trade transactions. Mr. Myers urged the Board to look at the long-term performance rather than the short-term performance.

Mr. Lauer said that South Dakota is unique in the cooperation experienced between the Legislature and the Investment Council. He said that the Council is very protective of its upstanding reputation.

Responding to Representative Derby, Mr. Myers said that the Investment Council is not statutorily permitted to invest in venture capital funds. He said that he has broached the possibility of making it a legal investment category for the Council, to no avail.

Mr. Myers briefly discussed the Dakota Cement Trust and said that he fully expected to "get the twelve million dollars income."

Mr. Lauer informed the Board that on November 7, 2001, the Investment Council passed a unanimous motion to recommend a bonus of $64,719 to Mr. Myers according to the current incentive plan.

**REPRESENTATIVE ECCARIUS MOVED, SECONDED BY SENATOR BROSZ, THAT THE BOARD GO INTO EXECUTIVE SESSION TO DISCUSS THE RECOMMENDED BONUS FOR THE INVESTMENT OFFICER. MOTION PREVAILED UNANIMOUSLY ON A VOICE VOTE.**

The Board went into executive session at 2:50 p.m. and came out of executive session at

3:08 p.m.

## Report on the Investment Council Subcommittee

Reporting that the subcommittee is recommending a bonus to Mr. Myers based on the current formula, **REPRESENTATIVE ECCARIUS MOVED, SECONDED BY REPRESENTATIVE DERBY, THAT THE EXECUTIVE BOARD APPROVE THE AWARDING OF A BONUS OF $64,719 TO THE STATE INVESTMENT OFFICER FOR THE TWO-YEAR PERIOD ENDING JUNE 30, 2001.**

### Investment Officer's Bonus Plan

Section 1. Definitions.

(1) "performance period" is the two fiscal years prior to the year in which the bonus is to be awarded.

(2) "incentive maximum" is one-half of the investment officer's salary during the second year of the performance period.

(3) "Investment Council capital market benchmark" is return of a portfolio mix determined by the South Dakota Investment Council during the performance period.

Section 2. Calculation of the bonus.

I. multiply the incentive maximum by 0.3, and multiply that product by:

(a) zero if performance during the performance period versus the large plan universe does not reach the 40th percentile;

(b) 0.2 if performance during the performance period versus the large plan universe reaches the 40th percentile;

(c) 0.5 if performance during the performance period versus the large plan universe reaches the 33rd percentile;

(d) 1.0 if performance during the performance period versus the large plan universe reaches the 25th percentile.

II. multiply the incentive maximum by 0.3, and multiply that product by:

(a) zero if performance during the performance period does not exceed the Investment Council capital market benchmark by 0.25%;

(b) 0.2 if performance during the performance period exceeds the Investment Council capital market benchmark by at least 0.25%;

(c) 0.4 if performance during the performance period exceeds the Investment Council capital market benchmark by at least 0.50%;

(d) 0.6 if performance during the performance period exceeds the Investment Council capital market benchmark by at least 0.75%;

(e) 0.8 if performance during the performance period exceeds the Investment Council capital market benchmark by at least 1.00%;

(f) 1.0 if performance during the performance period exceeds the Investment Council capital market benchmark by at least 1.25%.

III. multiply the incentive maximum by 0.4, and multiply that product by the quotient of the aggregate bonus earned by portfolio managers in the South Dakota Investment Council divided by the aggregate potential bonus of portfolio managers in the South Dakota Investment Council for the performance period.

IV.  The bonus is the sum of the results of steps I, II, and III.

**The motion prevailed unanimously on a roll call vote.**

### Trust Funds

At the request of the Chair, **Mr. Curt Everson**, Commissioner, Bureau of Finance and Management, addressed the Board concerning the Cement Trust Fund. He said that it is the only fund not requiring legislative action. The Health Care Trust Fund and the Education Enhancement Trust Fund are not yet defined for calculation of distribution. All the trust money is accounted for in the state treasury.

Discussion ensued. Responding to Representative Heineman, Senator Daugaard said that it is the intent that trust fund distribution defines the investment policy. Senator Daugaard also responded to a question posed by Senator Brosz regarding the Education Enhancement Funds by stating that it is not the intent that those funds replace other state aid funds.

Chair Brown suggested that perhaps after the Governor's budget message leadership would be able to meet with Mr. Everson to address concerns regarding defining calculation of distribution for the Health Care Trust Fund and the Education Enhancement Trust Fund.

### Reports of Interim Committees (Continued)

Prescription Drug Issues Committee—Jacquelyn Storm, Principal Staff Attorney, stated that committee members focused on educating themselves on the issues. The committee also reviewed the status of prescription drug issues on the federal level.

Retirement Laws Committee—Annie Mertz said that the committee was told that the reserve fund can absorb a one-year loss of ten percent and that the retirement fund is still healthy.

Rules Review Committee—Doug Decker said that the committee reviewed 79 sets of rules.

State-Tribal Relations Committee—Tom Magedanz, Principal Research Analyst, reported that those in attendance at the committee's third meeting held at Agency Village, headquarters of the Sisseton-Wahpeton Sioux Tribe, in the Tribal Council Chambers, were very appreciative of the presentations, testimony, and the tours of the Dakota Western plant, an economic development project at the Long Hollow District, and the Dakota Magic Casino, one of the tribe's three casinos.

Streamlined Sales Tax Project Task Force—Jim Fry discussed the requirements that are among issues for South Dakota regarding a streamlined sales tax.

Teacher Credentialing and Compensation Committee—Mark Zickrick, Principal Fiscal Analyst, said that, among other topics discussed, the committee heard testimony regarding the state's teacher certification process and what is perceived by those testifying on the subject to be a very cumbersome procedure.

Wind Power Generation Committee, David Becker, Senior Fiscal Analyst, reviewed legislation adopted by the committee and reviewed other committee activities, including a tour of the wind turbines on the Buffalo Ridge near Lake Benton, Minnesota.

**REPRESENTATIVE PEDERSON MOVED, SECONDED BY REPRESENTATIVE KONOLD, THAT THE EXECUTIVE BOARD APPROVE THE 2001 INTERIM COMMITTEE REPORTS AS PRESENTED. MOTION PREVAILED UNANIMOUSLY ON A VOICE VOTE.**

### Supreme Court Opinions Subcommittee

Ms. Storm informed the Board that the Supreme Court Opinions Subcommittee reviewed two court cases; one involved a dog bite case, the other involved confidentiality of records maintained by court services officers. Senator Albers stated that the subcommittee does not support nor disagree with either of the cases but decided that the issues involved should be addressed by the full Legislature.

**The Board agreed to accept the report of the Supreme Court Opinions Subcommittee.**

### Legislative Intern Program

**Mr. David Ortbahn,** Principal Research Analyst, LRC, distributed a summary of intern applications from 1990 to 2002 and a breakdown of 2002 legislative intern applications by school and party affiliation (Document #4). Mr. Ortbahn commented on the high caliber and qualifications of the 2002 interns. He urged the Board to consider increasing the per diem for interns by ten dollars. Mr. Ortbahn said that the competition will reach a higher level in the upcoming election year due to college students accepting intern positions with political campaigns.

### Other Action

On behalf of the Children's Home Society, Senator Daugaard requested permission for the Society to use the Senate Chamber for the Children's Home Society Annual Meeting on April 24, 2002, and to waive the fee.

**REPRESENTATIVE DERBY MOVED, SECONDED BY SENATOR MC CRACKEN, THAT THE EXECUTIVE BOARD GRANT PERMISSION FOR THE CHILDREN'S HOME SOCIETY TO USE THE SENATE CHAMBER FOR THE CHILDREN'S HOME SOCIETY ANNUAL MEETING ON APRIL 24, 2001, AND TO WAIVE THE FEE. MOTION PREVAILED UNANIMOUSLY ON A VOICE VOTE.**

Mr. Fry informed the Board that the Legislature leased seventy-five computers which may become available next November for buy-back by interested legislators.

Board members discussed legislative parking during session. Chair Brown suggested requesting an additional five spaces for legislative parking during session. Mr. Fry said that currently the Legislature has ninety-one reserved spaces, including one for the doctor of the day. Senator Dennert said that he supports reserving enough parking spaces for each interested legislator in that legislator's name. Senator Duxbury said that he prefers adding a few more parking spaces to the current reserved legislative parking space block.

**REPRESENTATIVE KONOLD MOVED, SECONDED BY REPRESENTATIVE SMIDT, THAT THE BOARD REQUEST THAT NINETY-SIX PARKING PLACES BE RESERVED FOR LEGISLATIVE PARKING DURING THE 2002 LEGISLATIVE SESSION. MOTION PREVAILED ON A VOICE VOTE.**

### Adjournment

**REPRESENTATIVE ECCARIUS MOVED, SECONDED BY REPRESENTATIVE SMIDT, THAT THE EXECUTIVE BOARD ADJOURN. MOTION PREVAILED UNANIMOUSLY ON A VOICE VOTE.**

The Executive Board adjourned at 5:10 p.m.

EXHIBIT B


Minutes of the Legislative Redistricting Committee

of the

Legislative Research Council


October 9, 2001



# LEGISLATIVE REDISTRICTING COMMITTEE

**Fifth Meeting LCR 1 & 2**

**October 9, 2001 State Capitol**

**2001 Interim Pierre, South Dakota**

The fifth meeting of the interim Legislative Redistricting Committee was called to order by Co-Chair Michael Derby at 9:05 a.m., October 9, 2001, in LCR 1 and 2 of the State Capitol, Pierre, South Dakota.

A quorum was determined with the following answering the roll call: Senators Eric Bogue, Don Brosz, Arnold Brown (Co-Chair), Robert Duxbury, Barbara Everist, Jim Hutmacher, and Gil Koetzle; and Representatives Mike Derby (Co-Chair), Jay Duenwald, Kent Juhnke, Matthew Michels, Mel Olson, Gordon Pederson, Bill Peterson, and Paul Valandra.

Staff members present included Jim Fry, Director; Reuben D. Bezpaletz, Chief of Research Analysis and Legal Services; David L. Ortbahn, Principal Research Analyst; Reed Holwegner, Senior Fiscal Analyst; Annie Mertz, Senior Fiscal Analyst; Fred Baatz, Senior Research Analyst; Jacquelyn Storm, Principal Legislative Attorney; and Teri Retrum, Senior Legislative Secretary.

(**NOTE:** For sake of continuity, the following minutes are not necessarily in chronological order. Also, all referenced documents are on file with the Master Minutes.)

(**NOTE:** Prior to the first meeting, June 19, 2001, LRC staff distributed three-ring binders containing redistricting information. Additional material presented at this meeting and at subsequent meetings will continue to be placed in the binder. The binder has been labeled as Document #1 and will be referred to as such throughout the duration of the committee's meetings. Materials distributed at each meeting will be sequentially labeled for that meeting, beginning with Document #2).

## Approval of Minutes

REPRESENTATIVE MICHELS MOVED, SECONDED BY REPRESENTATIVE BILL PETERSON, THAT THE MINUTES OF THE THIRD MEETING (AUGUST 20 & 21) BE APPROVED. The motion prevailed on a voice vote.

REPRESENTATIVE MICHELS MOVED, SECONDED BY SENATOR BOGUE, THAT ACTION ON THE MINUTES OF THE FOURTH MEETING (SEPBEMBER 28, 2001) BE DEFERRED TO THE AFTERNOON TO ALLOW TIME TO FORMULATE A POSSIBLE MOTION FOR AN ADDENDUM TO THE MINUTES. The motion prevailed on a voice vote.

## Remarks from Committee Members

Representative Bill Peterson said that he has received several calls from legislators, public officials, and the public regarding the southeastern part of the state. They all say that they like their district and asked that the Legislature try to keep their district the same as much as possible.

Senator Jim Hutmacher reported on an ad hoc meeting held in Huron. He said that there was a good turnout at the meeting, and the residents of Beadle County want to keep Beadle County together.

Senator Eric Bogue said that people in his district want Corson County kept together west river. Also, Senator Bogue said that residents want Meade County kept as whole as possible.

## Staff Report

Mr. Jim Fry, LRC Director, distributed copies of a letter received from the Department of Justice in response to the committee's submission for preclearance of redistricting the state maintaining old District 27 (Document #2). Mr. Fry said that the Department of Justice declined to make a decision on the submission until after the entire Legislature has acted on the map.

Representative Paul Valandra asked if the Department of Justice is concerned about "packing." Mr. Fry said that he does not want to speculate on what the Department of Justice officials' thoughts might be on the matter.

Representative Valandra suggested that it would be helpful if the committee asks the South Dakota Secretary of State's Office for demographic information on voters and voting patterns in the district.

Mr. Reuben Bezpaletz, LRC, said that some of that data has already been submitted to the Department of Justice. He said that it should be no trouble compiling whatever data the committee or the Department of Justice requests.

Senator Barbara Everist asked that staff provide Representative Valandra with a copy of the submission to the Department of Justice.

Representative Matthew Michels commented that no inference, either pro or con, should be derived from the decision from the Department of Justice. The declination does not mean that they are likely to reject the map; they are merely taking the path of least resistance.

Senator Hutmacher asked what would happen if the issue results in a lawsuit. Mr. Bezpaletz

said that if the Legislature enacts a redistricting map before December 1, 2001, it will have fulfilled its constitutional obligation. Usually, the federal courts will give the Legislature a chance to fix the map themselves if a lawsuit results and is lost. However, sometimes the solution is so obvious that the court simply orders an appropriate change. Mr. Bezpaletz stated that in his opinion the Legislature would almost surely be allowed to draw a second plan, if the lawsuit scenario plays out.

Representative Valandra commented that voter turnout in District 27 was extremely low and that the actual numbers may be "shocking." Due to this low voter turnout, Representative Valandra said that the Legislature made the right decision last time and should do the same this time. He said that, because of this, there needed to be a higher proportion of tribal members in his district to give another tribal member a fair chance to be elected. Representative Valandra said that the voting statistics would verify this.

Representative Valandra stated that District 27 people feel the need to come away with a redistricting plan that will get tribal members or Indians elected. He said that the American Civil Liberties Union (ACLU) did not have the same goal. According to Representative Valandra, the ACLU wants to see "on paper" that everyone has a fair shot at getting elected. He stressed that Indians have two governments, whereas non-Indians have one. Representative Valandra stated that he hopes to convince the ACLU to back away from their proposed plans because they will do more harm than what is intended.

Continuing with the staff report, Mr. Bezpaletz distributed the following:

- A map labeled "Lincoln Two" (Document #3)—Mr. Bezpaletz said that Senator Kenneth Albers prefers this configuration of Lincoln County. According to Mr. Bezpaletz, Senator Albers conveyed to him that he also prefers that all of northern Lincoln County be in a single Sioux Falls area district; and

- A map labeled "Fragment/Lodgepole Pine" (Document #4)—Mr. Bezpaletz said that this was a configuration that would provide for a single-member majority-minority house district that would fit in the Foundation/Pine or Prairie Two maps. He noted, however, that Lakota would constitute a minority of the voting area electorate in that district.

The committee recessed at 9:50 a.m. and reconvened at 10:30 a.m.

## Public Testimony

Mr. Curtis Nupen, Piedmont, SD, Meade County Commission, stated: "Leave Black Hawk with Meade County." He said that Ellsworth Air Force Base would fit better in current District 33.

Mr. Craig Shaver, Sturgis, SD, said that residents in Meade County want the county to remain whole. He said that if it is absolutely necessary to split the county, his preference is that the line be drawn as far away as possible from the town of Union Center. Mr. Shaver said that he does not want Union Center divided away from Sturgis.

Representative Valandra commented that Belle Fourche, Sturgis, and Black Hawk would

share a business commonality and asked Mr. Shaver his opinion of the map labeled "Sagebrush/Cocklebur." Mr. Shaver responded that he does not like the configuration in Sagebrush/Cocklebur. He said that in his opinion it would result in a loss of rural representation.

Representative Larry Rhoden, Union Center, SD, testified that Black Hawk is not in a Meade County school district and is basically a suburb of Rapid City. He said that Meade County is agricultural-based and urged that Meade County be kept together minus Black Hawk.

Ms. Mary Hollenbeck, Corson County Commissioner, urged the committee to keep Corson County in a district which was all west of the river. She asked the committee to create a dual-member house district instead of a single-member house district including Corson County. She suggested that if the committee wanted an A and B split that it look elsewhere.

In response to a question from Representative Mel Olson, Ms. Hollenbeck stated that it did matter if Corson County was placed in a district east of the river. She said that Corson County was all on a reservation. East River counties could not understand the special challenges faced by the coexistence of a county and a reservation. Ms. Hollenbeck said that, overall, Sagebrush/Cocklebur would work. She stated that all counties should be treated the same. If one single-member House district was created all districts should be single-member.

Representative Valandra asked about the difference between East River and West River. He suggested that two differences were the brand inspection area and the time differences.

Representative Thomas Van Norman, Eagle Butte, SD, testified in favor of the splitting of District 28 into 28A and 28B. He stated that the split was necessary to give Lakota voters a fair chance to elect one of their own. In response to a question, Representative Van Norman stated that he did not personally favor the Hollow Horn Bear Plan. He stated that there were problems with creating a plan which went four counties to the south. Representative Van Norman also stated that it would be desirable to keep Corson County within a district which was all west of the Missouri River. He had a concern with going over the river.

Ms. Jennifer Ring, ACLU, testified that her purpose was to look at the Foundation Pine and Prairie Two districts. She suggested single-member districts with Indian populations of 73.08 and 75.77%.

Mr. Bezpaletz stated that the plans presented by Ms. Ring were not compatible with either Prairie Two or Foundation/Pine.

Ms. Ring said that Sagebrush/Cocklebur is the ACLU favorite. Ms. Ring stated that she would try to come up with better numbers by the end of the meeting and that she had just gotten the map this morning.

Representative Van Norman testified that the more he saw of redistricting the more he saw how difficult it is. He stated that he hoped the changes would be minimal from the present district configuration for District 28A and that changes would be minor throughout the state. He said that, with regard to the Sagebrush map, it would be possible to take out the Kenel

District from Corson County and make District 28A workable. That would give the district the approximate same numbers as today.

In response to a question from Representative Michels, Representative Van Norman stated that he wanted to keep 28A as much as possible the same. He stated that there were a lot of reasons that this area constituted a community of interest. This included ancestry, economics, how close the communities are, the fact that these are two sister tribes with common interests, and a long common border. Representative Van Norman said that the tribal population percentage should be as it is today, although that was up to the committee.

Representative Van Norman said that even though there was a community of interests, getting a good turnout was very difficult because of a lot of historic factors. He said that there is a process of change that is developing and that faith is developing in the system.

Representative Van Norman said that 70% is pretty good but disagreed with the ACLU assessment that a minority voting population of 70% was sufficient in District 28A. He said that, even with the present numbers, he was only able to win a plurality in District 28A in the last election.

Representative Van Norman was asked questions with regard to how the Belle Fourche area should be treated. He responded that Belle Fourche is outside the present district today and that maybe it is wise to preserve that.

Senator Brosz asked a question of Senator Bogue. Senator Bogue stated that District 28A had the same configuration in 1992, 1994, 1996, and 2000. Only in 1998 was it different. Senator Bogue stated that due to growth in the Eagle Butte area, less of Corson County was needed to make the numbers work with regard to District 28A.

Representative Valandra stated that he feels strongly about the continuance of District 28A. He said that there is a lot of community of interest. Representative Valandra said that he thinks everybody can be appeased, including the rural interests and Rapid City.

Representative Valandra said that the committee should leave the law as it stands. He would like to keep this matter out of court. Representative Valandra said that the message from the plaintiffs in the former case is that their rights were violated. He would like to keep the opportunity for tribal members to elect members to the Legislature. Representative Valandra said that the building block should have been Districts 28A and 28B.

The committee recessed at 11:40 a.m. and reconvened at 1:05 p.m.

## Final Consideration of Redistricting Plans

Co-Chair Brown asked committee members not to make a distinction between urban and rural areas when considering a final state redistricting map. He said that elected legislators represent all residents and factions of their respective districts.

Upon a suggestion from Co-Chair Brown to begin with the eastern part of South Dakota, SENATOR EVERIST MOVED, SECONDED BY REPRESENTATIVE MICHELS, THAT THE COMMITTEE ADOPT THE PARTIAL MAP LABELED "PRAIRIE TWO/SIOUX FALLS."

Senator Everist said that the map keeps all incumbents running in the same areas, takes advantage of the growth areas, and did not cause a great deal of consternation among those attending the area's ad hoc meetings.

SENATOR KOETZLE MADE A SUBSTITUTE MOTION, SECONDED BY SENATOR HUTMACHER, THAT THE COMMITTEE ADOPT THE PARTIAL MAP TO BE LABELED "SIOUX FALLS MINIMAL (Document #5)."

Senator Gil Koetzle said that the map does not change as much as "Prairie Two/Sioux Falls" and takes into consideration the grown pattern.

Senator Bogue asked about the gross deviation of Sioux Falls Minimal and stated that it appeared to be out of compliance.

Senator Koetzle replied that both maps work regarding the numbers. He said that "Prairie Two/Sioux Falls" drastically changes the configuration of Sioux Falls. Senator Koetzle stated: "I believe that my map is more acceptable to Sioux Falls area people."

Representative Bill Peterson said that "Prairie Two/Sioux Falls" attempted to keep districts the same as much as possible. He said that the map maintains communities of common interest and that it is a superior map.

SENATOR KOETZLE'S SUBSTITUTE MOTION TO ADOPT THE PARTIAL MAP LABELED "SIOUX FALLS MINIMAL" FAILED ON A ROLL CALL VOTE WITH 5 VOTING AYE, 10 VOTING NAY, AND 0 EXCUSED. Those voting AYE: Duxbury, Hutmacher, Koetzle, Olson, and Valandra. Those voting NAY: Bogue, Brosz, Everist, Duenwald, Juhnke, Michels, Gordon Pederson, Bill Peterson, Brown, and Derby. Those EXCUSED: 0.

SENATOR EVERIST'S MOTION TO ADOPT THE PARTIAL MAP LABELED "PRAIRIE TWO/SIOUX FALLS" PREVAILED ON A ROLL CALL VOTE WITH 10 VOTING AYE, 5 VOTING NAY, AND 0 EXCUSED. Those voting AYE: Bogue, Brosz, Everist, Duenwald, Juhnke, Michels, Gordon Pederson, Bill Peterson, Brown, and Derby. Those voting NAY: Duxbury, Hutmacher, Koetzle, Olson, and Valandra. Those EXCUSED: 0.

REPRESENTATIVE MICHELS MOVED, SECONDED BY REPRESENTATIVE BILL PETERSON, THAT THE COMMITTEE DIRECT LRC STAFF TO CONFIGURE DISTRICT 28 AS TWO SINGLE-MEMBER HOUSE DISTRICTS.

Representative Michels said that the individuals testifying before the committee have proven their case for dividing District 28 into two single-member House districts. He said that the community of interest and consistency in the district make it more possible to elect a Native American from that district.

SENATOR BOGUE MADE A SUBSTITUTE MOTION, SECONDED BY REPRESENTATIVE VALANDRA, TO DIVIDE ALL DISTRICTS IN THE STATE INTO SINGLE-MEMBER HOUSE DISTRICTS.

Senator Bogue said that he does not disagree at all with dividing District 28; however, to be

fair, voters in all districts should be treated the same. Senator Bogue said that if one single-member district was created, all house member districts should be single-member districts. He said that when voters are treated differently because of race or locality, it is undesirable. Senator Bogue said that a South Dakota Attorney General opinion stated that both single-member and dual-member house districts at the same time were permissible, but the Attorney General opinion was not correct and not written with *Baker v. Carr* in mind.

Senator Everist stated that she agreed with Representative Michels and that the system maintained the integrity of one-man one-vote.

Senator Hutmacher said that he agreed with Senator Bogue and that it is an excellent idea to divide all districts in the state into single-member districts.

Representative Kent Juhnke said that every representative is a statewide representative. He also stated that it was better to have three persons representing a person than two. Representative Juhnke said that he opposes Representative Matthews' motion and Senator Bogue's substitute motion.

Senator Robert Duxbury said that it was easier to recruit candidates for a house in a single-member district.

Representative Michels stated that just because a single-member district was set up in one area did not mean that it had to be set up in the rest of the state. Setting up single-member districts throughout the state would add to voter confusion. There is already a single-member house district in District 28A.

Representative Valandra said that he supports dividing District 28 into two single-member districts; however, to be fair, he said that he would support Senator Bogue's motion to redistrict the entire state in the same manner. Representative Valandra stated that, according to the law, the Legislature was not setting up Districts 28A and 28B on a racial basis. Rather, the Legislature was basing its decision on community of interests, economics, and language.

Representative Bill Peterson stated that the tradition of dual-member house districts has served the state well. He interjected the possibility of "slotting."

Senator Duxbury said that there is not a lot of support for "slotting."

SENATOR BOGUE'S SUBSTITUTE MOTION TO DIVIDE ALL DISTRICTS IN THE STATE INTO SINGLE-MEMBER HOUSE DISTRICTS FAILED ON A ROLL CALL VOTE WITH 6 VOTING AYE, 9 VOTING NAY, AND 0 EXCUSED. Those voting AYE: Bogue, Duxbury, Hutmacher, Koetzle, Olson, and Valandra. Those voting NAY: Brosz, Everist, Duenwald, Juhnke, Michels, Gordon Pederson, Bill Peterson, Brosz, and Derby. Those EXCUSED: 0.

REPRESENTATIVE MICHELS' MOTION TO DIRECT LRC STAFF TO CONFIGURE DISTRICT 28 AS TWO SINGLE-MEMBER HOUSE DISTRICTS PREVAILED ON A ROLL CALL VOTE WITH 13 VOTING AYE, 2 VOTING NAY, AND 0 EXCUSED. Those voting AYE: Brosz, Duxbury, Everist, Hutmacher, Koetzle, Duenwald, Michels, Olson, Gordon Pederson, Bill Peterson, Valandra, Brown, and Derby. Those voting NAY: Bogue and

Juhnke. Those EXCUSED: 0.

SENATOR HUTMACHER MOVED, SECONDED BY SENATOR DUXBURY, THAT THE
COMMITTEE KEEP ALL COUNTIES WHOLE, EXCEPT THE ONES THAT MUST BE
SPLIT DUE TO POPULATION.

REPRESENTATIVE DUENWALD MADE A SUBSTITUTE MOTION, SECONDED BY
REPRESENTATIVE MICHELS, THAT THE COMMITTEE ADOPT THE PARTIAL MAP TO
BE LABELED "MODIFIED SAGEBRUSH (Document #5)."

Representative Duenwald said that the map "does not break any counties, except for
population."

Senator Duxbury said that there is "no reason to take a portion of McPherson—splitting
counties that have common interests, this map does not keep them together."

Representative Mel Olson said that the map does not keep counties together—"Meade
County is not together—There are other maps that are more compact."

Senator Hutmacher said that the map splits five counties unnecessarily. He asked for a
recess to consider the numbers.

The committee recessed at 2:20 p.m. and reconvened at 3:04 p.m.

Staff distributed demographics concerning "Modified Sagebrush" (Document #6).

Representative Olson said that McPherson County is not split in the "Foundation" map. He
said that Brown and Spink Counties are together in the Foundation map and that the
committee work reflects that map.

Co-Chair Brown said that the committee did not vote on the Foundation map.

Senator Brosz stated that the Foundation map was "something to work with and build on.
It's impossible to give everyone what they want."

REPRESENTATIVE DUENWALD'S SUBSTITUTE MOTION THAT THE COMMITTEE
ADOPT THE PARTIAL MAP TO BE LABELED "MODIFIED SAGEBRUSH" PREVAILED ON
A ROLL CALL VOTE WITH 10 VOTING AYE, 4 VOTING NAY, AND 1 EXCUSED. Those
voting AYE: Bogue, Brosz, Everist, Duenwald, Juhnke, Michels, Gordon Pederson, Bill
Peterson, Brown, and Derby. Those voting NAY: Duxbury, Hutmacher, Koetzle, and Olson.
Those EXCUSED: Valandra.

SENATOR HUTMACHER MOVED, SECONDED BY SENATOR DUXBURY, TO KEEP MC
PHERSON COUNTY WHOLE. The motion failed with 4 voting AYE, 10 voting NAY, and 1
EXCUSED. Those voting AYE: Duxbury, Hutmacher, Koetzle, and Olson. Those voting
NAY: Bogue, Brosz, Everist, Duenwald, Juhnke, Michels, Gordon Pederson, Bill Peterson,
Brown, and Derby. Those EXCUSED: Valandra.

REPRESENTATIVE MICHELS MOVED, SECONDED BY REPRESENTATIVE GORDON

PEDERSON, THAT LRC STAFF CONFIGURE A MAP TO DIVIDE DISTRICT 28 INTO TWO SINGLE-MEMBER HOUSE DISTRICTS IN CONCERT WITH CURRENT DISTRICTS 28A AND 28B, IF PERCENTAGES WORK, USING "MODIFIED SAGEBRUSH," SUCH MAP TO BE MAILED TO COMMITTEE MEMBERS.

At this time, Mr. Bezpaletz demonstrated a map dividing District 28 into two single-member House districts and said that the map is the best majority-minority House district as can be developed considering the circumstances.

Representative Michels withdrew his motion.

Representative Valandra said that this is the best Lakota district they could draw.

REPRESENTATIVE MICHELS MOVED, SECONDED BY REPRESENTATIVE BILL PETERSON, THAT THE COMMITTEE ADOPT THE HOUSE MAJORITY-MINORITY DISTRICT 28 MAP AS CONFIGURED. The motion prevailed on a roll call vote with 12 voting AYE, 3 voting NAY, and 0 EXCUSED. Those voting AYE: Brosz, Duxbury, Everist, Hutmacher, Koetzle, Duenwald, Michels, Olson, Bill Peterson, Valandra, Brown, and Derby. Those voting NAY: Bogue, Duenwald, and Gordon Pederson. Those EXCUSED: 0.

Co-Chair Derby distributed a collection of Rapid City conurbation maps (Document #7).

REPRESENTATIVE DERBY MOVED, SECONDED BY REPRESENTATIVE BILL PETERSON, THAT THE COMMITTEE ADOPT THE DISTRIBUTED RAPID CITY CONURBATION MAPS. The motion prevailed on a roll call vote with 10 voting AYE, 4 voting NAY, and 1 EXCUSED. Those voting AYE: Bogue, Brosz, Everist, Duenwald, Juhnke, Michels, Gordon Pederson, Bill Peterson, Brown, and Derby. Those voting NAY: Hutmacher, Koetzle, Olson, and Valandra. Those EXCUSED: Duxbury.

## Committee Discussion of Special Session Procedures

Representative Olson said that in his opinion the special session to redistrict the state should be modeled after the way the general bill is handled—the bill is introduced, and amendments can be made to that bill; the redistricting map should be introduced with allowances for amendments; however, a new bill should not be introduced.

Co-Chair Brown said that the Legislative Procedure Committee will meet prior to the special session to determine the procedures.

Representative Olson asked: "Who draws the legislation?"

Mr. Bezpaletz said that, in the past, the map has been reduced to written form and incorporated into a bill to be voted on by the Legislature. He suggested that the committee direct that all amendments to the map be posted on the Internet and perhaps made available on two screens—one in the House chamber and one in the Senate chamber—to facilitate viewing the maps.

Co-Chair Brown agreed and suggested that the public hearing be held in the committee of the whole in one chamber.

Representative Michels said that the map labeled "Modified Sagebrush" incorporating Districts 28A and 28B as divided should be put on the Internet.

Senator Hutmacher asked that the map be broken down along city lines also.

Senator Brosz said that all legislators should be encouraged to have any amendments prepared in advance.

Representative Michels distributed copies of draft legislation—An Act to provide for redistricting principles for the 2001 legislative redistricting (Document #8).

REPRESENTATIVE MICHELS MOVED, SECONDED BY SENATOR BROSZ, THAT THE COMMITTEE ADOPT DRAFT LEGISLATION—AN ACT TO PROVIDE FOR REDISTRICTING PRINCIPLES FOR THE 2001 LEGISLATIVE REDISTRICTING—TO BE INTRODUCED IN THE SPECIAL SESSION AS A SEPARATE BILL NOT ATTACHED TO THE REDISTRICTING BILL.

Senator Hutmacher expressed opposition to the draft legislation and objected to subdivisions (3) Preservation of existing Senate and House district boundaries and (4) Respect for geographical and political boundaries because, in his opinion, those principles were not accomplished in the committee map.

Senator Everist said that the principles are simply those that are of primary significance, not required principles.

Representative Olson said that subdivision (3) should be removed because the principle was not followed. Responding to Representative Michels, Representative Olson said that he could support the draft legislation if subdivision (3) was removed. Representative Michels agreed to remove subdivision (3); Senator Brosz concurred.

REPRESENTATIVE OLSON MOVED, SECONDED BY REPRESENTATIVE MICHELS, TO AMEND REPRESENTATIVE MICHELS' MOTION BY DELETING SUBDIVISION (3) AND RENUMBERING THE SUBDIVISIONS. The motion prevailed on a voice vote.

REPRESENTATIVE MICHELS' MOTION THAT THE COMMITTEE ADOPT DRAFT LEGISLATION—AN ACT TO PROVIDE FOR REDISTRICTING PRINCIPLES FOR THE 2001 LEGISLATIVE REDISTRICTING—AS AMENDED, TO BE INTRODUCED IN THE SPECIAL SESSION AS A SEPARATE BILL NOT ATTACHED TO THE REDISTRICTING BILL PREVAILED ON A ROLL CALL VOTE WITH 12 VOTING AYE, 2 VOTING NAY, AND 1 EXCUSED. Those voting AYE: Bogue, Brosz, Everist, Duenwald, Juhnke, Michels, Olson, Gordon Pederson, Bill Peterson, Valandra, Brown, and Derby. Those voting NAY: Hutmacher and Koetzle. Those EXCUSED: Duxbury.

### Approval of Minutes from the September 28, 2001, Meeting

After speaking with Representative Thomas Van Norman, and with Representative Van Norman's approval, REPRESENTATIVE MICHELS MOVED, SECONDED BY SENATOR EVERIST, THAT THE MINUTES OF THE FOURTH MEETING (SEPTEMBER 28, 2001) BE

APPROVED, WITH THE FOLLOWING ADDENDUM (Document #9):

*Representative Van Norman urged the committee to keep District 28A as it is and said that keeping the district like it is would satisfy legal requirements. The object was fairness to allow Lakota voters the opportunity to elect one of their own members.*

*Representative Van Norman explained his view that the Lakota people in the area constituted a community of interest. He explained that this is shown by the fact that people have relatives both in the Standing Rock and the Cheyenne River Reservations and on both sides of Highway 212.*

*Representative Van Norman said the community of interest is found in the history of the Sioux Nation. The tribal bands were separated by an act of Congress. He explained that there was also a social and political community of interest. The historic significance of the reservation boundaries also expressed a community of interest. He said it was not much different on the Standing Rock and the Cheyenne River sides of the border. Representative Van Norman said communities on both sides have much in common for those who live there.*

*Representative Van Norman expressed his view that the relationship between the Standing Rock and Cheyenne River Reservations was so strong that it would be a disservice to split some part of that area out of a district.*

*Representative Van Norman also said that there may not be enough votes if only Dewey and Ziebach are kept together.*

*Representative Van Norman was asked questions on the handling of areas within Butte County as within or without the new district. Representative Van Norman expressed his view view that it was important to keep a broad array of options open.*

*Representative Van Norman also noted that he was the first tribal member from the Cheyenne River Reservation to be elected to the State Legislature to represent that area.*

*Representative Van Norman also stated that the ACLU was supplying a map which might deal with some of the difficulties regarding the Belle Fourche area.*

*Representative Van Norman noted that there are four bands of Cheyenne River Indians. The The people had intermarried all along. For example, he lives in Eagle Butte but has relatives in Little Eagle on the Standing Rock Reservation. The whole tribe is, in reality, the Sioux Nation.*

*Representative Van Norman stated that the area had been changed twice since 1991 and it was desirable to have stability in the area.*

*He said that to satisfy the numbers the Legislature may have to be creative. He also stated that he simply wanted the situation to stay the way it was with regard to Belle Fourche.*

*In response to a question with regard to the percent of Lakota voters in District 28A, Representative Van Norman stated that the majority should be sufficient to give the Lakota*

voters an opportunity to elect one of their own. The present figures are apparently somewhere between 72 and 78 percent.

The ACLU district is about 78 percent, according to Mr. Bezpaletz. He said that without Corson County the area would lose about 2,000 inhabitants. This would put the percent, without doing any calculations, at about 55 percent.

Ms. Brenda Blue Arm is a member of the Cheyenne River Sioux Tribe who lives in Eagle Butte in Dewey County. She explained she went door to door to get people involved in voting.

Ms. Blue Arm stated she would really like to see District 28A stay the way it is. She likes to see someone of Lakota descent in the Legislature. She stated that gives members of the Tribe pride and that it is really important. She explained that having a member of the Tribe in in the Legislature allowed the tribal members to express their views.

In answer to a question as to why she believed the system worked so well, she explained that before, the people were not involved in voting for the state elections. In fact, many tribal members believed that registration for a tribal election allowed a tribal member to vote in a state election. They did not understand the difference.

She stated that she went door to door and explained in Lakota the facts of what was occurring. She explained how to vote in a state election.

She also complained that a registrar or registrars did not give her sufficient registration cards. She could only get fifty at a time. Therefore, she went from registrar to registrar to get enough forms.

She said that tribal people are comfortable with the way it is regarding the configuration of District 28A. Many are self-assured because Representative Van Norman is there to talk to them. They are very proud to have Representative Van Norman there.

In response to questions, she again stated that the county auditors had limited the number of forms but that none of the forms that she gathered was rejected.

Senator Bogue later noted that the registrars had been surprised by the request for so many forms at one time and were not trying to keep people from registering or discriminate. Nobody had ever asked for 50 at a time.

Ms. Madonna Thunder Hawk stated that she is enrolled with the Cheyenne River Sioux Tribe as a resident of Swift Bird. She is a consultant for tribes in South Dakota. Although she she is a member of the Cheyenne River Sioux, she has extended family in Wakpala.

She said the extended families run across the reservation lines.

She said that Cheyenne River had four bands and the Hunkpapa were just one of the bands. bands. She stated that tribal members deal with a lot of boundaries that are not relevant to who they are. She stated that she struggled to get people interested in voting in District 28A. Some Indian people do not want to vote in state elections because they fear termination.

*She stated that tribal members were still in transition.*

*She said that one of the few times she had felt proud to be a South Dakotan was when the Legislature created District 28A. She stated that District 28A stands for equal opportunity. 28A can be accommodated in the Sagebrush map but there are problems with Meade County.*

*Mr. Bezpaletz said that if the committee stays within the foundation maps it may be very difficult to accommodate a division of District 28A.*

*Representative Van Norman presented three plans to satisfy the voting rights problem. He stated his view that the area dealt with the history of discrimination and that if there is difficulty in voting, it will push marginal voters away. He said driving from Cherry Creek to Dupree to vote was quite far. He said it was 34 miles.*

*He said that there was a history of discrimination. He said that there needed to be more than than a simple majority of Indians to give Lakota people a fair chance to elect one of their own.*

*As to whether any of the configurations would satisfy the one-person-one-vote requirement in other areas, it would be necessary to continue to look at that problem.*

*In response to a question, Representative Van Norman stated that he was against the Hollow Horn Bear plan.*

REPRESENTATIVE MICHELS' MOVION CONCERNING THE ABOVE ADDENDUM PREVAILED ON A VOICE VOTE.

After brief committee discussion, REPRESENTATIVE BILL PETERSON MOVED, SECONDED BY REPRESENTATIVE OLSON, THAT THE LEGISLATION—AN ACT TO PROVIDE FOR REDISTRICTING PRINCIPLES FOR THE 2001 LEGISLATIVE REDISTRICTING, AS AMENDED—BE INTRODUCED IN THE HOUSE, AND THAT THE REDISTRICTING BILL BE INTRODUCED IN THE SENATE, AND THAT AN ADDITIONAL SIMILAR REDISTRICTING BILL BE DRAFTED TO BE HELD IN ABEYANCE, IF NEEDED. The motion prevailed on a roll call vote with 14 voting AYE, 0 voting NAY, and 0 EXCUSED. Those voting AYE: Brosz, Duxbury, Everist, Hutmacher, Koetzle, Duenwald, Juhnke, Michels, Olson, Gordon Pederson, Bill Peterson, Valandra, Brown, and Derby. Those voting NAY: 0. Those EXCUSED: Bogue.

With the consensus of the committee, Co-Chair Brown and Co-Chair Derby agreed to work with staff to determine whether a conference call of the committee is required before the special session.

### Adjournment

REPRESENTATIVE MICHELS MOVED, SECONDED BY REPRESENTATIVE JUHNKE, THAT THE COMMITTEE BE ADJOURNED. The motion prevailed on a voice vote.

The committee adjourned at 4:40 p.m.

All Legislative Research Council committee minutes and agendas are available at the South Dakota Legislature's Homepage: http://legis.state.sd.us. Subscribe to receive electronic notification of meeting schedules and the availability of agendas and minutes at **MyLRC** (http://legis.state.sd.us/mylrc/index.cfm).

Interim Menu | LRC Menu

This page is maintained by the Legislative Research Council