IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

**FILED**

**JAN 2 3 2002**

CLERK

ALFRED BONE SHIRT, et al.,           )
                                      )
        Plaintiffs,                   )
                                      )
            v.                        )        Civil Action No. 01-3032
                                      )
JOYCE HAZELTINE, et al.,              )
                                      )
        Defendants.                   )
                                      )

PLAINTIFFS' REPLY TO DEFENDANTS' BRIEF IN OPPOSITION TO
THEIR MOTION FOR A PRELIMINARY INJUNCTION UNDER
SECTION 5 OF THE VOTING RIGHTS ACT

The plaintiffs respectfully submit this reply to the Defendants' Brief in Opposition to Motion for a Preliminary Injunction Under § 5 of the Voting Rights Act ("Defendants' Brief"). The defendants' arguments are completely without merit and should be rejected.

I.   THE PLAN IS COVERED BY SECTION 5

A.   The Administrative Official With Statutory
Authority to Enforce Section 5 Has Determined
That the Plan Requires Preclearance, and That
Determination Is Entitled to Considerable Deference.

Two recent letters from the Department of Justice express the United States Attorney General's opinion that South Dakota's 2001 legislative redistricting plan is covered by Section 5. On January 14, 2002, the Chief of the Voting Section at the Department of

Justice sent the State what is commonly known as a "please submit" letter.  Referring to the new redistricting plan, the letter states that "it is necessary that such voting changes either be brought before the District Court for the District of Columbia or submitted to the Attorney General . . . ."  Letter from Joseph D. Rich, Chief, Voting Section of the Civil Rights Division of the Department of Justice, to James Fry, Director, Legislative Research Council, at 1 (January 14, 2002) (attached as Exhibit A).[1]  This was merely a recitation of the position taken by the Department months earlier.

In a letter dated October 3, 2001, the Acting Chief of the Voting Section rejected as premature the State's submission of District 27 for preclearance before the full redistricting plan had been finally enacted.  He stated plainly, however, that "When this change is formally adopted, preclearance under Section 5 should be sought."  Id. at 3 (appended to letter from Rich to Fry) (Ex. A).  The State was thus well aware of the Department's position before the final plan was enacted.

The defendants' brief fails to mention either letter.  This is perhaps not surprising given the weight of authority for the

---

[1]   The letter further asks the State to respond within ten days.  Letter from Rich to Fry at 2 (Ex. A).  As of this writing, the plaintiffs have not received a copy of any such response.

proposition that the Department's interpretation of Section 5 is due "considerable deference" by the courts. N.A.A.C.P. v. Hampton County Election Comm'n, 470 U.S. 166, 178-79 (1985)("Any doubt that these changes are covered by § 5 is resolved by the construction placed upon the Act by the Attorney General, which is entitled to considerable deference"); accord, e.g., Lopez v. Monterey County, 525 U.S. 266, 281 (1999); Dougherty County Bd. of Ed. v. White, 439 U.S. 32, 39 (1978); United States v. Sheffield Bd. of Comm'rs, 435 U.S. 110, 131 (1978); Perkins v. Matthews, 400 U.S. 379, 391-92 (1971). Deference is due, according to the Court, unless Congress has spoken differently on the issue or the Department's construction is unreasonable. See Presley v. Etowah County Comm'n, 502 U.S. 491, 508-09 (1992). Because neither is the case here, this Court should defer to the opinion expressed in the Department's letters.

B. A Change in the Boundaries<br>of a Voting District is Covered.

A change in the boundaries of a voting district is subject to preclearance. A voting district is undoubtedly a "standard, practice, or procedure with respect to voting." 42 U.S.C. § 1973c. Regulations promulgated by the Attorney General make clear that "Any change in . . . the boundaries of a voting unit" is a change covered by Section 5. 28 C.F.R. § 51.13(e). Boundary changes are

3

mentioned repeatedly as an example of a covered change in the legislative history of the Act. See, e.g., S. Rep. No. 94-295, at 15-18 (1975), reprinted in 1975 U.S.C.C.A.N. 774, 781-84. And the case law is replete with decisions finding that voting-district boundary changes fall within the scope of the Act. See, e.g., Georgia v. United States, 411 U.S. 526, 531 (1973) (state legislative redistricting is subject to Section 5 preclearance); Brooks v. State Bd. of Elections, 775 F. Supp. 1470, 1477 (S.D. Ga. 1989) (three-judge court) (and cases cited therein) ("the changing of geographical boundaries of election districts, either by redrawing or splitting pre-existing districts, however minor, is unquestionably a change that must be precleared under section 5"), aff'd mem., 498 U.S. 916 (1990). In light of the defendants' concession that the boundaries of District 27 have changed, there can be no question that the 2001 legislative redistricting plan is subject to preclearance under Section 5.

The defendants nonetheless attempt to confuse the issues before the Court by focusing their brief on the magnitude and effect of the change in the boundaries of District 27, Defendants' Brief at 6-8, even though neither issue is properly before this Court. Those are factors that Congress has chosen to reserve for consideration by the District Court for the District of Columbia in an action for a declaratory judgment or by the Attorney General

4

upon review of an administrative submission.   See 42 U.S.C. §
1973c.   Indeed, the Supreme Court could not be clearer on this
point:

> What is foreclosed to such district court is
> what Congress expressly reserved for
> consideration by the District Court for the
> District of Columbia or the Attorney
> General--the determination whether a covered
> change does or does not have the purpose or
> effect 'of denying or abridging the right to
> vote on account of race or color.'

Perkins v. Matthews, 400 U.S. at 385 (holding that the district
court had exceeded its authority under the Voting Rights Act when
it considered the effect of the changes at issue); see also, e.g.,
Lopez v. Monterey County, 519 U.S. 9, 29 (1996) (local three-judge
court "lacks authority" to consider the effect of a change),
Connor v. Waller, 421 U.S. 656, 656 (1975) (per curiam); Allen v.
State Bd. of Elections, 393 U.S. 544, 561 (1969).   This Court is
without authority even to consider the defendants' main argument.

However, even if the magnitude of the change were an issue
properly before this Court, the defendants' claim runs counter to
longstanding precedent and the clear intent of Congress.   The
Supreme Court recognized more than 30 years ago that Congress
intended to give the Voting Rights Act "the broadest possible
scope," reaching "any state enactment which altered the election
law of a covered State in even a minor way." Allen v. State Bd. of

Elections, 393 U.S. at 566-67.  There is no de minimus exception to Section 5 coverage, and the defendants are unable to cite a single case in which a change in the boundaries of a voting district has been found by a court not to be covered.  They claim that the change is small, but they concede that it is a change nonetheless.

In support of their argument, the defendants cite and rely exclusively on one case, Pleasant Grove v. United States, 479 U.S. 462 (1987), Defendants' Brief at 6-8, but this reliance is entirely misplaced.  Pleasant Grove dealt not with a change in the boundaries of a voting district, as is the case here, but with an annexation of a city.  The importance of this distinction comes from the language of Section 5 itself.  Section 5 applies only to changes in a "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting."  42 U.S.C. § 1973c.  Whereas the boundaries of a voting district are unquestionably a 'standard, practice, or procedure with respect to voting,' an annexation arguably become a voting change only when someone inhabits the annexed land and thereby changes the composition of the electorate.  Pleasant Grove merely acknowledges the Attorney General's recognition of that distinction.[2]

---

2.  In any event, the Attorney General is entitled to reconsider and refine his positions.  Whatever the Attorney General's position with regard to the City of Pleasant Grove, he
(continued...)

In addition, Pleasant Grove merely concerned whether or not a change was entitled to preclearance; that a change had occurred was not in dispute.  The City of Pleasant Grove did not claim that either of its two annexations – one of which was uninhabited – was not a voting change subject to preclearance.  The only question in that case was whether the District Court for the District of Columbia had erred when it refused to preclear both annexations, and the Court ruled that it had not.  The entire discussion relied upon by the defendants occurs in dicta and is contained in a small part of a background section of the opinion.  It is simply disingenuous for the defendants to characterize the opinion as providing strong support for, or making clear the Court's agreement with, the proposition on which they rely.  Defendants' Brief at 7. Pleasant Grove stands for no such thing.

The Supreme Court has created special rules under Section 5 for municipal annexations, and this fact is indeed reflected in Pleasant Grove.  But the Court created these rules in recognition of the disastrous economic and social problems that could befall a city or town if it were unable to grow in size and population.  See City of Richmond v. United States, 422 U.S. 358, 375 (1975); see

---

2.   (...continued)
has made clear his opinion that South Dakota's 2001 legislative redistricting plan is subject to preclearance.  See supra Part I.A.

also id. at 384 (Brennan, J., dissenting) (noting that municipal annexations constitute "a 'municipal hardship' exception" from normal preclearance rules). The Court has never extended this rationale to legislative redistricting plans, and the defendants can cite no case for the proposition that it has. Contrary to the defendants' characterization, the change at issue in this case is not an annexation or a loss of land area but a complete legislative redistricting plan in which the boundaries of all 35 of South Dakota's legislative districts have admittedly been changed. Such redistricting plans are indisputably covered by Section 5.

C. The 2001 Legislative Redistricting Plan
Would Be Subject to Preclearance Even If the
Boundaries of District 27 Had Not Changed.

1. <u>Gestalt Review.</u> The defendants devote virtually their entire brief to a close examination of District 27, and, in doing so, they completely ignore the big picture. District 27 does not exist in isolation. It is part of a complete redistricting plan for the entire State of South Dakota, and there can be no legitimate dispute that the plan, as a whole, has changed.[3] Whatever the change (or lack thereof) to one district within that

---

3. Indeed, Article III, Section 5 of the South Dakota Constitution requires the Legislature to enact a new plan every ten years.

8

plan, the plan as a whole is subject to preclearance under Section 5.

It is true, of course, that Shannon and Todd counties are currently the only parts of South Dakota covered by Section 5. See 28 C.F.R. Pt. 51 App. (list of covered jurisdictions). It is also true that the Attorney General could not properly object to the plan based upon its purpose or effect outside of Shannon and Todd counties. See generally, 42 U.S.C. § 1973c. But it would not be possible for the Attorney General to gauge the plan's purpose or effect in these counties without examining the plan as a whole. Changes in other districts could have a retrogressive effect and could reveal a retrogressive purpose in District 27.

Consider, for example, the effect on District 27 if the Legislature had decided to double the size of its membership without changing the boundaries or representation of that one district. Instead of electing one thirty-fifth of the Legislature, District 27 would elect one seventieth of its members. Such a plan would be patently retrogressive.

In this very case, moreover, District 27 changed from the most underpopulated district in 1991 to one of the most overpopulated districts in 2001. This change decreases the potential voting strength of the voters in District 27 relative to the voters in other districts and is retrogressive on its face.

9

In addition, the 2001 redistricting plan "packs" Indian voters into District 27 to a greater extent than did the 1991 redistricting plan.  Native Americans were 87% of the total population and 82% of the voting-age population of District 27 under the 1991 plan.  Under the 2001 plan, Native Americans are 90% of the total population and 86% of the voting-age population of District 27.  This packing dilutes the voting strength of Indian voters and is also retrogressive.

As these examples demonstrate, the boundaries of one district in a complete redistricting plan need not change for it to suffer a retrogressive effect based on other factors within or without the district.

It is for this reason that the Department of Justice has asked South Dakota to submit the entire plan for review.  See supra Part I.A.  Any submission containing only District 27 would be incomplete and would foreclose the kind of gestalt review that Section 5 requires.  See generally 28 C.F.R. §§ 51.26 to 51.28 (describing the contents of a proper submission).  As the Supreme Court recognized in City of Lockhart v. United States, 460 U.S. 125, 131 (1983), voting changes cannot be viewed "in isolation," but must be evaluated in the context of the entire "election plan."

Whatever the change (or lack thereof) to the boundaries of District 27, that district is a new district because it is part of

10

a new election plan.  The new plan has new district lines, a new legislative purpose and the demographic changes of an entire decade.  For all of these several reasons, it must be submitted for preclearance under Section 5.

2.  <u>Discriminatory Purpose.</u>  The defendants contend in their brief that "It is not <u>discriminatory</u> purpose but <u>retrogressive</u> purpose which is at issue, contrary to Plaintiffs' claims." Defendants' Brief at 10.  This argument is nonsensical.  The defendants apparently do not understand that the term "discriminatory purpose" is <u>synonymous</u> with the term "retrogressive purpose" in the context of Section 5.

The plaintiffs use the term "discriminatory purpose" because that is the statutory language.  A covered jurisdiction has the burden of proving that a voting change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color [or membership in a language minority]."  42 U.S.C. § 1973c.  A voting change that denies or abridges the right to vote on account of race, color, or membership in a language minority is discriminatory.  In other words, a covered jurisdiction has the burden of proving that a voting change does not have a discriminatory purpose and will not have a discriminatory effect.

11

As used in Section 5, however, discrimination has two components: denial and abridgement. Vote denial is not at issue here and is frankly uncommon in the post-civil-rights era. The vast majority of Section 5 cases today involve the second form of discrimination--abridgement of the right to vote. More than 25 years ago, in <u>Beer v. United States</u>, the Supreme Court held that a voting change will have the effect of abridging the right to vote only if it diminishes electoral opportunities for minority voters. 425 U.S. 130, 140-41 (1976). The Court adopted the term "retrogression" to describe this form of discrimination. <u>Id.</u> at 141. <u>Reno v. Bossier Parish School Board</u>, 528 U.S. 320 (2000), merely extends <u>Beer</u>'s holding to the purpose prong of Section 5. Thus, with respect to vote-abridgement, a covered jurisdiction has the burden of showing that a voting change does not have a retrogressive purpose and will not have a retrogressive effect. Because the term "discriminatory purpose" encompasses both vote-denial and vote-abridgement, it is technically more accurate than the term "retrogressive purpose" by itself. But in the vast majority of cases, including this one, the two terms mean effectively the same thing.

The defendants' argument proceeds, however, as though the terms were mutually exclusive. They contend, for example, that <u>Bossier Parish</u> overrules the case cited in the plaintiffs' opening

12

brief, Texas v. United States, 785 F. Supp. 201 (D.D.C. 1992), because the latter refers only to "discriminatory purpose." Defendants' Brief at 10-11.   In truth, the cases are completely compatible.   The persuasive holding of the Texas case is simply that a redistricting plan enacted legislatively is subject to preclearance even if it is identical in substance to the preexisting benchmark.   785 F. Supp. at 205-06.   It must be precleared, according to the court, because the legislative purpose for re-enactment could be different from the legislative purpose behind the original enactment.   Id.   And when the legislative purpose motivating re-enactment is discriminatory (i.e., retrogressive), the plan must be rejected.

The same reasoning would have applied in this case if the boundaries of District 27 had not changed.  Whatever multi-faceted considerations motivated the South Dakota Legislature in 1991, they were not the same factors motivating the Legislature in 2001. Section 5 places the burden on the State to show the Attorney General or the D.C. District Court that the 2001 Legislature was not motivated by a discriminatory purpose.

3.   Legal Description.   The defendants point out in their brief that the legal description of District 27 has changed. Defendants' Brief at 3.   Whatever the actual change in the

13

boundaries of District 27, this change in the legal description is sufficient to trigger the preclearance requirement.

As enacted in 1991, District 27 was described as follows: "Todd and Shannon counties and that portion of Bennett County south of U.S. Highway 18, except the city of Martin."  S.D.C.L. § 2-2-25(27).  As enacted in 2001, by contrast, District 27 is described as: "Shannon and Todd counties and that portion of Bennett County consisting of Precinct 27 Voting District."  An Act to provide for the decennial redistricting of the State Legislature § 2(27), ____ S.D. Laws ____ .

Nearly everyone involved in this case, including the Legislature itself, appears to have assumed initially that the two sections describe the same district.  Counsel for the defendants have represented, however, that their analysis reveals that the boundaries are not, in fact, identical.  While the plaintiffs have no reason to doubt the results of this analysis, this Court does not have the authority to adopt the defendants' representations regarding <u>the effect</u> of the change in the legal description of District 27.  Only the Attorney General or the D.C. District Court can properly engage in that sort of analysis.  <u>See</u> <u>supra</u> Part I.B.

Thus, even if the actual boundaries of District 27 had not changed, this Court would be without authority to look behind the

14

changed legal descriptions.  These descriptions show a change on their face, and that change is enough to require preclearance.

## II.  THE PLAINTIFFS ARE ENTITLED TO AN INJUNCTION

The defendants apparently agree with the plaintiffs that the appropriate remedy, should this Court find that the plan is subject to preclearance, is an injunction.  In light of the unambiguous direction of the Supreme Court, this is perhaps not surprising. See, e.g., Lopez v. Monterey County, 519 U.S. at 20 ("If a voting change subject to § 5 has not been precleared, § 5 plaintiffs are entitled to an injunction prohibiting implementation of the change.").  The parties differ greatly, however, on the proper scope and practical effect of that relief.

The plaintiffs have asked the Court for a narrow injunction prohibiting the defendants from implementing the 2001 legislative redistricting plan in Shannon and Todd counties and in only those other areas of the State which could be affected by this litigation. See Plaintiffs' Motion for a Preliminary Injunction, filed December 26, 2001, at 1.  This would include, at a minimum, the portion of District 27 located in Bennett County and all of District 26.  District 26 borders District 27 to North and West and contains a sizeable Native American population.  Any objection to District 27 by the Attorney General or the D.C. District Court would almost certainly require District 26 to be changed.  An

15

injunction against implementation of the plan in both District 26 and District 27 is therefore the minimum necessary to preserve the plaintiffs' ultimate remedy in the event of an objection and is thus within the equitable power of this Court to grant.  See generally, 11A Charles Alan Wright, et al., Federal Practice and Procedure 123-24, 327-28 (2d ed. 1995).

The effect of such an injunction would be to leave District 26 and District 27 temporarily without an election plan for the State Legislature, but this result is not uncommon in voting-rights cases.  In Lopez, for example, the Court held that the district court should not have allowed judicial elections to go forward in Monterey County even though there was a possibility that an injunction would leave the county without a judicial election system in place for the upcoming elections.  519 U.S. at 20-24. Writing for the Court, Justice O'Connor sympathized with the predicament facing Monterey County and the District Court, but she ruled nonetheless that an injunction was required despite the consequences.  Id.  Similarly, an injunction is appropriate here even if it would leave District 26 and District 27 temporarily without an election plan for the State Legislature.[4]

---

4.   As a practical matter, an injunction prohibiting the defendants from implementing the plan in District 26 and 27 unless and until they obtain preclearance should provide ample incentive
(continued...)

The defendants have suggested, however, that the appropriate injunction would not leave District 26 or District 27 without an election plan for any period of time.  Defendants' Brief at 12 n.3.  They even suggest that the appropriate relief is to allow elections to go forward under the 1991 plan.  Id.  This is wrong as a matter of both state and federal law.

As a matter of state law, the 1991 plan has been repealed.  An Act to provide for the decennial redistricting of the State Legislature § 9, _____ S.D. Laws _____.  The law containing the new plan has no saving clauses or severability provisions which could resurrect the old plan in whole or in part.  Severability is also impossible as a practical matter because the boundaries of all 35 districts have changed.  They are like pieces of a jigsaw puzzle that fit together as a cohesive whole. But none of the boundaries

---

4.   (...continued)
for the State to submit the plan immediately to the Attorney General.  However, to provide a further safeguard against leaving the voters of District 26 and District 27 unrepresented in the Legislature, the Court could set a deadline for the State to obtain preclearance.  See, e.g., Berry v. Doles, 438 U.S. 190 (1978).  If the State should refuse or choose not to obtain preclearance by this deadline, the Court would then have the authority to draw its own plan for these districts.  See, e.g., Abrams v. Johnson, 521 U.S. 74 (1997) (court-ordered plan ordered into effect following legislative default).  (The State might choose not to seek preclearance, for example, because members of the Legislature prefer to have the Court draw its own plan.)  Any such plan would not be subject to preclearance and could be implemented immediately.  See McDaniel v. Sanchez, 452 U.S. 130 (1981); 28 C.F.R. § 51.18.

of the old plan is entirely consistent with the boundaries of the new plan, so it is impossible to make the two plans work together. Resurrection is also impossible as a legal matter under state law because the South Dakota Constitution requires the Legislature to reapportion itself every ten years.  See S.D. Const. art III, § 5. It would therefore violate the state constitution to proceed under the old plan.

As a matter of federal law, the 1991 plan is so severely malapportioned that it is unusable under the principle of one person, one vote.  The total deviation of the 1991 plan under 2000 figures is nearly 75%, which is far in excess of acceptable limits. See White v. Regester, 412 U.S. 755, 764 (1973); Brown v. Thompson, 462 U.S. 835, 842-43 (1983).  It would therefore violate the United States Constitution to proceed under the old plan.

Furthermore, as noted above, the 1991 configuration of District 27 is retrogressive on its face.  See supra Part I.C.1. It is one of the most overpopulated districts in the State and its Indian population has become more concentrated, or "packed," into its boundaries.  To allow such a facially retrogressive configuration to be used in another election would be to permit precisely what Section 5 is designed to guard against, and would constitute improper judicial circumvention of the preclearance process.

Of course, the Court is not without remedial options other than the narrow injunction specifically requested by the plaintiffs.  Indeed, the Court has the power to order much broader relief, including enjoining the upcoming elections, see Clark v. Roemer, 500 U.S. 646, 655 (1991), and ordering the defendants to submit the plan for preclearance, see Lopez, 519 U.S. at 24.  The court even has the power to draw its own districts to the extent necessary for elections to proceed if it finds that the Legislature is unwilling or unable to take action within the time available. See, e.g., Abrams v. Johnson, 521 U.S. 74 (1997) (court-ordered plan ordered into effect following legislative default).[5]  Such districts would not be subject to preclearance and could be implemented immediately.  See McDaniel v. Sanchez, 452 U.S. 130 (1981); 28 C.F.R. § 51.18.  What the Court may not do, however, is allow elections to proceed, in whole or in part, under the 1991 plan.

---

5.    Indeed, in light of the fact that the June primaries are fast approaching, the  Court could decide that there simply is not sufficient time for the Legislature to act.  And there may be some question whether the Legislature even has the authority to take action in light of Article III, Section 5 of the South Dakota Constitution, which forbids the Legislature from redistricting more than once in a decade.

III.   THE COUNTIES ARE NOT NECESSARY PARTIES

The defendants contend in their brief that this case should be dismissed because the plaintiffs did not name Shannon and Todd counties as defendants.  Defendants' Brief at 5-6.  These counties are necessary parties, they suggest, because the counties, and not the State, are obligated by law to seek preclearance.  Id.  This argument has no merit.

As the Attorney General's regulations for the administration of Section 5 provide, "When one or more counties or other political subunits within a State will be affected, the State may make a submission on their behalf."  28 C.F.R. § 51.23(a).  The State of South Dakota has, in fact, made many such submissions on behalf of the covered counties in the past and even signaled its intention to submit this plan during the redistricting process.  Nothing but the defendants' own obstinance would prevent them from doing so now.

In any event, responsibility for preclearance is not the plaintiffs' concern.  The plaintiffs have not sought an injunction ordering the defendants to submit their plan.  They have sought an order prohibiting its implementation.  See Plaintiffs' Motion for a Preliminary Injunction.  This is precisely the relief that the Supreme Court has said is appropriate.  See, e.g., Lopez v. Monterey County, 519 U.S. at 20 ("If a voting change subject to §

5 has not been precleared, § 5 plaintiffs are entitled to an injunction prohibiting implementation of the change.").

Joyce Hazeltine is the Secretary of State of the State of South Dakota, and, as such, she is the chief election officer of the State.   In her official capacity, she alone is ultimately responsible for implementing the 2001 legislative redistricting plan in Shannon and Todd counties and throughout the State of South Dakota.   She is the only defendant necessary for the requested relief.   The only purpose to be served by adding county officials to this lawsuit would be to add substantially to its expense and to increase its delay.

IV.   ARNOLD BROWN IS A PROPER DEFENDANT

The defendants contend in a footnote that Arnold Brown is due to be dismissed as a defendant because the plaintiffs have inaccurately described his official title.   Defendants' Brief at 1 n.1.   The plaintiffs' complaint does indeed describe Mr. Brown as President of the Senate when he is in fact President Pro Tempore of the Senate.   See Complaint ¶ 17.   Even so, it is obvious that Mr. Brown is a proper party to this lawsuit.   He is a member of the Legislature.   He voted for the plan at issue.   He is also Chairman of the Executive Board of the Legislative Research Council, and, as such, is the person to whom the Legislature has delegated the responsibility to submit voting changes for preclearance.   He

21

therefore has an interest in the outcome of the case and is properly named as a defendant.

As a practical matter, moreover, the President _Pro Tempore_ of the Senate will often preside over the Senate and perform such duties as maintaining order in the legislative chamber, controlling the flow of business, recognizing those legislators wishing to speak, and signing bills and resolutions after they have passed. It is primarily because of these duties that Mr. Brown has been named as a defendant.

### V.   THE PLAINTIFFS' CLAIM IS NOT FRIVOLOUS

The defendants close their brief with the bald assertion that the plaintiffs' claim is frivolous. Defendants' Brief at 13. The plaintiffs respectfully disagree.

The plaintiffs have asked for nothing more than a straightforward application of well settled law to a clear set of agreed-upon facts. There are no unusual factual claims or frivolous legal theories in the plaintiffs' briefs. (Unfortunately, the same cannot be said about the defendants.) Counsel for the plaintiffs are completely unable to conceive of a basis for the defendants' assertion, unless its purpose is "to harass or to cause unnecessary delay or needless increase in the cost of litigation." Fed. R. Civ. P. 11(b)(1). In any event, the

defendants' unsupported assertion should be rejected as totally devoid of merit.

## VI.  CONCLUSION

For the foregoing reasons, the Court should grant the plaintiffs' motion for a preliminary injunction and rule in their favor on the merits.

Respectfully submitted,

BRYAN SELLS
LAUGHLIN McDONALD
NEIL BRADLEY
MEREDITH BELL
American Civil Liberties Union
   Foundation, Inc.
2725 Harris Tower
233 Peachtree Street
Atlanta, Georgia  30303
(404) 523-2721


PATRICK DUFFY
604 Mt. Rushmore Road
Rapid City, SD  57709-8027
(605) 342-1973

ATTORNEYS FOR THE PLAINTIFFS

CERTIFICATE OF SERVICE

I hereby certify that I have served this pleading by facsimile transmission, with a copy by U.S. Mail, first-class postage prepaid, upon the following attorneys:

John P. Guhin
Deputy Attorney General
Sherri Sundem Wald
Assistant Attorney General
500 East Capitol Avenue
Pierre, South Dakota  57501-5070

This 23rd day of January, 2002, at Rapid City, South Dakota.


Patrick Duffy

JAN.-23'02(WED) 17:47   A C L U F  SRO                          TEL:4048232721                     P. 002



**U.S. Department of Justice**

**Civil Rights Division**

JDR:GLT:RTH:jdh
DJ 166-012-3
2001-2930

*Voting Section - GSt.*
*930 Pennsylvania Avenue, N. W.*
*Washington, DC 20530*

January 16, 2002

James Fry
Director, Legislative Research Council
State of South Dakota
State Capitol Building
500 East Capitol
Pierre, South Dakota  57501-5070

Dear Mr. Fry:

This refers to the adoption by the State of South Dakota of
a 2001 redistricting plan for the state's House and Senate.  We
understand that on November 1, 2001, the governor signed Senate
Bill 1, providing for the decennial redistricting of the South
Dakota State Legislature.

As you know, Shannon and Todd Counties in South Dakota are
covered by Section 5 of the Voting Rights Act, 42 U.S.C. 1973c,
requiring the state to seek preclearance of any change related
to voting that may be implemented in those counties.  Pursuant
to the Voting Rights Act, it is necessary that such voting
changes either be brought before the District Court for the
District of Columbia or submitted to the Attorney General for a
determination that they do not have the purpose and will not
have the effect of discriminating on account of race, color, or
membership in a language minority group.  Changes that affect
voting are legally unenforceable without Section 5
preclearance.  Clark v. Roemer, 500 U.S. 646 (1991); Procedures
for the Administration of Section 5 (28 C.F.R. 51.10).



EXHIBIT

*A.*

JAN -23'02(WED) 17:48   A C L U F  SRO                TEL:4045232721                    P. 003

- 2 -

On September 17, 2001, we received information from you concerning a possible redistricting plan that the state might adopt.  At that time, however, it was inappropriate for the Attorney General to make a determination concerning your submission because the plan had not been finally enacted and was, therefore, not ripe for review.  See Procedures for the Administration of Section 5, 28 C.F.R. 51.22(a) and 51.35.  We stated in our response to you on October 3, 2001, that preclearance should be sought when the redistricting plan was formally adopted (copy of letter attached).  Although the plan was passed by the legislature in a special session on October 23 and 24, and signed into law by the governor on November 1, 2001, our records indicate that the final plan has not been submitted for preclearance.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us within ten days of the action the State of South Dakota plans to take concerning this matter.  We note that the 2001 redistricting plan has been challenged under the Voting Rights Act.  Bone Shirt v. Hazeltine, Case No. 01-CV-3032 (D.S.D. filed Dec. 26, 2001).  Accordingly, we are sending a copy of this letter to counsel in that case and to the court.  In light of the pending litigation and ongoing qualification period for the June 2002 primary elections, we will make every effort to expedite our review of your submission.

If you have any questions, please call Tamar Hagler (202-616-5617), an attorney in our office.  Refer to File No. 2001-2930 in any response to this letter so that your correspondence will be channeled properly.

Sincerely,

Joseph D. Rich
Chief, Voting Section

Attachment

cc:  The Honorable Charles B. Kornmann
     The Honorable Mark Barnett
     Patrick K. Duffy, Esq.
     Bryan Sells, Esq.
     Scott A. Abdallah, Esq.

JAN. -23' 02 (WED) 17:49   A C L U P  SRO                TEL:4045232721                P. 004



U.S. Department of Justice

Civil Rights Division

JDR:GLT:JTT:nj
DJ 166-012-3
2001-2930

*Voting Section*
*P.O. Box 66128*
*Washington, DC 20035-6128*

October 3, 2001

Mr. James Fry
Director, Legislative Research Council
State of South Dakota
State Capitol Building
500 East Capitol
Pierre, South Dakota  57501-5070

Dear Mr. Fry:

This refers to the 2001 redistricting plan for the State of South Dakota's House and Senate, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. We received your submission on September 17, 2001.

Your submission indicated that the legislature will not convene its special session to consider the redistricting plan until October 23, 2001, and may enact the plan some time after that date. A proposed change which is not finally enacted or capable of administration is not ripe for review by the Attorney General (with certain limited exceptions not applicable here). Accordingly, it would be inappropriate for the Attorney General to make a determination concerning your submission now. See the Procedures for the Administration of Section 5 (28 C.F.R. 51.22(a) and 51.35). When this change is formally adopted, preclearance under Section 5 should be sought. Refer to File No. 2001-2930 in any response to this letter so that your correspondence will be channeled properly.

To assist you in assembling the submission after final enactment of the redistricting plan, we are enclosing a copy of the Procedures for the Administration of Section 5.

JAN -23' 02 (WED) 17:49   A C L U F  SRO                TEL:4048232721                    P. 005

-2-

Future submissions under Section 5 for delivery by the
United States Postal Service should be addressed as follows:
Chief, Voting Section, Civil Rights Division, Department of
Justice, P.O. Box 66128, Washington, D.C. 20035-6128.
Submissions for delivery by commercial express service companies
should be addressed as follows: Chief, Voting Section, Civil
Rights Division, Department of Justice, 1800 G Street, N.W., Room
7254, Washington, D.C. 20006.  In either case, the envelope and
first page should be marked:  Submission under Section 5 of the
Voting Rights Act.

                    Sincerely,

                    Joseph D. Rich
                    Acting Chief
                    Voting Section


Enclosure