

FILED
DEC 3 1 2003
CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | | |
|---|---|---|
| ALFRED BONE SHIRT; BELVA BLACK LANCE; BONNIE HIGH BULL; and GERMAINE MOVES CAMP, | ) ) ) ) | CIV. 01-3032-KES |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | ORDER DENYING DEFENDANTS' MOTION TO STRIKE |
| JOYCE HAZELTINE, in her official capacity as Secretary of the State of South Dakota; SCOTT ECCARIUS, in his official capacity as Speaker of the South Dakota House of Representatives; SOUTH DAKOTA HOUSE OF REPRESENTATIVES; ARNOLD BROWN, in his official capacity as President of the South Dakota Senate; and SOUTH DAKOTA SENATE, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

Defendants move to strike the testimony of plaintiffs' experts Dr. Steven P. Cole and William Cooper and their five illustrative plans. Plaintiffs oppose the motion. The court denies the motion.

**BACKGROUND**

Plaintiffs filed this action challenging a redistricting plan promulgated by the South Dakota legislature. Plaintiffs allege that the plan violates various federal laws and dilutes Native American voting power. Specifically, plaintiffs contend that South Dakota's redistricting plan creates a Native American supermajority in District 27. As a result, Native American voting power in District 26 is diluted, and Native Americans do not have an equal opportunity to elect their preferred candidates.

Plaintiffs hired a demographic expert, William S. Cooper. He would testify that defendants could have easily drawn a redistricting plan that would prevent dilution of Native American voting power in District 26. Plaintiffs also employed a statistical expert, Dr. Steven Cole, to analyze election results. Dr. Cole used two statistical techniques: homogeneous precinct analysis and bivariate ecological regression. From these analyses, Dr. Cole opined on Native American and white cohesion and polarization in Districts 26 and 27.

Defendants argue that the court should exclude Dr. Cole's and Cooper's testimony and reports as scientifically invalid. Defendants contend that the reports are flawed, unreliable, and inadmissible under the Daubert standard. Defendants cite their expert, Dr. Jeffrey Zax, as proof that the scientific community does not accept Dr. Cole's analyses. At a minimum, defendants argue that the court should exclude Dr. Cole's report relating to his analysis of multi-candidate contests. Defendants also maintain that the court should exclude 26 of the 46 races considered by Dr. Cole because he used poor math and reached impossible results. Defendants allege that the court should strike much of Cooper's testimony since he has no expertise on Native American culture. Finally, defendants assert that striking these experts requires the court to exclude the five illustrative plans because the plans would not be supported by an expert opinion.

## DISCUSSION

1. **Dr. Steven Cole**

    a. **Rule 702**

A person qualifies as an expert if he or she has specialized knowledge, skill, experience, training, or education that will assist the trier of fact to understand a fact in issue. Fed. R. Evid.

2

702. In this case, Dr. Cole satisfies the requirements of Rule 702. He has particular knowledge of statistics, quantitative methods, research design, and development and evaluation of test and measurement procedures. His educational background evidences his expertise. He received a doctorate in human experimental psychology from Emory University and a masters degree in developmental psychology from Columbia University.

Dr. Cole's work experience further demonstrates his knowledge of statistics and human behavior. He has been the director of research at Research Design Associates, Inc., in New York since 1982. He is an adjunct professor at Emory University. He has also worked as a consultant to the Minority Access to Research Careers Program at Atlanta University Center. He was the chair of Georgia's psychology and Public Interest Committee from 1993 to 1994 and is a member of the American Psychological Association.

Dr. Cole has extensive experience particularly with analyzing voting behavior. He has analyzed voting behavior for the Lawyer's Committee for Civil Rights Under Law in Washington, D.C. from 1992 to the present, the American Civil Liberties Union (ACLU) from 1989 to the present, the Southern Poverty Law Center in 2000, the Center for Constitutional Rights from 1992 to 1994, and the Florida Rural Legal Services from 1990 to 1995. Dr. Cole has also testified in numerous cases, and many parties have relied on his expert reports and analyses. A number of these cases directly involved the Voting Rights Act.[1] Dr. Cole's education, his work history, and his trial experience evidence his knowledge and skill in

---

[1] For example, Dr. Cole's expertise was used in Old Person v. Brown, 182 F. Supp. 2d 1002 (D. Mont. 2002); Rural West Tennessee African-American Affairs Council v. Sundquist, 29 F. Supp. 2d 448 (W.D. Tenn. 1998); Askew v. City of Rome, 127 F.3d 1355 (11th Cir. 1997); Cousin v. McWherter, 904 F. Supp. 686 (E.D. Tenn. 1995); and Hines v. Mayor & Town Council of Ahoskie, 998 F.2d 1266 (4th Cir. 1993).

3

analyzing voting rights. See Williams v. Orange County, Fla., 783 F. Supp. 1348, 1352-53 (M.D. Fla. 1992) (court accepted expert's use of bivariate ecological regression and homogeneous precinct analysis based on his experience, education, knowledge and the reliability and legal sufficiency of these methods).

"Doubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility. Attacks on the foundation for an expert's opinion as well as the expert's conclusions, go to the weight rather than the admissibility of the expert's testimony." Sphere Drake Ins. PLC v. Trisko, 226 F.3d 951, 955 (8th Cir. 2000). A challenge to the factual basis of Dr. Cole's testimony relates to its credibility, not its admissibility. Ray v. Wal-Mart Stores, Inc., 120 F.3d 882, 885 (8th Cir. 1997). "Only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." Hose v. Chicago Northwestern Transp. Co., 70 F.3d 968, 974 (8th Cir. 1995). Dr. Cole's expertise, deriving from his work experience, his education, his skill, and knowledge, will assist the court in understanding the voting patterns at issue in this case. Accordingly, Dr. Cole is qualified to give an expert opinion under Rule 702.

    b.    **Daubert Factors**

The United States Supreme Court held that under Rule 702, "the trial judge [has] the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597, 113 S. Ct. 2786, 2799, 125 L. Ed. 2d 469 (1993). This gatekeeping function applies to all specialized knowledge. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147, 119 S. Ct. 1167, 1174, 143 L. Ed. 2d 238 (1999). "The trial judge's effort to assure that the specialized testimony is reliable

4

and relevant can help the jury evaluate that foreign experience, whether the testimony reflects scientific, technical, or other specialized knowledge." Id. at 1174-75. District court have "wide latitude in making its reliability and relevance determinations." United States v. Kehoe, 310 F.3d 579, 593 (8th Cir. 2002).

### i. Relevance

Dr. Cole's testimony and report relates to the voting behavior of people in certain South Dakota counties. Dr. Cole analyzed state legislative contests from 1986 to 2002 to determine the extent of cohesion among Native American voters and the amount of crossover voting. He also looked at contests during this time period that involved only non-Native American candidates and those involving only Native American candidates. The major questions Dr. Cole addressed included whether voting in Districts 26 and 27 is polarized, whether Native American voters in these districts are politically cohesive, and whether Native American preferred candidates are usually defeated by non-Native American majority voting.

Defendants do not contend that Dr. Cole's testimony and report are irrelevant. Indeed, his testimony is relevant to proving the three factors identified in Thornburg v. Gingles, 478 U.S. 30, 106 S. Ct. 2752, 92 L. Ed. 2d 25 (1986).[2] His report sets forth the methodology, data, and statistical analyses he used to answer these questions. See Hemmings v. Tidyman's, Inc., 285 F.3d 1174, 1184 (9th Cir. 2002) (courts often rely on statistical evidence as proof of discrimination). It will assist the trier of fact in understanding election results and voting

---

[2] The first factor is whether the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district. Second, the minority group must be politically cohesive. Third, the minority must demonstrate that the white majority votes sufficiently as a block to enable it to usually defeat the minority's preferred candidate.

5

patterns in Districts 26 and 27. Accordingly, his report and any testimony relating to it make facts of consequence in this case more or less probable. See Ventura v. Titan Sports, Inc., 65 F.3d 725, 733 (8th Cir. 1995) (expert's opinion admissible where it made a material fact more likely than in the absence of that testimony).

### ii. Reliability

Daubert lists four factors a court can consider to evaluate the admissibility of expert testimony for reliability purposes: "whether the testimony can be or has been tested, . . . whether the theory or technique has been subjected to peer review and publication, . . . the known or potential rate of error," and whether the relevant scientific community has generally accepted the theory or technique. Daubert, 509 U.S. at 593-94. These factors, however, are meant to be helpful rather than a "definitive checklist or test." Id. at 593. Trial judges have "broad latitude" in determining whether the specific factors reasonably measure reliability. Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1082 (8th Cir. 1999). Indeed, "the gatekeeping inquiry must be tied to the facts of a particular case." Kumho Tire, 119 S. Ct. at 1175.

The focus of the inquiry remains on the principles and methodology rather than the expert's conclusions. Daubert, 113 S. Ct. at 2797. Experts can express opinions "so long as there are sufficient facts already in evidence or disclosed by the witness as a result of his or her investigation to take such expert opinion testimony out of the realm of guesswork and speculation." Hurst v. United States, 882 F.2d 306, 311 (8th Cir. 1989). "Nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that

6

there is simply too great an analytical gap between the data and the opinion proffered." General Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L. Ed. 2d 508 (1997).

Defendants contend that Dr. Cole's use of ecological regression makes his testimony, conclusions, and reports scientifically invalid. The method relies on a double regression analysis, which defendants contend is invalid because the relationship between the critical factors is unknown. Defendants cite tests conducted by their expert, Dr. Zax, as evidence that this method does not accurately measure cohesion or polarization.

Next, defendants argue that Dr. Cole's use of R squared analysis is invalid. In his report, Dr. Cole stated that the higher the R square number, the more reliable the analysis. Dr. Zax contests this conclusion. Dr. Zax contends that because the R squared statistic does not have a well-defined definition, it cannot be compared to any standard to demonstrate significance. Dr. Zax's simulations demonstrated that higher R squared numbers increase the rate of error. Defendants maintain that because Cole relied solely on the R squared analysis which yields unreliable results, the court should strike his report and related testimony.

The defendants then contend that Cole's homogenous area or precinct analysis is flawed. Dr. Cole opined that "If there are precincts that are over-whelmingly composed of members of the same race (90% or more is a standard criterion), one can estimate the voting behavior of members of that group." Dr. Zax, however, concluded that near-homogenous precincts do not reveal sufficient information to determine cohesiveness among the minority group in those precincts. Thus, they reveal nothing about the polarization of voting in those precincts. Dr. Zax stated that his simulations "demonstrate that homogenous area analysis fails to reliably identify most, if not all of the structural parameters that determine voting outcomes."

7

Finally, defendants maintain that the court should exclude at least 26 of the 46 races considered by Dr. Cole due to faulty math or impossible results. Defendants note that Dr. Cole reported varying precinct sizes in six races, which resulted in disparate outcomes. Defendants cite Dr. Cole's analysis of the 1994 general election race for the Senate in District 27 as yielding inconsistent results. These inconsistencies render his analyses and any conclusions based on them invalid. Defendants also argue that because double regression technique often creates impossible results, the court must exclude any turnout rates that exceed 100%. They note that Dr. Cole does not contend that these are appropriate results. Accordingly, the court should strike this evidence as speculative and unreliable.

The court finds that Dr. Cole's methodology is reliable and satisfies the Daubert standard. He employs two techniques: the homogeneous precinct analysis and bivariate ecological regression. Numerous courts, including the United States Supreme Court, have accepted these methods as reliable in § 2 cases. See Gingles v. Thornberg, 478 U.S. 30, 52-53, 106 S. Ct. 2752, 2767, 92 L. Ed. 2d 25 (1986) (relying on bivariate ecological regression analysis, which the Court considered "standard in the literature for the analysis of racially polarized voting). See also Old Person, 230 F.3d at 1123 (relying on Dr. Zax's bivariate ecological regression analysis); Rural West Tennessee African-American Affairs Council, 209 F.3d at 839 (considering Dr. Cole's bivariate ecological regression and homogenous precinct analysis); Harvell v. Blytheville School Dist. No. 5, 71 F.3d 1382, 1386 (8th Cir. 1995) (relying on regression analysis). The prevalence of both district and circuit courts relying on these methods demonstrates the wide acceptance of Dr. Cole's analyses. See Teague v. Attala

8

County, 92 F.3d 283, 290 (5th Cir. 1996) (district court erred by disregarding the "established acceptance of regression analysis as a standard method for analyzing racially polarized voting").

Discounting this statistical analysis amounts to reversible error. In Sanchez v. State of Colorado, the Tenth Circuit reversed the district court for rejecting plaintiffs' bivariate ecological regression and homogeneous precinct analysis. 97 F.3d 1303, 1321 (10th Cir. 1996). The Fifth Circuit also required the district court to consider this method and noted that the Supreme Court used this analysis. Teague, 92 F.3d at 291. See also Houston v. Lafayette County, 56 F.3d 606 (5th Cir. 1995) (same). Precedent, therefore, supports the acceptance of Dr. Cole's analysis.

Defendants contend that although courts have accepted this analysis, none have rigorously examined the merits of bivariate ecological regression. Daubert, however, does not require a "rigorous examination" of the merits of a method. Daubert mandates reliability.

> As long as an expert's scientific testimony rests upon 'good grounds based on what is known,' it should be tested by the adversary process–competing expert testimony and active cross-examination–rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.

Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998). Furthermore, several district courts have indeed scrutinized the reliability of the ecological regression technique. In Garza v. County of Los Angeles, California, the court considered defendants' attack on the degree of bias in the ecological regression technique and the R squared correlation coefficient. 756 F. Supp. 1298, 1334 (C.D. Cal. 1990). The court concluded that ecological regression was sufficiently reliable to determine racial polarization in voting. Id. In Jeffers v. Clinton, the court discussed the debate between which statistical

9

method has the most merit. 730 F. Supp. 196, 208 (E.D. Ark. 1989). Ultimately, it relied on single regression, double regression, and homogeneous-precinct analysis, stating that the entirety of the statistical exhibits reliably demonstrated racial polarization. Id. Even defendants' expert Dr. Zax has previously accepted and relied on the methodology employed by Dr. Cole. See Old Person, 230 F.3d at 1123. Defendants, moreover, can highlight any discrepancies in Cole's report through their experts and through cross-examination.

The extensive reliance by other courts on the techniques used by Dr. Cole demonstrates that these methods have undergone testing and peer review. Courts have repeatedly considered conflicting statistical methods and how ecological regression analysis withstands attacks from other methods. See, e.g., Jeffers, 730 F. Supp. at 208; Garza, 756 F. Supp. at 1334. Defendants cite an article refuting the reliability of Dr. Cole's analysis and endorsing Dr. Zax's analysis.[3] Plaintiffs cite articles concluding that the two methods produce consistent results and support ecological regression analysis.[4] Although this academic debate evidences varying views, it does not undermine the reliability of Dr. Cole's methods. After considering the testimony of and the

---

[3] Defendants rely heavily on an article written by Zax that was subjected to double blind peer review by the American Political Science Review. Defendants note that Dr. Cole based his conclusions on a single article by Grofman and Migalski. Dr. Zax refers to a contradictory article he published in 2002 that shows arithmetical error invalidating Grofman and Migalski's approach. The editors of Sociological Methods and Research, the journal that published Dr. Zax's article, did not invite Grofman and Migalski to rebut Dr. Zax's article. Dr. Zax stated that "This is most unusual. It indicates that the editor of the journal believed that no constructive response was possible."

[4] For example, plaintiffs quote Allan Lichtman's article, "Passing the Test: Ecological Regression Analysis in the Los Angeles Case and Beyond," 15 Evaluation Rev. 770 (1991), as stating, "ecological regression has proved itself to be a reliable indicator of voting behavior and has also proved itself to be remarkably accurate in predicting the ethnic composition of districts that provide minorities opportunities to elect candidates of their choice." They also cite numerous other recent articles supporting Dr. Cole's methodology.

10

reports from both parties' experts, the finder of fact can decide which theory should receive more weight.

Defendants also note that Dr. Cole's method contains a high potential rate of error.[5] Dr. Cole and Dr. Zax, however, reached similar results although employing different techniques. For example, in the 2002 Senate race in District 26, Dr. Cole, using ecological regression, calculated Indian cohesion at 88% and non-Indian cohesion at 69%. Using homogeneous precinct analysis, Dr. Cole reached estimates of 91% and 66%. For the same Senate race, Dr. Zax found 82% Indian cohesion and non-Indian cohesion at 66%.[6] Although these percentages differ, they are significantly similar and do not create a disparity that renders Dr. Cole's methodology unreliable.

The court finds defendants' argument regarding errors in Dr. Cole's analysis unpersuasive. Differing definitions of legal terms such as cohesion and polarization do not invalidate Dr. Cole's studies. See Askew, 127 F.3d at 1367 n.2 (although court accepted Dr. Cole's numerical estimates, it did not necessarily accept his legal conclusions regarding polarization because the court must base that determination on the relevant law). Nor do other inconsistencies pointed out by defendants render Dr. Cole's studies inadmissible. Proving a pattern of voting behavior does not require complete accuracy in Dr. Cole's numerical

---

[5] Dr. Zax and Dr. Cole agreed that the standard error rate is around 5%. Dr. Zax concluded that double regression resulted in a 30% error rate, which he found "completely unacceptable from the perspective of statistical analysis in the social sciences."

[6] Another example lies in Dr. Cole's and Dr. Zax's analysis of the 2002 Senate race in District 27. Using regression analysis, Dr. Cole found 95% Indian cohesion and 65% non-Indian cohesion. He found 88% Indian cohesion and 69% non-Indian cohesion using the homogeneous precinct analyses. Dr. Zax found 93% Indian cohesion and 62% non-Indian cohesion.

11

estimates. A "pattern will not be fatally altered if a few of his percentages are somewhat inaccurate." Id.

> Daubert does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct. . . . Daubert neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.

Ruiz-Troche, 161 F.3d at 85. Furthermore, if, after hearing all of the evidence, the court finds defendants' experts more persuasive, it can accept those estimates rather than Dr. Cole's. See Heller v. Shaw Indus., Inc., 167 F.3d 146, 160 (3d Cir. 1999) (expert testimony is not invalid where another expert employed a different test and where both tests are accepted and reliable); Sanchez, 97 F.3d at 1318 (court found Dr. Zax's statistical model less persuasive than plaintiffs' expert because Zax analyzed predictions rather than actual outcomes).

Accordingly, the court will not exclude Dr. Cole's report or testimony. His conclusions are based on principles and methodology accepted by numerous courts. His analysis is not based on speculation or guesswork nor is it unsubstantiated. His expertise is sufficiently reliable to satisfy Daubert and is, therefore, admissible.

### 2. **William Cooper**

#### a. **Rule 702**

Defendants contend that Cooper's testimony does not satisfy Rule 702 because he does not have the expertise to testify to discrimination or social equality in South Dakota. Defendants contend that Cooper is not a sociologist, political scientist, historian, economist, or econometrician and has no expertise in Sioux culture or discrimination. Particularly,

12

defendants state that Cooper lacks knowledge of communities of interest and incumbency. As a result, defendants argue that the court should strike his testimony about the illustrative plans' compliance with traditional districting principles. Because no expert testimony then supports the five illustrative plans, defendants move the court to strike the plans.

Cooper satisfies Rule 702 and the court will strike neither his testimony nor the five illustrative plans. Cooper has a degree in economics from Davidson College and works as a demographic and redistricting consultant. He has prepared redistricting maps of approximately 475 jurisdictions since 1986 and prepared election plans for § 2 litigation in 18 states. He has analyzed census data from the year 2000 and helped prepare draft election plans in 15 states. He has testified numerous times in federal voting rights cases. Cooper's education, experience, skill, and knowledge about population demographics and the drafting of districts will assist the fact finder in this case. His testimony will help in determining whether the state's current districts prevent Native Americans from having an equal opportunity to vote and whether drafting alternative districts is possible. Defendants' specific arguments relating to the deficiencies of the plans go to the weight of Cooper's testimony rather than its admissibility.

The court will also not strike his statement that "Indians in South Dakota bear the effect of discrimination in such areas as education, income, housing, and unemployment." First, Cooper need not be an expert in discrimination or Sioux culture to make this statement. He need not be a sociologist, political scientist, historian, economist, or an econometrician to opine about discrimination toward Indians in South Dakota. He can formulate this opinion from his knowledge, experience, and understanding of demographics in South Dakota. His extensive

13

experience with minority populations in numerous states in the context of voting rights litigation provides Cooper a basis for forming these opinions.

Next, numerous courts have recognized the link between discrimination and a depressed socio-economic status. The Eighth Circuit recognized the district court's conclusion that "Native Americans bear the effects of social, economic, and educational discrimination." Stabler v. County of Thurston, Neb., 129 F.3d 1015, 1023 (8th Cir. 1997). See Gingles, 106 S. Ct. at 2776 ("Both this Court and other federal courts have recognized that political participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education, poor employment opportunities, and low incomes"). Accordingly, Cooper need not have any special expertise to repeat an observation made by various courts. The finder of fact can consider the entirety of the evidence when evaluating what weight to give this opinion.

Furthermore, contrary to defendants' contention, plaintiffs need not prove that discrimination caused inequities in Indians' opportunity to vote. Proving a prima facie case under § 2 does not require proof of causation or intent, and defendants may not rebut the case with evidence of causation or intent. Gingles, 106 S. Ct. at 2778.

> Disproportionate educational, employment, income level and living conditions arising from past discrimination tend to depress minority political participation. Where these conditions are shown, and where the level of [minority] participation in politics is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation.

Whitfield v. Democratic Party of the State of Arkansas, 890 F.2d 1423, 1431 (8th Cir. 1989) (quoting S. Rep. 417 at 29 n.114, 1982 U.S.C.C.A.N. 207). See United States v. Dallas County

14

Comm'n, 739 F.2d 1529, 1537 (11th Cir. 1984) (once plaintiffs show lower socio-economic status of blacks, they need not show the causal link of this status on political participation). Accordingly, the court will not strike this portion of Cooper's testimony.

The court also will not exclude Cooper's plans for failing to comply with traditional redistricting principles. This goes to the weight to be given his conclusions rather than the admissibility of his analysis.

Defendants also seek to invalidate Cooper's plans because he did not perform any mathematical or statistical tests to determine whether they afford Indians an equal opportunity to vote. Plaintiffs need only demonstrate the feasibility of alternative districts. Gingles neither requires a supermajority in the proposed plan nor a complete remedy. See Gingles, 106 S. Ct. at 2767 n.17 (plaintiffs must show that minority voters "possess the *potential* to elect representatives in the absence of the challenged structure or practice); See Dickinson v. Indiana State Election Bd., 933 F.2d 497, 503 (7th Cir. 1991) (completeness of remedy considered at the remedial stage of litigation). Cooper has sufficient knowledge, skill, and education to testify as an expert. His plans are supported by reliable facts and data. Accordingly, his testimony and the five proposed plans are admissible.

## CONCLUSION

The court finds that plaintiffs' experts Dr. Cole and William Cooper satisfy both Rule 702 and Daubert. Their testimony and reports are relevant, reliable, helpful to the finder of fact, and therefore, admissible. Because their expert testimony is admissible, plaintiffs' five redistricting plans are likewise admissible. No further hearing on this matter is necessary.

Accordingly, it is hereby

15

ORDERED that defendants' motion to strike (Docket 151) is denied.

Dated December 31, 2003.

BY THE COURT:

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE