UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | | |
|---|---|---|
| ALFRED BONE SHIRT; BELVA BLACK LANCE; BONNIE HIGH BULL; and GERMAINE MOVES CAMP, | ) ) ) | CIV. 01-3032-KES 2004 DSD 18 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| JOYCE HAZELTINE, in her official capacity as Secretary of the State of South Dakota; SCOTT ECCARIUS, in his official capacity as Speaker of the South Dakota House of Representatives; SOUTH DAKOTA HOUSE OF REPRESENTATIVES; ARNOLD BROWN, in his official capacity as President of the South Dakota Senate; and SOUTH DAKOTA SENATE, | ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**TABLE OF CONTENTS**

I.      **Parties & Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

II.     **History of Districts 26 and 27** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

III.    **2000 Census Data and the Current Legislative Plan** . . . . . . . . . . . . . . . . . . . . . .   7

IV.     **Section 2 of the Voting Rights Act** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
        A.      **Sufficiently Large and Geographically Compact** . . . . . . . . . . . . . . . . . . .   15
        B.      **Minority Political Cohesiveness** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31
                1.      **Dr. Cole's Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33
                2.      **Dr. Zax's Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38
                3.      **Reliability of Each Method** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43
                4.      **Non-Statistical Evidence of Cohesiveness** . . . . . . . . . . . . . . . . . . .   49
                5.      **Partisanship and Low Voter Turnout** . . . . . . . . . . . . . . . . . . . . . . .   57
        C.      **Usual Defeat of Indian-Preferred Candidates** . . . . . . . . . . . . . . . . . . . . . . .   61
        D.      **Totality of the Circumstances** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   74
                1.      **History of Discrimination** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   76
                        a.      **Voting** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   76

|   | b. | Discrimination in Representation | 84 |
|   | c. | Recent Electoral Processes | 86 |
|   | d. | Access to Polling Places | 92 |
|   | e. | 1975 Amendments to the Voting Rights Act | 93 |
|   | f. | Redistricting and Representation | 94 |
|   | g. | Other Evidence of Official Discrimination | 96 |
|   | h. | Unofficial Discrimination | 101 |
| 2. | | The Extent of Racially Polarized Voting | 107 |
| 3. | | Use of Voting Procedures for Discriminatory Purposes | 111 |
| 4. | | Access to Candidate Slating Process | 112 |
| 5. | | Socioeconomic Disparities | 113 |
| 6. | | Racial Appeals in the Political Process | 121 |
| 7. | | Indian Elected Officials | 122 |
| 8. | | Unresponsiveness | 124 |
| 9. | | Tenuousness | 133 |
| 10. | | Proportionality | 135 |
| 11. | | Indian Candidacies | 137 |
| 12. | | Voter Apathy and Low Turnout | 138 |

**V.    Remedy** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

## INTRODUCTION

Plaintiffs contend that South Dakota's 2001 legislative redistricting plan dilutes Indian voting strength by packing District 27 with a 90 percent supermajority of Indians, in violation of § 2 of the Voting Rights Act of 1965. This, plaintiffs contend, minimized the total number of districts in which Indians could select the candidate of their choice. Plaintiffs seek to create at least one additional single-member house district with a majority of Indians as a remedy. Defendants deny the allegations. After considering the evidence admitted during a nine-day court trial, the court determines by a preponderance of the evidence the following facts and conclusions of law.

2

## I.      Parties & Background

Plaintiffs Alfred Bone Shirt and Belva Black Lance are Indians, qualified electors,

members of the Rosebud Sioux Tribe, and residents of Todd County, which is currently part of

District 27.   T.III p.634, 688.  Plaintiffs Bonnie High Bull and Germaine Moves Camp are

Indians, qualified electors, and residents of Bennett and Jackson Counties, respectively, which

are currently part of District 26.  Joint Stipulations of Fact § 1 (Docket 267).

Defendant Chris Nelson is South Dakota's Secretary of State, Secretariat of the State

Election Board, and the successor in office to the original defendant, Joyce Hazeltine.

Complaint (Docket 1); Answer (Docket 23); T.VI p. 1513.  Defendant South Dakota House of

Representatives is one of two houses of South Dakota's legislature.  Defendant Matthew

Michaels is the Speaker of the House of Representatives and the successor-in-office to Scott

Eccarius, an original defendant in this case.  Complaint (Docket 1); Answer (Docket 23);

T.VIII p. 2215.  Defendant South Dakota Senate is South Dakota's other house of the

legislature and defendant Arnold Brown is the President Pro Tempore of the South Dakota

Senate.  Complaint (Docket 1); Answer (Docket 23); T.VIII p. 2158.

Plaintiffs filed suit on December 26, 2001, alleging that South Dakota's 2001 legislative

redistricting plan ("the Plan") violates their rights under §§ 2 and 5 of the Voting Rights Act of

1965.  Complaint (Docket 1).  On January 29, 2002, a three-judge panel heard plaintiffs' § 5

claim and held that defendants violated § 5 by failing to preclear the Plan.  Only the § 2 claim

now remains to be decided by this court.  See Bone Shirt v. Hazeltine, 200 F. Supp. 2d 1150

(D.S.D. 2002).

## II.      History of Districts 26 and 27

From 1973 to 1975, a task force analyzed Indian/State government relations to improve tribal and state relations in South Dakota.  It consisted of nine tribal chairmen, two senators, two representatives, and five lay people. Thomas Short Bull, a member of the Oglala Sioux Tribe (OST), was the executive director.  T.II p. 488-89; Ex. 268-270.

As of 1970, there were 28 legislative districts; none were majority Indian, and no Indians had been elected under that plan.  One of the task force's reports discussed voting as it related to Indians in South Dakota.  T.II p. 491-94; Ex. 18 p. 162-185; Ex. 267 p.14.

At trial, Short Bull testified that the task force concluded that the legislative district plan gerrymandered the Rosebud[1] and Pine Ridge[2] Reservations by "divid[ing it] into three legislative districts, effectively neutralizing the Indian vote in that area."  None of the districts

---

[1]The Act of March 2, 1889, sets apart the Rosebud Reservation, encompassing what were later organized as three full counties (Todd, Mellette, and Tripp), a major portion of Gregory County, and a small portion of Lyman County.  Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S. Ct. 1361, 1364, 51 L.Ed. 2d 660 (1977).  By subsequent acts of Congress, the Rosebud Reservation was diminished and the Reservation now consists of Todd County.  Id. at 1377.  To the extent Indians are residing on unextinguished allotted lands in Tripp, Millette, Gregory and Lyman Counties, however, they are residing in "Indian country" within the definition of 18 U.S.C. § 1151.  See id., n.48.

[2]The Act of March 2, 1889, set apart the Pine Ridge Reservation, encompassing what were later organized as three full counties (Bennett, Washabaugh, and Shannon).  United States ex rel. Cook v. Parkinson, 396 F. Supp. 473, 477 (D.S.D.), aff'd, 525 F.2d 120, 124 (8th Cir. 1975).  Washabaugh County was consolidated with Jackson County in 1976.  See Oglala Sioux Tribe of Pine Ridge Reservation v. South Dakota, 770 F.2d 730, 733 (8th Cir. 1985).  By a subsequent act of Congress, the Pine Ridge Reservation was diminished and parts of Bennett County were opened up for settlement.  Cook, 396 F. Supp. at 489.  Thus, the Pine Ridge Reservation now consists of Shannon County and the portion of Jackson County that lies south of the White River, which constitutes the area formerly known as Washabaugh County.  To the extent Indians are residing on unextinguished allotted lands in Bennett County, however, they too are residing in "Indian country" within the definition of 18 U.S.C. § 1151.

were majority Indian.  T.II p. 491; Ex. 18 p. 167; Ex. 269 p. 9.  A 1974 report by the task force

recommended that Shannon, Washabaugh, Todd, and Bennett Counties be combined into one

legislative district, which would be a majority Indian district.  T.II p. 495; Ex. 18 p. 186; Ex.

267 p. 25.

 The legislature never considered the plan.  Short Bull testified that "the state

representatives and senators felt it was a political hot potato. . . . [T]his was just too pro-Indian

to take as an item of action. . . . [The legislature] always tried to get . . . a compromise on

things, but there really wasn't much to compromise here; either you gerrymander it, or you try

to have a district that has more Indian people in the legislative district."  The task force did

propose eight other bills in 1974 that affected Indians, and the legislature passed seven of them.

T.II. p. 497-506; Ex. 268 p. 43.  In 1975, the legislature chose to not fund the task force and it

was dissolved.  A state Civil Rights Commission followed instead.  T.II p. 506, 514.

 Following the 1980 census, the legislature drew a new redistricting plan.  The state

Civil Rights Commission recommended that the state should create a district in the area of the

Rosebud and Pine Ridge Reservations.  After the national Civil Rights Commission received

the state commission's report, the Department of Justice instructed South Dakota that it would

not approve its reapportionment plan unless the state created a substantially Indian district.  T.II

p. 513-14. The redistricting plan that was enacted in 1981 had 35 single-member senate

districts.  Each district also elected two house members.  District 28, which included Shannon

and Todd Counties and half of Bennett County, became the first majority Indian district in

South Dakota.  SL 1881, ch. 14, § 2; 1983, ch. 10, § 2.  In 1982, District 28 was 86 percent

Indian.  Short Bull was elected from District 28 in 1982 and became the first Indian state Senator.  T.II. p.488, 515-16.

The court finds Short Bull's testimony credible.  His knowledge and experiences as the director of the task force and as the first Indian state senator in South Dakota make his testimony reliable, credible, and probative.  Accordingly, the court accepts his testimony and gives it substantial weight.

Following the 1990 census, the legislature again engaged in re-districting.  Ex. 869; Ex. 870.  Meetings on the issue were held in June 1991 at Sinte Gleska College in Mission, South Dakota, the Bennett County Courthouse, and Oglala Lakota College (OLC) in Kyle, South Dakota.  Ex. 869 p. 1.  Testimony at the meetings expressed concern about diluting the Lakota (Indian) vote and about drawing districts "to maximize the opportunity for Lakota people to elect a Lakota to represent them."  People testified about concerns regarding the accuracy of the census results.  They believed the reservations had a "significantly greater population than the Census indicated."  Although some testimony urged the legislature to retain the current boundaries, there was also testimony that if a census recount evidenced a strong population increase, "two Indian districts would be preferable."  Ex. 869 p. 1-2.  The re-districting plan adopted in 1991 retained a district consisting of Todd and Shannon Counties and a part of Bennett County, except the city of Martin.  1st SS 1999, ch. 1, § 3.  This district was renumbered District 27.  Id.  The redistricting plan did not create a second district containing a majority of Indians.  Ex. 869; Ex. 870.  During a second special session in 1991, the legislature created two single-member house districts, namely Districts 28A and 28B, which encompass part of the Standing Rock Reservation and all of the Cheyenne River Indian Reservation.

6

According to the statute, the districts were created for the purpose of protecting minority voting rights.  2nd SS 1991, ch. 1.

### III.    2000 Census Data and the Current Legislative Plan

South Dakota's Constitution requires reapportionment of its membership every ten years after 1991.  S.D. Const. art. III, § 5.  The legislature convened on October 23-24, 2001, for the purpose of redistricting.  Ex. 401 Tab 2; Ex. 402.[3]

When drafting the 2001 Plan, the legislature relied on the Census 2000 Redistricting Data Summary File produced by the United States Census Bureau.  This was the first federal Census that allowed respondents to identify themselves with more than one racial group.  Consequently, there are several ways to assign people to racial groups for the purpose of redistricting.  T.I p. 258, 260.  The single-race method classifies only those who identify themselves exclusively as a single racial group within that category.  The multiple-race method assigns each multiple race response to every category with which the person identifies.  Black Political Task Force v. Galvin, 300 F. Supp. 2d 291, 301 (D. Mass. 2004).  The dual-race method assigns any multiple-race response that includes white and one of the other five race categories to the minority race listed in the response.  Guidance Concerning Redistricting and Retrogression Under Section 5 of the Voting Rights Act, 66 F.R.D. 5412-01, 5414 (2001).  Because this "case involves an examination of only one minority group's effective exercise of

---

[3]Pursuant to the court's oral order at the close of trial, the parties submitted post-trial findings of fact, conclusions of law, and objections to the opposing party's findings.  Defendants specifically objected to many of plaintiffs' findings, but did not respond to every proposed finding.  The court finds that a failure to object to a finding results in a waiver of any objection by defendants to the information within that paragraph.  As long as the record supports these findings, therefore, the court will consider them factual and unopposed.

the electoral franchise, . . . it is proper to look at *all* individuals who identify themselves as [Indian.]"  Georgia v. Ashcroft, 539 U.S. 461, 123 S. Ct. 2498, 2507-8 n.1, 156 L. Ed. 2d 428 (2003).  This court will, therefore, consider all people who self-identify as Indian, whether single, dual, or multiple race.  See id.; T.I p. 260-263.[4]

According to the 2000 census, the total population of the state of South Dakota is 754,844, with an Indian population of 67,990.  Thus, Indians constitute 9.05 percent of the total population and 6.79 percent of the voting age population (VAP).[5]  Ex. 358 p. 6. sub-ex.1. There are nine federally recognized tribes that have land in South Dakota.[6]  All of "Indian country" is located in rural areas.  The total population of South Dakota's "Indian country" is 59,366, of whom 42,460 are Indians.  Ex. 358 p.7-8.  Nearly two-thirds (62.55 percent) of South Dakota's Indian population lives in "Indian Country."  Eight predominantly rural counties are Indian majority:  Shannon, Bennett, Todd, Mellette, Dewey, Ziebach, Corson, and Buffalo.  Ex. 358, Ex. 2.

The redistricting committee consisted of 15 members.  Senator Arnold Brown was the committee co-chair.  Two Indian legislators were members of the committee, namely Representative Paul Valandra (member of the Rosebud tribe) and Senator Dick Hagen (member

---

[4] The record contains statistics for the dual-race, single-race, and multiple-race methods. The method used does not alter any conclusions because the results of each analysis are very similar.

[5] Under the single-race method, Indians make up 8.25 percent of the total population and 6.24 percent of the VAP.  Under the dual-race method, Indians constitute 9.01 percent of the total population and 6.77 percent of the VAP.  Ex. 358 sub-ex. 1. ("Sub-ex" refers to numbered exhibits contained within a larger exhibit.

[6] The tribes are Cheyenne River, Crow Creek, Flandreau Santee Sioux, Sisseton-Wahpeton (Lake Traverse), Lower Brule, Oglala Sioux, Rosebud, Standing Rock, and Yankton.

of the Oglala Sioux tribe).  Both are elected officials from District 27.  Representative James Bradford, also from District 27, requested placement on the committee but was told there was not enough room for another member.  T.VIII p. 2164; T.IV p. 1080; Ex. 401.

The 2000 redistricting committee held six meetings, four in Pierre, one at Sinte Gleska College on the Rosebud Reservation, and one at Wolf Creek school on the Pine Ridge Reservation.  Legislative members from Districts 26 and 27 encouraged the holding of meetings at Sinte Gleska and Wolf Creek to provide an opportunity for local input.  Senator Hagen and Representative Valandra were in charge of establishing the meeting dates and advertising.  Both meetings were poorly attended.  Six people attended the Wolf Creek meeting, and only one person spoke.  T.VIII p.2168-71, 2242; T.IV p.1101.

Representative Bradford testified that although Senator Hagen publicized the occurrence of a meeting, he did not adequately advertise the location or time.  Originally the meeting was planned to be held at Billy Mills Hall which is located in the town of Pine Ridge; however, Senator Hagen failed to reserve the hall.  Representative Bradford offered Wolf Creek school for the meeting, which is located five miles outside of the town of Pine Ridge.  Representative Bradford attributes the low attendance at the meeting to its inconvenient and unadvertised location.  T.IV p. 1081-82.

Representative Valandra set up the meeting at Sinte Gleska College.  Representative Bradford testified that Indians were "very, very sensitive to the atmosphere."  The formality of the room and the committee's attire made Indians feel like they were inadequate "to appear before a committee of that magnitude."  T.IV p.1100-01.

9

Following the redistricting committee hearings, the legislature took up the issue of redistricting at a special session held on October 23 and 24, 2001.  Like previous plans, the 2001 Plan divided South Dakota into 35 legislative districts, each of which elects one member to the Senate and two members at large to the House of Representatives, except for District 28.  District 28 is divided into two single-member districts, Districts 28A and District 28B, which each elect one member to the House of Representatives.  SDCL 2-2-34.  Under the Plan, District 27 includes all of Shannon and Todd Counties, and Precinct 27 of Bennett County, which is the southern portion of Bennett County.  District 26 borders District 27 and includes all of Haakon, Jackson,  Jones, Lyman, Mellette and Tripp Counties, and Precinct 26 of Bennett County, which is the northern portion of the county.  SDCL 2-2-34.

During the house floor discussion, Representative Bradford introduced an amendment to provide for a new configuration of Districts 26 and 27, which would have created a majority-Indian Senate District 27 consisting of Haakon, Jackson, and Shannon Counties and a portion of Bennett and Todd Counties.  Senate District 26 would have consisted of Jones, Mellette, Lyman, and Tripp Counties.  Two single-member house districts would have been created for District 26, wherein majority-Indian District 26A would have consisted of Mellette County and a portion of Bennett, Jones, and Todd Counties.  District 26B would have consisted of the remainder of District 26 and would have been a majority-white district.  The amendment was defeated by a vote of 51 to 16.  Ex. 402, p. 18 of House Journal.  The bill was passed by both houses and the governor signed the bill into law on November 1, 2001.  Ex. 402 p. 37; SDCL 2-2-34.  A map of the adopted plan follows as Figure 1.

10



FIGURE 1
2001 Redistricting Map

Every district in the 2001 Plan is majority white except Districts 27 and 28A, which are majority Indian.  According to the 2000 Census, Indians make up approximately 90 percent of District 27's total population and 86 percent of the VAP.[7]  Indians make up approximately 30 percent of District 26's total population and 23 percent of the VAP.[8]  Ex. 358 p. 14; Ex. 369.  Part of the Pine Ridge Reservation and all of the Rosebud Reservation are located within

---

[7]Under the single-race method, Indians constitute 88.66 percent of the total population and 84.81 percent of the VAP.  Under the dual-race method, they make up 89.91 percent of the total population and 86.04 percent of the VAP.  Ex. 370.

[8]Under the single-race method, Indians make up approximately 30 percent of the total population and 23 percent of the VAP.  Under the dual-race method, they constitute 30.14 percent of the total population and 23.20 percent of the VAP.  Ex. 370, Ex. 358 p. 15.

District 27.  This district elects one senator and two representatives to the legislature.  Part of the Standing Rock Reservation and all of the Cheyenne River Reservation are within House District 28A.  This district elects one representative and is half of a district that elects one senator to the legislature.  Ex. 358 p. 14

The court finds the testimony of Representative Bradford to be highly credible.  He grew up in Parmalee, South Dakota, on the Rosebud Reservation and lived there for 15 years as an adult.  He graduated from Sinte Gleska College, which is also located on the Rosebud Reservation.  He has lived in Mission, South Dakota, on the Rosebud Reservation and near Martin, South Dakota, in Bennett County for 15 years.  His wife is from Pine Ridge, and they have lived there since 1978.  His mother was part Indian, and although neither his mother nor he are enrolled members, he is eligible for tribal benefits such as Indian Health Service and education and he has always identified himself as an Indian person.  He has been a representative in the South Dakota legislature since 2000.  T.IV p. 1059-64.  The court finds that his experiences and knowledge about Indian issues make his testimony probative.  The court, therefore, accepts his testimony in its entirety and gives it great weight.

Representative Valandra and Senator Hagen preferred keeping the districts in the current form.  Representative Matthew Michels, a member of the redistricting committee and Speaker of the House of Representatives, testified that Senator Hagen stated that "he had not heard an outcry to change [the districts]" and that people who testified at the meetings on the Rosebud and Pine Ridge Reservations wanted to "leave the status quo."  T.VIII p. 2173, 2180-81, 2231-32.  Representative Bradford proposed an alternative map that would have increased the number of Indian-majority districts.  T.VIII p. 2180-81.

Although no evidence refutes that  Representative Valandra and Senator Hagen told others on the redistricting committee that they would prefer the district boundaries to be left unchanged, the court gives little weight to this evidence because as incumbents, they had a vested interest in resisting change to their district's boundaries.  The limited public testimony at the Sinte Gleska and Wolf Creek meetings also does not necessarily represent the attitudes of Indians in the affected districts.  The low attendance at these meetings detracts from the probative value of the evidence.

Furthermore, there is evidence that directly refutes this evidence.  During the special session in October 2001, Representative Valandra voted in favor of an amendment proposed by Representative Bradford that would have changed the boundary lines of  Districts 26 and 27.  Ex. 402 p. 19.  Additionally, lay testimony at trial undermines the claim that Indians wanted to keep Districts 26 and 27 unchanged.  Elsie Meeks testified that the current configuration of Districts 26 and 27 is unfair because it "segregates Indians."  T.V p. 1376.  Lyla Young described the current districts as unfair because they "dumped us all in this bloc," which gives Indians less choice.  T.III p. 676.  Short Bull stated that District 27 was unfair because there were "just too many Indians in that legislative district," which dilutes their vote.  T.II p. 518.

Defendants point to evidence that it was reasonable for legislators to rely on the statements by Senator Hagen and Representative Valandra.  T.IV p. 1094.  While their reliance may not be unreasonable, the court does not find this evidence probative of whether the Plan violates § 2.  Regardless of Senator Hagen's and Representative Valandra's statements, legislators were obligated to draw district lines that comply with § 2.  This evidence, therefore, has little probative value.

Defendants also argue that ACLU representative Jennifer Ring testified at a redistricting meeting that the "Sagebrush/Cocklebur Plan" was her favorite. This plan is virtually the same as the current plan adopted by the legislature. Ex. 401 p. 5, Tab 10 p. 14. Ring testified at trial, however, that she did not choose a favorite and that she believed District 27 was a "packing plan." T.III p.767, 811-12. Furthermore, whether or not Ring favored a particular plan is irrelevant to determining whether Districts 26 and 27 comply with § 2 of the Voting Rights Act. Thus, the court does not give this evidence great weight.

## IV.    Section 2 of the Voting Rights Act

Section 2 of the Voting Rights Act of 1965, as amended, prohibits the use of any voting practice which "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or membership in a language minority. 42 U.S.C. §§ 1973(a), 1973b(f)(2); Thornburg v. Gingles, 478 U.S. 30, 44, 106 S. Ct. 2752, 2763, 92 L. Ed. 2d 25 (1986). A violation of § 2 is established "if, based on the totality of the circumstances, it is shown that . . . [members of a protected minority group] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). The voting strength of a politically cohesive minority group can be diluted either "by fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them, or by packing them into one or a small number of districts to minimize their influence in the districts next door." Johnson v. De Grandy, 512 U.S. 997, 1007, 114 S. Ct. 2647, 2655, 129 L. Ed. 2d 775 (1994). Both the dispersal of Indians into districts in which they constitute an ineffective minority of voters or the concentration of Indians into districts where they constitute an excessive majority

14

may dilute racial minority voting strength.  Voinovich v. Quilter, 507 U.S. 146, 154, 113 S. Ct. 1149, 1155, 122 L. Ed. 2d (1993).

The Supreme Court has established a test to prove vote dilution through the use of multimember districts under § 2 of the Voting Rights Act:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. . . . Second, the minority group must be able to show that it is politically cohesive. . . .Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it–in the absence of special circumstances, such as the minority candidate running unopposed–usually to defeat the minority's preferred candidate.

Gingles, 478 U.S. at 51.  Upon satisfying these three factors, the court must then consider the totality of the circumstances "to determine, based upon a searching practical evaluation of the past and present reality whether the political process is equally open to minority voters.  This determination is peculiarly dependent upon the facts of each case and requires an intensely local appraisal of the design and impact of the contested electoral mechanisms."  Id. at 2781.  A violation of § 2 is established "if, based on the totality of the circumstances, it is shown that . . . [members of a protected minority group] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  42 U.S.C. § 1973(b).

### A.    Sufficiently Large and Geographically Compact

Under the first Gingles factor, plaintiffs must demonstrate that the minority is sufficiently large and geographically compact to constitute a majority in a single-member district.  Gingles, 478 U.S. at 50.  Small and dispersed minority groups undermine the ability to create a district that would remedy the grievance.  Sanchez v. Colorado, 97 F.3d 1303, 1311

(10th Cir. 1996).  It considers whether the court can "fashion a permissible remedy in the particular context of the challenged system."  Sanchez, 97 F.3d at 1311. When requiring proof of this factor, the Court noted that:

> [u]nless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice. . . . Thus, if the minority group is spread evenly throughout a multimember district, or if, although geographically compact, the minority group is so small in relation to the surrounding white population that it could not constitute a majority in a single-member district, these minority voters cannot maintain that they would have been able to elect representatives of their choice in the absence of the multimember electoral structure.

Id. at 50 n.17.

This factor does not require "some aesthetic ideal of compactness," but rather looks at whether the minority population is sufficiently compact to constitute a majority in a single-member district.  Clark v. Calhoun County, Miss., 21 F.3d 92, 95 (5th Cir. 1994) (Clark I).  The constitution does not require regularity of district shape.  Bush v. Vera, 517 U.S. 952, 963, 116 S. Ct. 1941, 1953, 135 L. Ed. 2d 248 (1996); Sanchez, 97 F.3d at 1312.  Plaintiffs, therefore, need only propose a plan that demonstrates the possibility of a majority-minority district.  Houston v. Lafayette County, Miss., 56 F.3d 606, 611 (5th Cir. 1995).  The court must determine "whether the affected minority is diffused and thus politically ineffective, not whether the area by which it is bound is geographically dense."  Sanchez, 97 F.3d at 1312.

Plaintiffs introduced into evidence five illustrative redistricting plans which were drawn by their demographic expert, William Cooper.  Each plan creates at least one additional majority-Indian house district.  Ex. 358 p. 16, sub. ex. 9-13; T.I p. 270-71.  Illustrative Plan A creates three majority-Indian districts, including two majority-Indian senate districts and one

16

majority-Indian single-member house district.  It divides one of the majority-Indian senate

districts into two single-member house districts, one of which is majority-Indian.  Thus, six

legislative seats are majority-Indian.  The following table summarizes the total population and

VAP.  Ex. 358 p. 16-17, sub. ex. 9; Ex. 369.

|  | Single Race | Dual Race | Multi-Race |
|---|---|---|---|
| District 26 Senate (VAP) | 48.57 | 50.15 | 50.20 |
| (total population) | 57.03 | 58.96 | 59.01 |
| District 26A single-member House (VAP) | 67.58 | 69.81 | 69.88 |
| (total population) | 74.52 | 77.01 | 77.08 |
| District 27 Senate (VAP) | 70.20 | 71.41 | 71.42 |
| (total population) | 76.67 | 77.91 | 77.92 |
| District 28A single-member House (VAP) | 67.00 | 67.94 | 67.98 |
| (total population) | 74.13 | 75.26 | 75.32 |

Illustrative Plan B creates two majority-Indian senate districts and divides one of the

majority-Indian senate districts into two single-member house districts, both of which are

majority-Indian.  A total of six legislative seats in Illustrative Plan B are majority-Indian.  The

table summarizes the total population and VAP.  Ex. 358 p. 17-18 sub-ex. 10; Ex. 369.

|  | Single Race | Dual Race | Multi-Race |
|---|---|---|---|
| District 26 Senate (VAP) | 61.10 | 62.53 | 62.57 |
| (total population) | 68.57 | 70.22 | 70.28 |
| District 26A single-member House (VAP) | 69.10 | 69.94 | 69.99 |
| (total population) | 75.65 | 76.70 | 76.76 |
| District 26B single-member House (VAP) | 53.20 | 55.20 | 55.24 |
| (total population) | 61.35 | 63.61 | 63.68 |
| District 27 Senate (VAP) | 84.81 | 86.04 | 86.07 |
| (total population) | 88.66 | 89.91 | 89.9 |

Illustrative Plan C creates one majority-Indian senate district and two majority-Indian single-member house districts.  A total of five legislative seats are majority-Indian.  The table summarizes the total population and VAP.  Ex. 358 p. 18-19 sub-ex. 11; Ex. 369.

|  | Single Race | Dual Race | Multi-Race |
|---|---|---|---|
| District 26A single-member House (VAP) | 65.70 | 67.83 | 67.89 |
| (total population) | 73.08 | 75.62 | 75.69 |
| District 27 Senate (VAP) | 69.21 | 70.46 | 70.47 |
| (total population) | 75.81 | 77.09 | 77.11 |
| District 28 Senate (VAP) | 68.38 | 69.25 | 69.29 |
| (total population) | 75.03 | 76.04 | 76.10 |

Illustrative Plan D creates one majority-Indian senate district and two majority-Indian single-member house districts.  A total of five legislative seats are majority-Indian.  The table summarizes the total population and VAP.  Ex. 358 p. 19-20 sub-ex. 12; Ex. 369.

|  | Single Race | Dual Race | Multi-Race |
|---|---|---|---|

| | | | |
|---|---|---|---|
| District 26A single-member House (VAP) | 65.60 | 66.65 | 66.70 |
| (total population) | 73.06 | 74.21 | 74.25 |
| District 27 Senate  (VAP) | 67.19 | 68.96 | 68.98 |
| (total population) | 74.05 | 75.99 | 76.02 |
| District 28A single-member House (VAP) | 68.38 | 69.25 | 69.29 |
| (total population) | 75.03 | 76.04 | 76.10 |

Illustrative Plan E creates one majority-Indian senate district and two majority-Indian single-member house districts.  A total of five legislative seats are majority Indian.  The table summarizes the total population and VAP. Ex. 358 p. 20-21 sub-ex. 13; Ex. 369.

| | Single Race | Dual Race | Multi-Race |
|---|---|---|---|
| District 26A single-member (VAP) | 73.10 | 74.31 | 74.36 |
| (total population) | 79.39 | 80.84 | 80.88 |
| District 27 Senate (VAP) | 63.87 | 65.54 | 65.56 |
| (total population) | 71.16 | 72.98 | 73.00 |
| District 28A single-member (VAP) | 68.38 | 69.25 | 69.29 |
| (total population) | 75.03 | 76.04 | 76.10 |

Cooper's plans present various alternatives, each of which creates at least one additional majority-minority legislative district in South Dakota while adhering to traditional redistricting principles.  For instance, Plan E largely follows existing county and reservation boundaries. For illustrative purposes, Plan E is shown here as Figure 2.

FIGURE 2



**Illustrative Plan E**

Plans A and B, while splitting some counties, avoid splitting precincts. The proposed districts are also compact and relatively contiguous. T.I p. 271; Ex. 358 sub-exs. 9-13.

The fact that Cooper's socio-economic data reports only information relating to single-race Indians does undermine the credibility of his report. This section of the report was derived from census data that only provided information for single-race Indians. As noted previously, there is not a significant difference between the number of people who self-identified themselves as single, dual, or multiple race Indians. Although less comprehensive, Cooper's

20

use of single-race Indian data does not discredit his redistricting maps or his findings. Furthermore, even though Cooper has not taught at a college, written for a journal, and is not a sociologist, political scientist, economist, or econometrician, he is nonetheless credible and qualified as an expert to draw redistricting maps.  Neither his testimony nor his report require expertise in these social sciences for purposes of providing reliable testimony about alternative redistricting plans for South Dakota.  He need not be an expert in anthropology, Sioux culture and history, or South Dakota history to reliably report on redistricting options in South Dakota. He can reliably base his analysis and conclusions on his experience in South Dakota and his knowledge of redistricting.  T.II p. 306-14.

Furthermore, the fact that Cooper did not analyze what effect, if any, discrimination had on producing a relatively depressed economy and less prosperous population of Indians than non-Indians in Districts 26 and 27 does not undermine his analysis, conclusions, or illustrative plans.  In fact, this issue is not in real dispute because even defendants' expert, Michael Lawson, acknowledged that past discrimination has contributed to present day depressed socioeconomic status among Indians. T.II p. 333-35; T.VIII p. 2116.

Defendants argue that plaintiffs did not satisfy the first Gingles factor because they failed to propose a complete, narrowly tailored remedy that contains constitutionally workable districts.  Plaintiffs need not propose a complete remedy at this stage.  See Gingles, 478 U.S. at 50 n.17 (plaintiffs must show that minority voters "possess the *potential* to elect representatives in the absence of the challenged structure or practice") (emphasis added).  Plaintiffs' proposed districts simply demonstrate the feasibility of drawing a majority-minority district and are not

cast in stone.  Houston, 56 F.3d at 611.  See also Dickinson v. Indiana State Election Bd., 933

F.2d 497, 503 (7th Cir. 1991) (completeness of remedy considered at the remedial stage of

litigation).  "If a § 2 violation is found, the [state] will be given the first opportunity to develop

a remedial plan."  Id.  See also Clark v. Calhoun County, Miss., 88 F.3d 1393, 1407 (5th Cir.

1996) (Clark II) (county's challenge to the remedy was not ripe for review because the county

was "free, within limits, to develop a different remedial plan from those proposed by

plaintiffs"); Sanchez, 97 F.3d at 1315 ("drawing the necessary district is not [plaintiffs'] onus

because the State must be given the first opportunity to fashion a remedy").

    Defendants also argue that plaintiffs have failed to satisfy this factor because any

proposed remedy requires above a supermajority of 65 percent Indian VAP.  The court

disagrees.  First, the law does not definitively require establishing supermajority districts.

Gingles, 478 U.S. at 50 (requiring proof of a majority); Valdespino v. Alamo Heights Ind. Sch.

Dist., 168 F.3d 848, 852-53 (5th Cir. 1999) (requiring proof that the minority group exceeds 50

percent of the relevant population); Solomon v. Liberty County, Fla., 899 F.2d 1012, 1013,

1018 (11th Cir. 1990) (holding that plaintiffs satisfied the first factor of Gingles where minority

voters made up 49 percent of the total population, 51 percent of the VAP and 46 percent of the

registered voters).

    Second, any necessary supermajority is required only at the remedial stage of litigation.

Indeed, the 65 percent guideline is a general remedial goal and "is irrelevant to the first part of

the Thornburg tripartite threshold test for liability."  Magnolia Bar Ass'n v. Lee, 793 F. Supp.

1386, 1397 (S.D. Miss. 1992).  In <u>Dickinson</u>, the Seventh Circuit noted that although several

cases have recognized a need for a supermajority of minority voters in the proposed district:

> the Supreme Court requires only a simple majority of eligible voters in the
> single-member district.  The court may consider, at the *remedial* stage, what
> type of remedy is possible based on the factors traditionally examined in single-
> member districts, such as minority voter registration and turn-out rates. . . . But
> this difficulty should not impede the judge at the liability stage of the
> proceedings.

933 F.2d at 503 (citations omitted).  Because the current case is at the liability stage of the

proceedings, the court concludes that proof of a supermajority is not required.

Defendants rely on <u>Jeffers v. Tucker</u> to support their contention that a supermajority is

necessary.  <u>Jeffers</u> notes that

> in fashioning remedies for Voting Rights Act violations, the creation of districts
> with bare majorities is not enough for a complete remedy.  In order to
> compensate for historically low rates of voter registration and turnout,
> 'minorities must have something more than a mere majority even of voting age
> population in order to have a reasonable opportunity to elect a representative of
> their choice.'

847 F. Supp. 655, 660 (E.D. Ark. 1994).

Defendants' argument fails for several reasons.  First, the current stage of the litigation is determining liability, not fashioning a remedy.  Second, plaintiffs have proposed five plans[9] which maintain at least a 65 percent[10] Indian VAP in District 27 and create a new single member house district with at least a 65 percent Indian VAP in District 26A.

Third, a 65 percent supermajority does not necessarily apply.  In <u>James v. City of Sarasota, Fla.</u>, the district judge referenced the 65 percent guideline.  611 F. Supp. 25, 28 n.3 (M.D. Fla. 1985).  The court later attached a letter from the chief of the civil rights division of the Justice Department to the opinion:

> There is no 65 percent threshold population figure. . . . Rather, our responsibility is to determine whether the number of districts in which minority voters will have a fair opportunity for electing representatives of their choice (whatever the percentage of minority voters in each district) has been decreased by the proposed redistricting plan submitted under Section 5. . . .
>
> In this context, the Section 5 inquiry is much less concerned with discrete percentages of minority voters in reconfigured districts . . . [We do not attach]

---

[9] Plaintiffs' plans calculated the percentages of voting age Indians, factoring in both dual- and single-race Indians.  Their percentages are as follows:

| District | 26 | 26A | 26B | 27 | 28A |
|----------|------|-------|-------|-------|-------|
| Plan A | 50.15 | 69.81 | | 71.41 | 67.94 |
| Plan B | 62.53 | 69.94 | 55.20 | 86.04 | |
| Plan C | | 67.83 | | 70.46 | 69.25 |
| Plan D | | 66.65 | | 68.96 | 69.25 |
| Plan E | | 74.31 | | 65.54 | 69.25 |

[10]Defendants derive the 65 percent supermajority from Department of Justice guidelines.  DOJ reached this number by taking a simple majority and adding 5 percent for young population, 5 percent for low voter registration, and 5 percent for low voter turnout.  <u>Ketchum v. Byrne</u>, 740 F.2d 1398, 1416 (7th Cir. 1984).

particular significance to a 65 percent population figure, and no attempt is made to add arbitrarily increments of five percentage points each to compensate for age, registration and turn-out differences. . . .

Each Section 5 submission must, of course, be evaluated in light of the particular factual circumstances . . . not on the basis of some preordained population percentage.

Id. at 32-33.

Even though DOJ's letter in James referenced a § 5 violation, the court finds it persuasive on the issue of whether the law requires proof of a particular percentage of minority voters in a proposed district.  The law does not require a discrete number.  See Magnolia Bar Ass'n, 793 F. Supp. at 1397 ("The 65 percent guideline, therefore, is a general remedial goal in Voting Rights Act cases that is irrelevant to the first part of the Thornburg tripartite threshold test for liability."); Neal v. Coleburn, 689 F. Supp. 1426, 1438 (E.D. Va. 1988) ("Contrary to defendants' contention, the general 65 percent guideline for remedial districts is not a required minimum which the plaintiffs must meet before they can be awarded any relief under § 2 of the Voting Rights Act.  Rather, the 65 percent standard is a flexible and practical guideline to consider in fashioning relief for a § 2 violation.").  Accordingly, the court finds that no supermajority is required at this stage of the litigation, and even if the law did so require, plaintiffs have proposed several remedies that satisfy a 65 percent supermajority standard.

While defendants contend that the supermajority should be higher than 65 percent, defendants have not identified any case law which requires a supermajority higher than 65 percent.  Gingles requires only that a plaintiff show that minority voters "possess the potential to elect representatives."  Gingles, 478 U.S. at 50 n.17.  Section 2 is not a guarantee that

25

minority voters will elect the representative of their choice.  Therefore, the court is not persuaded that a supermajority greater than 65 percent is required.

Additionally, defendants contend that plaintiffs' plans are race based, are impermissible gerrymanders, and fail to account for communities of interest.  In Jeffers, 847 F. Supp. at 655, Chief Judge Arnold found that any plan "would have to be consistent with the spirit of Shaw v. Reno, 509 U.S. 630 (1993)."  In Shaw v. Reno, 509 U.S. 630, 113 S. Ct. 2816, 125 L. Ed. 2d 511 (1993), the Court held that an equal protection claim that triggers strict scrutiny is raised when a voting scheme is "so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting, without regard for traditional districting principles and without sufficiently compelling justification."  Id. at 2824.  Here, plaintiffs have proposed several redistricting plans that do not appear any more irregular or gerrymandered on their face than the plan that the legislature enacted.

Furthermore, "drawing racial distinctions is permissible where a governmental body is pursuing a 'compelling state interest.'"  Shaw v. Hunt, 517 U.S. 899, 908, 116 S. Ct. 1894, 1902, 135 L. Ed. 2d 207 (1996) (Shaw II).  The Supreme Court has assumed without deciding that compliance with the results test of § 2 of the Voting Rights Act (VRA) is a compelling state interest.  See Shaw v. Hunt, 116 S. Ct. at 1905; Miller v. Johnson, 515 U.S. 900, 920-21, 115 S. Ct. 2475, 2490-91, 132 L. Ed. 2d 762 (1995); Bush v. Vera, 517 U.S. at 977.  Justice O'Connor in a separate concurrence found that compliance with VRA in fact is a compelling state interest.  Vera, 116 S. Ct. at 1968.  A state may then pursue that compelling state interest

26

and create a district that is narrowly tailored to remedy the VRA liability.  Id. at 1970.  Thus, the consideration of race when proposing a plan does not necessarily invalidate the plan.

Additionally, the proposed plans are not so irregular on their face that they appear to be solely an effort to segregate races for the purpose of voting.  In fact, the proposed plans are no more irregular than the current districting plan.  Indeed, illustrative plans C, D, and E largely coincide with the current plan.  Ex. 358 p. 19 sub-exs. 9-13; T.I p. 271.  Plaintiffs' plans consider race to the extent necessary to determine whether additional minority-majority districts are possible but not any more than reasonably necessary.  Accordingly, the plans do not impermissibly subordinate race-neutral districting principles to racial considerations.  T.II p. 281-82; Ex. 358 sub-exs. 9-13.

Furthermore, Figure 3, which is a South Dakota map based on Indian population by county, as shown here,



FIGURE 3

Indian Population by County

reflects it is not difficult to draw an additional majority-minority legislative seat because the Indian population is concentrated in the area from the Crow Creek and Lower Brule Reservations toward the Pine Ridge and Rosebud Reservations. The areas between these reservations are also sparsely populated. T.I p. 271.

In response to defendants' claim that each plan fails to incorporate important community values and traditional redistricting principles, plaintiffs point to Cooper's testimony

28

as evidence that he adhered to South Dakota's traditional redistricting principles when drafting the five plans.  Traditional redistricting principles as recognized by the South Dakota state legislature include population equality, protecting community of interests through compact and contiguous districts, respect for geographical and political boundaries, and protection of minority voting rights.  SDCL 2-2-32.  Similar principles have been recognized as traditional redistricting principles by the United States Supreme Court.  See, e.g., Miller, 515 U.S. at 916 (identifying "respect for political subdivisions and communities defined by actual shared interests" as traditional districting principle); Shaw v. Reno, 509 U.S. at 651-52 (identifying population equality as a traditional districting principle); Miller, 515 U.S. at 916 (identifying compactness and contiguity as traditional districting principle).  The court accepts Cooper's explanation that he applied traditional districting principles.  A review of the plans reveals that the plans attempt to keep county and precinct boundaries intact, adhere to traditional geographic boundaries, consider current and historical reservation boundaries, create districts with the population equality, create compact and contiguous districts, and make minimal changes to the 1991 Plan.  T.II p. 281, 289-91, 339.

Defendants stressed other nuances about South Dakota history and culture, including differences between East and West River and differences between farmers and ranchers, to discredit Cooper's redistricting plans.  Defendants contend Cooper's plans combine East and West River counties into the same district and put farmers and ranchers into the same district. The court notes, however, that the 2001 Plan that was adopted by the legislature has two districts, 24 and 21, that include counties from both East and West River and several districts

combine counties occupied by both farmers and ranchers.  Thus, it appears that such concerns are not significant enough to discredit Cooper's five plans.  Furthermore, if the court finds a § 2 violation, defendants will have the first opportunity to draft a remedial plan and will have the opportunity to consider any differences between East and West River they deem relevant to redistricting.  See Sanchez, 97 F.3d at 1315.

The court finds that Cooper's testimony is credible and probative.  Cooper is a geographic information system consultant who works with census data to prepare maps that show demographic patterns or trends.  He has extensive experience in drawing redistricting maps, having drafted "thousands and thousands" of maps.  Cooper has prepared such maps since 1986 for approximately 475 jurisdictions to promote compliance with the Voting Rights Act.  He has proposed redistricting plans for § 2 litigation for 18 states.  He has also analyzed the 2000 census data for 100 local jurisdictions in 15 states and has developed plans for 8 states.  He has testified as an expert witness in approximately 24 voting rights cases in 10 different states and has been involved in 19 other cases.  T.I p. 241-44; Ex. 358 p. 1-3.

Since 1999, Cooper has worked with various Indian communities in South Dakota relating to redistricting.  In addition, he has researched socio-economic factors affecting Indians and voting rights.  The court further finds that Cooper employs reliable methods, including a software mapping program that he has used extensively for 13 years.  T.I p. 244-46.  For the reasons previously detailed herein and for the reasons stated in this court's order dated December 31, 2003, the court finds Cooper's testimony credible and his methods reliable.  The court gives significant weight to the analysis and findings contained in Cooper's testimony and

report.  Defendants' Objections to Plaintiffs' Proposed Findings of Fact and Conclusions of Law (Docket 319); Ex. 358; Court Order 12/31/03 (Docket 204).

In addition to the maps proposed by Cooper, there is additional evidence in the record that supports the conclusion that a permissible remedy in the context of the challenged system can be fashioned.  During the 2001 redistricting process, legislative research staff members drafted several plans that added at least one additional majority-minority seat, including:  the "Little Wound" plan, the "Spotted Tail" plan, and the "Hollow Horn Bear" plan.  All committee members received copies of these maps.  Ex. 401 Tab 7; T.V p. 1416.  Although several of the proposed legislative plans had only a simple majority of Indians and no VAP majority of Indians, the population trends according to the 2000 census indicate that the Indian population in the counties at issue continues to grow rapidly while the white population declines.  Ex. 401 Tab 7.  Furthermore, the additional district created in the "Hollow Horn Bear" plan contained a greater than 65 percent VAP.

After considering all the evidence, including Cooper's five illustrative plans and the plans drafted by the legislative research staff, the court finds as a matter of law that plaintiffs have met their burden of showing that a permissible remedy in the context of the challenged system can be fashioned, which is the first Gingles factor.

### B.    Minority Political Cohesiveness

The second Gingles factor requires plaintiffs to show that the minority group is politically cohesive.  Gingles, 478 U.S. at 51.  This ensures that the minority group at issue has distinctive minority group interests.  Id.  Without such distinct interests, unequal opportunity in

the political arena cannot harm the minority group.  Id.  "A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, . . . and, consequently, establishes minority bloc voting within the context of § 2."  Id. at 2769.  Voting patterns are the central focus.  Campos v. City of Baytown, Tex., 840 F.2d 1240, 1244 (5th Cir. 1988).  See also Ruiz v. City of Santa Monica, 160 F.3d 543, 552 (9th Cir. 1998) (candidate who received sufficient votes to be elected if the election were held among the minority group was considered the minority-preferred candidate even if he received less than 50 percent of the minority vote).

Proving this factor typically requires statistical evaluation of elections.  Campos, 840 F.2d at 1244-45.  "The number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances."  Gingles, 478 U.S. at 57 n.25.  Courts have relied on various statistical methods.  See, e.g., Houston, 56 F.3d at 611 (use of bivariate ecological regression and extreme case analysis); Clark, 88 F.3d at 1397 (expert employed regression and homogenous precinct analysis); Sanchez, 97 F.3d at 1317-18 (court considered both ecological and multivariate regression analysis).  This court will examine each method used by the experts in this case.

The first method is homogeneous precinct analysis (HPA) or extreme case analysis. This technique examines voting behavior in precincts that are closest to being racially or ethnically homogeneous in population, typically 90 percent or more.  The vote in the most heavily minority precincts is used as an estimate of minority voting behavior and the voting behavior in the most heavily majority precincts is used as an estimate of majority voting

behavior.  HPA is based directly on voter behavior and requires no statistical inference.  Ex. 359 p. 4, 7-9.

A second technique is bivariate ecological regression analysis (BERA).  Under this technique, precinct-by-precinct election results are correlated with census data or some other measure of the racial or ethnic composition of the electorate to generate estimates of the voting behavior of majority and minority voters.  Ex. 359 p. 4-5.

A third technique is ecological inference (EI), or the King method.  It assumes that the actual votes of two groups for two particular candidates are based on fixed underlying propensities, but vary from precinct to precinct in random ways.  It estimates the underlying propensity of each group to turn out for an election and to vote for a particular candidate using the estimation technique of maximum likelihood.  T.VII p. 1786-87.

Certain elections are more probative of unequal electoral opportunity than others. Interracial elections are generally more probative than racially homogeneous elections because voters have a racial choice.  See Gingles, 478 U.S. 30 at 80-82 (relying exclusively on interracial legislative contests to determine whether a legislative redistricting plan diluted the black vote); United States v. Blaine County, Mont., 363 F.3d 897, 911 (9th Cir. 2004) (contests between white and Indian candidates are most probative of bloc voting).  Endogenous elections, contests within the jurisdiction and for the particular office that is at issue, are more probative then exogenous elections.  See Sanchez, 97 F.3d at 1317 (greater weight to endogenous elections).  Recent elections are more probative than elections in the distant past. See Uno v.

City of Holyoke, 72 F.3d 973, 990 (1st Cir. 1995) (recent elections more probative); Meek v.

Metropolitan Dade County, Fla., 985 F.2d 1471, 1482-83 (11th Cir.1993).

Although interracial elections are highly probative of minority voting patterns, the court

recognizes that the minority preferred candidate is not always a minority.  See Lewis v.

Alamance County, N.C., 99 F.3d 600, 605-06 (4th Cir. 1996) (minority preferred candidate may

be white).  Thus, the court will not limit its consideration to interracial elections.  T.IV p. 908;

T.VII p. 1829-31.

### 1.    Dr. Cole's Analysis

Plaintiffs' expert, Dr. Steven Cole, used HPA and BERA.  Ex. 359 p. 4.  He applied the

dual-race method of identifying Indians.  Dr. Cole examined all state legislative elections in the

current Districts 26 and 27 and several interracial elections for statewide and county offices

from 1986 to 2002.  He aggregated his data across both districts for statewide offices.  Ex. 359

p.3.

Dr. Cole generated tables to demonstrate his results.  In the first table, using BERA,

Dr. Cole used a single regression analysis, which examines the relationship between the

precinct's racial composition and the candidate's vote share.  The R-squared value

demonstrates what percentage of the variables in a candidate's vote share can be predicted by

race alone.  It measures how close the precincts fall to the regression line and estimates Indian

cohesion and white crossover voting.  T.II p. 383-386; Ex. 359 p. 26-27.   The P-value

represents an analysis of variants by testing how well the regression model fits the data.  If the

P-value is less than .05, it is considered statistically significant.  T.II p. 386; Ex. 359 p. 26-27.

The third column estimates the percentage of Indian voters voting for a candidate and the fourth column estimates the percentage of non-Indian voters voting for that candidate. Dr. Cole used two regression equations adjusted for turnout differences in groups to determine these amounts. The final column is the number of votes received by that candidate, which is obtained from election returns. T.II p. 387; Ex. 359 p. 26-27.

In Table 2, Dr. Cole employed HPA. For this analysis, he relied on virtually all-white or all-Indian precincts, generally over 90 percent. Precincts with 90 percent or more non-Indian VAP provide an estimate of white crossover voting while precincts with 90 percent of more Indian VAP measure Indian cohesion. T.II p. 388; Ex. 359 p. 28-29. When drawing conclusions about cohesion, Dr. Cole averaged estimates of minority support across elections and relied on the overall pattern of results. Ex. 359 p.15; T.II p. 389-90. When defining "cohesion," Dr. Cole does not employ a strict numerical threshold. Rather, according to Dr. Cole, he measures political cohesiveness on a continuum, "starting slightly above 50 percent and going all the way up to 100 percent. There is no absolute cutoff that 59 percent is not cohesion and 60 percent is cohesion. . . . It's the degree to which people stick together is the measure of cohesiveness. There is no cut point." T.II p. 412.

Defendants argue that Dr. Cole erroneously finds cohesion if 50.1 percent of the Indian voters vote for the same candidate, noting that cohesion is absent only when two candidates tie. The court disagrees with this characterization of Dr. Cole's testimony. Dr. Cole explained that 50.1 percent represents the very beginning stages of cohesion but would be evidence of very weak cohesion. He repeatedly indicated that cohesion does not have a specific "cut point."

T.II p. 481-8.  In Dr. Cole's opinion, polarization exists in contests involving two candidates "when a majority of the voters of one race would elect a different candidate than would the majority of voters of the other race.  In head to head contests with more than two candidates, significant racial polarization is exhibited when a majority/plurality of the voters of one race would elect a different candidate than would a majority/plurality of voters of the opposite race." Ex. 359 p. 6.

Dr. Cole analyzed five interracial elections for the state senate: the 1998 general election for Districts 26 and 27, the 1994 general election for District 27, and the 1988 and 1990 general elections for District 28.  Ex. 359 p. 12.  He found the average estimate of Indian political cohesion in these races to be 83 percent, which is "highly politically cohesive."  T.II p. 389-90; Ex. 359 p. 15, 26-27.

He analyzed nine interracial elections for the state house: the 1994 and 2000 Democratic primary election, and the 1992, 1994, 1996, 1998, and 2000 general elections for District 27.  He also analyzed the 1986 and 1990 general elections for District 28.  Ex. 359 p. 19-20.  Using BERA, Dr. Cole estimated the average level of Indian political cohesion at 77 percent.  Although the percentages varied slightly, Dr. Cole's BERA analysis was largely consistent with his HPA analysis.  Ex. 359 p. 40-46.

Dr. Cole analyzed eight elections for the state senate which involved only non-Indian candidates: the 1992, 1996, and 2002 general elections for District 26.  He also analyzed the 1986 and 1990 general elections for Districts 27 and 29 and the 1988 general election for District 29.  Ex. 359 p. 16.  Using BERA, Dr. Cole estimated the average level of Indian

36

political cohesion was 80 percent.  This was consistent with his HPA analysis.  Ex. 359 p. 17, 30-35.

Dr. Cole analyzed eight[11] elections for the state house involving only non-Indian candidates: the 1992, 1994, 1996, 1998, 2000 and 2002 general elections for District 26, the 1988 general election in District 29, and the 1986 general election in District 29.  Ex. 359 p. 22. Dr. Cole found that using BERA, the average estimate of Indian political cohesion for the top preferred candidate in these races was 73 percent.  This analysis was largely consistent with his HPA analysis.  Ex. 359 p. 47-54.

Dr. Cole analyzed six elections for the state senate involving only Indian candidates: the 1996 and 2002 Democratic primary election, the 1992, 1996, 2000, and 2002 general election for District 27.  Ex. 359 p. 17-18.  Using BERA, the average Indian cohesion for the six contests was 89 percent.  Dr. Cole's HPA analyses were largely consistent with his BERA analyses.  Ex. 359 p. 18, 36-39.

Dr. Cole analyzed one election for the state house involving only Indian candidates: the 2002 general election for District 27.  Ex. 359 p. 22.  Using BERA, Dr. Cole estimated Indian political cohesion for the top preferred candidate in this race at 80 percent.  Dr. Cole's BERA analyses were consistent with his HPA analyses.  Ex. 359 p. 22, 55-56.

Dr. Cole also analyzed eight exogenous interracial elections: the 2002 nonpartisan primary election for Bennett County School Board, the 2002 Democratic primary for Bennett

---

[11]Dr. Cole acknowledged at trial that his analysis of the 1988 house contest in District 27 contained an error and, therefore, he would not rely on that race.  The court has also excluded that race from this discussion.  T.II p. 448.

County Commissioner at Large, the 2002 general elections for Attorney General, Bennett County Commissioner at Large, Register of Deeds and County Coroner, and the 1998 general election for Governor and Lieutenant Governor.  Ex. 359 p. 23-24.  Using BERA, Dr. Cole determined that Indian political cohesion for the top preferred candidate in these races was 87 percent.  His BERA analyses were consistent with his HPA analyses.  Ex. 359 p. 57-62.

Across the 22 interracial elections that Dr. Cole analyzed with BERA, the average estimate of Indian political cohesion for the top preferred candidates was 82 percent.  Ex. 359 p. 26-27, 40-42, 57-29.  Across the 37 endogenous elections that Dr. Cole analyzed with BERA, the average estimate of Indian political cohesion for the top preferred candidate was 80 percent.  Ex. 359 p. 26-27, 30-32, 36-37, 40-42, 47-50, 55.  Across the 12 elections in 2002 that Dr. Cole analyzed with BERA, the average estimate of Indian political cohesion for the top preferred candidate was 84 percent.  Ex. 359 p. 30, 36, 47, 55, 57-59.  Across the 45 elections Dr. Cole analyzed using BERA, the average estimate of Indian political cohesion for the top preferred candidate was 81 percent.  Ex. 359 p. 26-27, 30-32, 36-37, 40-42, 47-50, 55, 57-59.  His results demonstrate high political cohesion among Indians in Districts 26 and 27.  Ex. 359.

The court finds that Dr. Cole qualifies as an expert in this case.  He holds a Ph.D. in human experimental psychology with a sub-specialty in methodology and statistics.  He has taught courses in psychology, statistics, and the scientific analysis of data.  He currently teaches at Emory University and has taught courses at the law school.  He served as the director of research for Research Designs Associates, Inc., since 1982.  He has worked as a consultant for numerous schools and organizations.  He has published numerous papers and has testified about

38

voting behaviors in many cases.  T.II p. 377-78; Ex. 359 App. A; Court Order 12/31/03 (Docket

204).  The court finds that Dr. Cole's education, experience, knowledge, and skill qualify him

to testify as an expert in this case.

### 2. Dr. Zax's Analysis

Defendants' expert, Dr. Zax, used ecological inference (EI).  Ex. 948.  EI estimates

turnout and vote shares for two groups within a district and within each precinct of that district.

The basis for estimates of turnout and voting behavior for white and minority voters is referred

to as "Goodman's regression," and EI derives estimates from these parameters.  Ex. 948 p. 7.

EI estimates turnout rates and the proportion of voters choosing a particular candidate within

the feasible range.  The estimates will not be less than zero or greater than one, and the

parameters may be much narrower than this range.  EI calculates these bounds and ensures that

the estimated turnout rates and voting shares lie within them.  Ex. 948 p. 8.

Tables two and three in Dr. Zax's report provide examples of the bounds and estimates,

drawn from the analysis of the 2000 General Election in state senate District 27.  The first two

columns in Table 2 provide lower and upper bounds for the proportion of Indian voters in each

precinct choosing the Democratic candidate in the race.  Ex. 948 p. 8.  When Indians make up

only a small proportion of the electorate and provide only a small number of the votes

tabulated, the outcome of the race will not change much even if all Indian VAP vote for the

same candidate.  The vote share of Indians for the particular candidate could range anywhere

from zero to one.  Ex. 948 p. 8-9.  In contrast, where the population largely consists of white

voters, their voting patterns cannot differ greatly from the overall patterns observed in the precinct.  Their vote shares are then confined to relatively narrow ranges.  Ex. 948 p. 9.

Instructive bounds, which are smaller than the range between zero and one, appear for groups in precincts where they do not form a majority.  EI provides estimates of the vote shares cast by each group that not only lie between the absolute limits of zero and one, but that also lie within the boundaries established by the observed group shares and vote shares.  Ex. 948 p. 10.

Dr. Zax employed the single-race method of assigning individuals to racial categories in the main body of his report and used the multiple-race method in Appendix Table 1.  Ex. 948 p. 5.  Dr. Zax analyzed races for statewide office and ballot issues in the general elections of 1996, 1998, 2000 and 2002 in Districts 26 and 27.  He analyzed state senate races but excluded state house races.  Ex. 948 p. 13.

Dr. Zax defined cohesion as "arising when a group devotes a supermajority of at least 60 % of its votes to a particular alternative. . . . In other words, statistical evidence of cohesion arises when the estimated vote share cast by a group for some alternative is 60 % or greater and the probability that the group actually provided less than 60 % of its votes for its favored alternative is 10% or less."  Ex. 948 p. 3, 11.  The court finds that Dr. Cole's and Dr. Zax's definitions of cohesion are consistent.  Both agree that cohesion exists when 60 percent or more of the votes cast are for a particular alternative.  Dr. Zax believes that no cohesion exists below that point; Dr. Cole believes that at amounts below 60 percent, weak cohesion can exist. Factoring in the margin of error and the arbitrary nature of setting a specific point, the court

holds that cohesion exists at levels above 60 percent and may exist, albeit more weakly, at lower levels.  T.II p.482.

Dr. Zax's statistical identification of polarization is analogous to his cohesion definition.  "[S]tatistical evidence of polarization arises when the probability that one group actually provided less than 60% of its vote for its favored alternative, and that the other group actually provided more than 40% of its vote for this alternative, is 10% or less."  Ex. 948 p. 12.

Although Dr. Zax did not categorize his election analysis with reference to whether the elections were endogenous or exogenous, the court will so categorize his statistics.  Dr. Zax analyzed five endogenous elections: (1) the 2002 general election for State Senate District 26, (2) the 2002 general election for State Senate District 27, (3) the 2000 general election for State Senate District 27, (4) the 1998 general election for State Senate District 27, and (5) the 1996 general election for State Senate District 27.  Zax Report at 20, 35, 38, 42, 45.  Using the multi-race method of assigning census respondents to racial categories, Dr. Zax found that Indians voted cohesively in 5 out of 5 (100 percent) endogenous contests, and he estimated the Indian political cohesion in these races to be 78 percent, 93 percent, 89 percent, 86 percent, and 93 percent respectively.  Id. at 55, 69, 72, 76, 79.

Dr. Zax also did not identify interracial contests in his report.  By using racial identification information from Dr. Cole's report, the court has identified such races to be: (1) the 2002 election for Attorney General in District 26; (2) the 2002 election for Attorney General in District 27: (3) the 1998 election for Governor in District 26[12]; (4) the 1998 election

_____

[12]The court recognizes that the 1998 election for Governor was interracial only to the extent that the lieutenant governor on the ballot was an Indian person.  The court does not find

41

for Governor in District 27, and (5) the 1998 election for State Senate in District 27.  Using the multi-race methods of assigning census respondents to racial categories, Dr. Zax found that Indians voted cohesively in 5 out of 5 (100 percent) interracial contests, and the estimate of Indian political cohesion in these races was 66 percent, 92 percent, 66 percent, 87 percent, and 86 percent.  See id. at 54, 62, 68, and 76.   (It should be noted that the fifth race identified here is the same as the fourth endogenous race discussed above).

Dr. Zax analyzed 24 exogenous general election contests for public office in District 27 for the years 1996, 1998, 2000, and 2002.   These races ranged in importance from President of the United States to Public Utilities Commissioner.  Using a multi-race definition for these analyses and using Dr. Zax's definition of cohesion and polarization, Dr. Zax found Indian cohesion in all 24 races.  The estimated cohesion rates ranged from 72 percent to 96 percent, with an average of 89 percent.  Ex. 948 p. 68-69, 72, 76, and 79.  (It should be noted that three of these races were included in the interracial contests discussed in the previous paragraph.)

Applying the multiple-race definition, Dr. Zax analyzed the 1996, 1998, 2000, and 2002 exogenous general elections in District 26.  These races ranged in importance from President of the United States to Public Utilities Commissioner.  Dr. Zax determined that Indians were cohesive in 17 out of 24 contests for public office.  The estimated cohesion rates ranged from 43 percent to 79 percent, with an average of 67 percent.  Ex. 948, p. 54-55, 58, 62, 65.  (It should be noted that two of these races were included in the interracial contests discussed previously.)

_____

this characterization misleading and weighs the analysis accordingly.

Dr. Zax also analyzed 48 ballot-issue elections.  Using the multiple-race method of assigning census respondents to racial categories, Dr. Zax found that Indians voted cohesively according to his definition in 17 out of 44 (39 percent) ballot-issue elections.  The court does not give these results any weight, however.  Defendants have not explained why or how Indian voting behavior with regard to ballot issues would be probative of vote dilution.  Even if the court did give such evidence weight, the weight would be significantly less than the weight given to endogenous races and interracial contests.

Even Dr. Zax, after considering all contests equally, whether they were endogenous or exogenous contests, whether they were interracial or only contests involving candidates of the majority race, and whether or not the contest involved a candidate or a ballot issue, concluded that Indians were cohesive in 24 of the 47 analyzed races in District 26 and in 37 of 50 of the analyzed races in District 27.  Ex. 948 p. 13.

The court finds that Dr. Zax qualifies as an expert.  Dr. Zax has a doctorate in economics and has taught in the field of economics since 1984.  He currently teaches at the University of Colorado where he has received several teaching awards.  He is writing a text book in econometrics, has published several articles, and referees various journals.  Dr. Zax has testified in several trials on the issue of voting rights.  Ex. 451; T.VII p. 1764-73.  The court finds that Dr. Zax's education, experience, knowledge, and skill qualify him as an expert in this case.

### 3.      Reliability of Each Method

In Sanchez, the court evaluated both experts' analyses and results to determine which reached the most reliable results.  97 F.3d at 1316-1319.  The court is not obliged to accept either parties' statistical evidence.  Clark, 21 F.3d at 96.

Dr. Cole employs two techniques: HPA and BERA.  Numerous courts, including the United States Supreme Court, have accepted these methods as reliable in § 2 cases.  See Gingles, 478 at 52-53 (relying on single regression analysis, which the Court considered "standard in the literature for the analysis of racially polarized voting").  See, e.g., Old Person v. Cooney, 230 F.3d 1113, 1123 (9th Cir. 2000) (relying on Dr. Zax's BERA); Rural West Tennessee African-American Affairs Council v. Sundquist, 209 F.3d 835, 839 (6th Cir. 2000) (considering Dr. Cole's BERA and HPA); Harvell v. Blytheville Sch. Dist. No. 5, 71 F.3d 1382, 1386 (8th Cir. 1995) (relying on regression analysis).  The prevalence of both district and circuit courts relying on these methods demonstrates the wide acceptance of Dr. Cole's analyses.  See Teague v. Attala County, Miss., 92 F.3d 283, 290 (5th Cir. 1996) (district court erred by disregarding the "established acceptance of regression analysis as a standard method for analyzing racially polarized voting").

Other courts have found that discounting this statistical analysis amounts to reversible error.  In Sanchez, the Tenth Circuit reversed the district court for rejecting plaintiffs' BERA and HPA.  97 F.3d at 1321.  The Fifth Circuit also required the district court to consider this method and noted that the Supreme Court used this analysis.  Teague, 92 F.3d at 291.  See Houston, 56 F.3d at 606.  Precedent, therefore, supports the acceptance of Dr. Cole's analysis.

Defendants contend that although courts have accepted this analysis, none have rigorously examined the merits of BERA.  Several district courts, however, have indeed scrutinized the reliability of the ecological regression analysis.  In <u>Garza v. County of Los Angeles, California</u>, the court considered defendants' attack on the degree of bias in the ecological regression technique and the R-squared correlation coefficient.  756 F. Supp. 1298, 1334 (C.D. Cal. 1990).  The court concluded that ecological regression was sufficiently reliable to determine racial polarization in voting.  <u>Id.</u>  In <u>Jeffers v. Clinton</u>, the court discussed the debate between which statistical method has the most merit.  730 F. Supp. 196, 208 (E.D. Ark. 1989).  Ultimately, it relied on single regression, double regression, and homogeneous-precinct analysis, stating that the entirety of the statistical exhibits reliably demonstrated racial polarization.  <u>Id.</u>  Even defendants' expert Dr. Zax has previously accepted and relied on the methodology employed by Dr. Cole.  <u>See</u> <u>Old Person</u>, 230 F.3d at 1123.

Dr. Zax questions the reliability of Cole's analysis and the high error rate, and contends that the theory is based on a faulty algebraic equation because the two sides of the equation are not equal.[13]  Dr. Cole admitted that the equation contains an error, but he states that the effect of that error is unknown.  The court finds that although there may be in error in the equation, experts continue to use BERA and it is accepted in the field.  Furthermore, the equation error

---

[13] The reliability of BERA is disputed in the scientific literature.  For example, plaintiffs quote Allan Lichtman's article, "Passing the Test: Ecological Regression Analysis in the Los Angeles Case and Beyond," 15 <u>Evaluation Rev.</u> 770 (1991), as stating, "ecological regression has proved itself to be a reliable indicator of voting behavior and has also proved itself to be remarkably accurate in predicting the ethnic composition of districts that provide minorities opportunities to elect candidates of their choice."  Defendants cite Dr. Zax's article which was published in <u>Sociological Methods & Research</u>, which alleges that an arithmetical error invalidates BERA.

must not be significant, because Dr. Cole's BERA results are consistent with the results obtained under both HPA and EI.  Ex. 359 p. 2; V.II p. 1836-37; Ex. 729, 853, 854; T.II p.404, 543.  For example, in the 2002 Senate race in District 26, Dr. Cole, using BERA, calculated Indian cohesion at 88 percent and non-Indian cohesion at 69 percent.  Using HPA, Dr. Cole reached estimates of 91 percent and 66 percent.  For the same Senate race, Dr. Zax, using EI, found 82 percent Indian cohesion and non-Indian cohesion at 66 percent.[14]  Although these percentages differ, they are significantly similar and do not indicate a disparity that shows Dr. Cole's methodology to be unreliable.

Dr. Zax strenuously criticized Dr. Cole's methods and conclusions during trial.  Based on simulated elections, he claims that BERA over-predicted cohesion among a group of voters when such cohesion in fact did not exist. Ex. 858 p. 26, T.VII p. 1908.  From this he concluded that BERA does not provide accurate estimates.  T VII p. 1908.  Dr. Zax also criticized the R-squared analysis of BERA and contends that there is no mathematical proof that the R-squared calculation makes double regression estimates more reliable.  T. VII p. 1910-19; Ex. 858 p. 30: Ex. 359 p.9.

Dr. Zax's criticisms of BERA are the same criticisms he articulated regarding the BERA method in articles he submitted for publication to the American Political Science Review and the Political Analysis journal.  Both publications declined to publish Zax's articles. T.VII p. 1991-95.  One of the double-blind reviewers of his articles described his discussion of

---

[14] Another example lies in Dr. Cole's and Dr. Zax's analysis of the 2002 Senate race in District 27.  Using BERA, Dr. Cole found 95 percent Indian cohesion and 65 percent non-Indian cohesion.  He found 88 percent Indian cohesion and 69 percent non-Indian cohesion using HPA. Dr. Zax found 93 percent Indian cohesion and 62 percent non-Indian cohesion using EI.

46

the variance of the estimators as misleading, his simulations were described as incomplete, his criticisms of R-squared were described as skewed, and his presentation was described as sometimes being unfair.  Ex. 901.  A second reviewer commented that his simulations were made "under assumptions that are rather specialized (or even implausible)[.]"  Ex. 930.  A third reviewer commented that while he would certainly choose EI over BERA, he believes Zax is "being unduly harsh" in his criticism of BERA.  Ex. 854.  This reviewer noted that EI is an improvement over BERA, which occurred over the course of time because of recent developments in the science.  Id.  The court agrees with the third reviewer that EI is an improvement over BERA, but finds that the flaws that exist in BERA are not significant enough to reject the BERA results wholesale.

BERA can also produce impossible results, that is, values that exceed 100 percent.  The results from EI are contained within the Duncan-Davis bounds and therefore, cannot exceed 100 percent.  T.VII p. 1809-10, 1819.  The fact that the BERA results sometimes exceed 100 percent, however, is not the result of a flawed analysis.  Rather it appears to occur because of census undercount, because some counties do not purge their voter registration rolls frequently, or because some voters moved away but remain on the rolls for a certain amount of time.  T.VII p. 2006-09.

Defendants also allege that the experts used differing definitions of legal terms such as cohesion and polarization, and thus Dr. Cole's analysis should be found invalid.  A court can accept numerical calculations of an expert, however, without adopting his legal conclusions regarding polarization.   See Askew v. City of Rome, 127 F.3d 1355, 1367 n.2 (11th Cir. 1997) (although court accepted Dr. Cole's numerical estimates, it did not necessarily accept his legal

conclusions regarding polarization since the court must base that determination on the relevant law). Nor do other inconsistencies pointed out by defendants render Dr. Cole's opinions inadmissible. Proving a pattern of voting behavior does not require complete accuracy in Dr. Cole's numerical estimates. A "pattern will not be fatally altered if a few of his percentages are somewhat inaccurate." Id.

With regard to HPA, which was also used by Dr. Cole, Dr. Zax admitted that he was unaware of any other experts who refused to employ HPA in litigation. T.VII p. 2043. The court acknowledges that HPA has some limitations, however. No precincts are entirely homogenous, and it is difficult to test the reliability of the necessary inferences. It reveals little about how voters that are not part of the majority will vote in the homogeneous precinct. Ex. 938; T.VII p. 1921-29. While there are limitations on the conclusions that can be drawn from HPA results regarding voters that are not part of the majority, HPA remains a statistical analysis that is commonly used by other experts in the field as a reliable indicator of how the majority will vote.

With regard to EI, the method employed by Dr. Zax, the court finds that EI is a reliable method of analysis. Courts recently have recognized EI as a reliable improvement on ecological regression analysis. Rodriguez v. Pataki, 308 F. Supp. 2d 346, 387-88) (S.D.N.Y. 2004) (citing Georgia v. Ashcroft, 195 F. Supp. 2d 25, 69 (D.D.C. 2002), vacated on other grounds, 539 U.S. 461, 123 S. Ct. 2498, 156 L. Ed. 2d 428 (2003)) (recognizing King's ecological inference as having the "prospect of improving on ecological regression" despite its recency in voting rights litigation); United States v. Alamosa County, Colo., 306 F. Supp. 2d

1016, 1023 (D. Colo. 2004) (noting use of King's EI by experts Weber and Engstrom).  Even Dr. Cole admits that EI is reliable.  TT. II, p. 468-69.

In applying EI, however, Dr. Zax did not include an analysis of primaries even though he admitted that experts in the field typically analyze such contests and courts routinely accept such evidence.  He was not aware of any other experts who refused to analyze primary results. T.VII p. 1960-62, 2043.  Dr. Zax also did not give more weight to endogenous contests as compared to exogenous elections.  And his opinion did not give interracial races more weight. He gave all races the same weight.  T.VII p. 2020-23.  This does not make his opinion inadmissible, however, as the court can and has considered his results and has given the appropriate weight to the respective contests.

A 2002 article co-authored by Bernard Grofman, who developed BERA, entitled "Ecological Regression and Ecological Inference," states that the contrast between BERA and EI "is too easily exaggerated."  He acknowledged that "most methods [of analyzing racial bloc voting] yield very similar estimates."  Ex. 1038 p. 2, 6 n.5, 18.  Similarly, the court finds that all three methods employed by the parties' experts in this case generate sufficiently similar results.  Even though Dr. Zax found cohesion in fewer races than Dr. Cole, the court finds that both experts' analyses demonstrate significant cohesion among Indian voters.  Dr. Zax concluded that in District 27, Indian voters were cohesive in 100 percent of the races analyzed. He found cohesion in 100 percent of the endogenous elections he analyzed, 83 percent of the exogenous elections, and 80 percent of the interracial contests.  Dr. Cole calculated the average estimate of Indian political cohesion in 45 elections analyzed was 81 percent.  Ex. 359, 948.  In light of the similar estimates and the general acceptance within the scientific community, the

court accepts both experts' testimony as reliable and probative of cohesion existing among Indians.  The court finds that the statistical evidence demonstrates political cohesiveness among Indians.

### 4.    Non-Statistical Evidence of Cohesiveness

The inquiry, however, "does not stop with bare statistics."  Whitfield v. Democratic Party of Ark., 890 F.2d 1423, 1428 (8th Cir. 1989).  "The experiences and observations of individuals involved in the political process are clearly relevant to the question of whether the minority group is politically cohesive. This testimony would seem to be required if the court is to identify the presence or absence of distinctive minority group interests."  Sanchez v. Bond, 875 F.2d 1488, 1494 (10th Cir. 1989).  Evidence that "a specified group of voters share common beliefs, ideals, principles, agendas, concerns, and the like such that they generally unite behind or coalesce around particular candidates and issues," demonstrates cohesion.  League of United Latin American Citizens, Council No. 4434 v. Clements, 986 F.2d 728, 744 (5th Cir. 1993).  See Askew, 127 F.3d at 1377 (both empirical and anecdotal evidence demonstrated cohesion).

Other evidence in the record demonstrates cohesion among Indians.  In 1952, the nine Indian tribes in South Dakota formed an organization called the United Sioux Tribes to speak out against mutual issues affecting Indians.  In 1963, this group was instrumental in defeating a referendum in South Dakota intended to eventually terminate the reservations.  It has continued "to speak out with one voice to promote, encourage, inspire and bring about the economic and social development of the Indian people."  The Oglala Sioux, who reside on the Pine Ridge Reservation, and the Rosebud Sioux are members of United Sioux Tribes.  Ex. 3; T.V p. 1359.

Recently, two Indian women formed an organization called First Voices.  First Voices promotes an ongoing Indian presence in the state legislature and advocates on behalf of the tribes to create political change.  It organized the first anti-racial profiling day at the state capitol in 2002, brought Indians to testify before the legislature, and secured a date for Native Americans' Day in the state capitol.  Ex. 2, 4; T.III p. 706-09.

Political parties and candidates have courted Indian voters with targeted advertisements and other appeals.  Ex. 50, 129, 151, 237.  Several Indian-oriented newspapers are circulated in South Dakota, including Indian Country Today, the Lakota Journal, and the Black Hills Peoples' News.  These papers cover a wide variety of social, cultural, and political topics, including voting rights, redistricting, and political campaigns.  Ex. 113, 122, 125, 132, 144, 147-50, 153, 155, 158-159, 168-174, 176, 182, 186, 190, 195, 199, 205-06, 218.  Non-Indian media also frequently reflect Indian issues and concerns.  Ex. 54-55, 64-65, 71, 75, 92, 94, 223, 225, 234, 238, 252-54, 256-57, 260.

Indians have organized a network of tribal colleges with courses that teach traditional tribal arts, language, and culture.  T.II p. 524-28, 531-32; Ex. 971.

The Lakota Nation Invitational basketball tournament brings together Indians from across the state every year to watch and participate in athletic and cultural activities.  Ex. 73.  Tribes and tribal members from across the state frequently come together at social, political, and economic conferences and seminars.  Ex. 70, 74, 76-77, 79, 84.

Examples of Indian people coming together regarding common interests include the holding of several protest marches to highlight issues of Indian concern ranging from alcohol abuse to school mascots.  Second, the LaCreek Civil Rights Commission, which is a group of

Indian people who reside in Bennett County, endorsed candidates in what they have called "the Indian Block" and have used print and broadcast media to encourage tribal members to support the slate.  Third, Indian people have worked together through their tribal governments on a host of political issues including voter registration, education, and economic development.  Ex. 356 p. 52-53.

Dr. McCool, one of plaintiffs' experts, opined that "there is a strong sense of cohesion and loyalty" within the Indian community.  He testified that there is a "high level of cohesion [regarding] issues affecting the relationship between state and local governments and Indian reservations and the relationship between the federal government and state and local and Indian reservations."  Ex. 356 p. 55; T.I p. 56.

The court accepts this testimony of Dr. McCool as reliable, and gives it some weight.  The court finds that he qualifies as an expert to testify in this case.  Dr. McCool has a doctorate degree in political science.  He has taught courses at the college level since the late 1970s and currently teaches political science at the University of Utah.  He is the director of the American West Center, a unit of the University of Utah that researches issues affecting the west, and he teaches classes about western issues, including classes on American Indians.  Dr. McCool has published numerous articles and books about the relationship between American Indians and non-Indians.  Some of this research specifically discussed Indian issues and political relationships in South Dakota.  He has testified as an expert in several other cases on the political relationship between Indians and non-Indians in the western United States.

The court finds that Dr. McCool has the education, training, skill, and knowledge necessary to make him a reliable expert.  The court also finds that his research and methods

were reliable and of the type typically practiced in his field.  His extensive publications, peer reviewed work, and involvement in western issues makes his research credible and reliable. Defendants' own expert, Dr. Michael Lawson, relied on Dr. McCool as an authority in the field when writing his report.  T.VIII p. 2126-27.  For these reasons and the analysis contained in the court's January 23, 2004 order, the court finds that Dr. McCool satisfies the requirements of Rule 702 and <u>Daubert</u>.  Ex. 356, T.II p. 17-21; Court Order 1/23/04 (Docket 215).

The court gives little weight, however, to the portions of Dr. McCool's report that relied on interviews of various people living on the Pine Ridge and Rosebud Reservations, including the conclusions he drew from those interviews.  When comparing evidence, the court finds that the testimony of witnesses at trial is entitled to more weight than the personal history information acquired by Dr. McCool in unstructured interviews.

Defendants' expert, Dr. Lawson, also testified about Indian cohesion in South Dakota. He stated that the Indians living in South Dakota "tend to vote as a bloc" in federal, state, and local elections.  He also stated: "The recent elections in South Dakota indicate that overwhelmingly they supported one candidate over another, and it can be said that that voting bloc has political cohesion.  The majority of them, the overwhelming majority of them, vote in the same way."  T.VIII p. 2108.

Dr. Lawson also testified that "tribal members have very practical considerations about the value of their vote for–for bringing about change.  They have a very practical approach. They are most likely to vote for a candidate or on an issue if it agrees with their viewpoints and their cultural integrity and their cultural values.  They are least likely to vote when they see that the vote doesn't make any difference."  T.VIII p. 2109.

Dr. Lawson believed that at the time he wrote his report, Indian cohesion was low because of low voter participation.  He acknowledged, however, that "there's a growing number of tribal members who see the importance of political participation at every level."  T.VIII p. 2109, 2132.

Dr. Lawson has the education, skill, knowledge, and training to make him qualified to testify as an expert on the issues of Indian voting behaviors in South Dakota.  He has a doctorate degree in philosophy with a specialty in the history of the American West and federal lending policy.  He has worked as a historian with the Bureau of Indian Affairs (BIA) in Aberdeen, South Dakota.  During this time, he worked with both the Rosebud and Oglala Sioux tribes.  Dr. Lawson then worked in the branch of the BIA that determined whether unrecognized tribes should gain recognition.

Dr. Lawson retired from the BIA in 1993 and began working as a consultant for a private, historical research firm in Montana.  He worked as the general manager and lead historian in their Washington, D.C. office.  Dr. Lawson currently works for Morgan, Angel, and Associates, a public policy consulting firm, where he researches history projects.  T.VIII p. 2063-67.

The court accepts Dr. Lawson's testimony as reliable and credible to the extent that it is based on his own education, experience, research, and knowledge of Indian issues and behaviors in South Dakota.  Dr. Lawson's report, however, is limited in its probative scope, because as he acknowledged his intent was to "do a literature search and to look at what other academics were looking at . . . in terms of Indian voter participation and Indian voting

patterns." T.VIII p. 2131.  Furthermore, major portions of the report were written by an assistant, James Muhn.  Ex. 314,T. VIII, p. 2088-89.

The court finds that although Dr. Lawson is generally qualified to testify in the area and used reliable methods to compile the report, his limited involvement when compiling the report and the limited scope of his research lessens the probative value of the report.  The court will therefore afford some weight to portions of Dr. Lawson's testimony, but not give any weight to his conclusion that Indians are not cohesive because that conclusion is not supported by his other statements.

Lay testimony also evidences cohesion among Indians.  Several witnesses consistently and readily identified numerous "Indian issues," including juvenile corrections, racial profiling, voting rights, Indian child welfare, and tribal sovereignty.  T.III p. 715-23 (Bear Heels McCowan), 771-73 (Ring); T.V p. 1300-02 (Van Norman); T.IV p. 1078-80 (Bradford).  The court finds this testimony to be credible based on the life experiences of these witnesses.

Representative Michels also testified that Indians are particularly interested in certain issues before the legislature, including racial profiling.  He agreed that Indians in South Dakota constitute a community of interest and have special interests.  He also agreed that the race of the voters in Districts 26 and 27 correlated with the way they voted.  Representaive Michels' testimony on these matters was credible and relevant.  He grew up around Indians and graduated from the University of South Dakota law school.  He was elected to the South Dakota legislature in 1999 and currently serves as Speaker of the House.  His background and experience make him a credible witness regarding issues of particular Indian concern.  T.VIII p. 2213-15, 2238-40.

The lay evidence also demonstrates Indian cohesiveness with regard to recruitment of candidates, registration of voters, and get-out-the-vote efforts.  Indians in Bennett County established a grass roots political organization in 2001 called the Lacreek District Civil Rights Committee.  Ex. 150, 159, 350.  Jesse Clausen, who lives in Bennett County, testified that for several years, certain incidents occurred that made him feel like local public officials violated his civil rights.  Indians felt as though law enforcement, particularly the Bennett County sheriff, unfairly singled them out.  A group of people who live within the Lacreek tribal council district of the Oglala Sioux Tribe began meeting to discuss concerns and ideas.  Clausen became the spokesperson or chairman of the group.  Eventually the Lacreek District Civil Rights Committee was formed and they met with the city council, county commissioners, and the mayor.  T.IV p. 993, 1036-37.  In the Committee's view, neither the sheriff, the city council, nor the mayor took action to remedy the situation.

When elected officials did not adequately respond to Indian concerns about law enforcement, the Committee turned its focus to the political process.  The Committee determined that by registering voters and getting people to the polls, they could elect a different sheriff and different representation in the county and city commissions.  T.IV p. 993.  In the spring of 2002, the Committee organized a peaceful march in Martin to protest against the actions of the sheriff's office.  Between 500 and 1000 people participated.  A second march took place that fall.  Approximately 400 people attended.  T.IV p. 1037-39.

The Committee registered Indian voters and recruited candidates for local offices.  It sponsored a slate of candidates in the municipal, school board, and county elections in 2002 and supported those candidates with campaign materials and advertisements in print media and

on the local tribal radio station.  The Committee met on a weekly basis, organized a phone tree, and registered voters, often by going door to door.  On election day, the Committee transported voters to the polls on election day and set up poll watchers.  The Committee compared a list of registered voters with those who had voted at the polls, contacted people who had not yet voted, and brought them to the polls.  T.IV p. 994-96, 1033-34; Ex. 114-15, 117, 119, 150, 350.

The Committee met with some success.  In the primary, they unseated three county commissioner incumbents.  During the general election, the Committee succeeded in electing the sheriff candidate they supported and in electing one county commissioner.  The actions and results of the Committee's efforts were publicized nationally.  T.IV p. 997, 1000-02; Ex. 121.

The court finds the testimony of Clausen and Craig Dillon, who both described the efforts of the Lacreek District Civil Rights Committee, to be reliable and credible and gives this testimony great weight.  The court finds that the actions of the Lacreek District Civil Rights Commission is strong evidence of cohesion among Indians.  It demonstrates that a significant portion of Indian voters support the same candidates and are concerned with the same issues.

Defendants point to testimony of internal division among tribal members and between tribes as evidence that Indians are not politically cohesive.  Defendants quote Rebecca Ann Three Stars as agreeing that "not all Indians think alike" to support their contention.  T.IV p. 909; T.II p. 517-18; T.V p. 1182.  The court agrees that there is some division among tribal members and between various tribes on certain issues, particularly in relation to internal tribal matters.  Cohesion on inter-tribal matters, however, is not relevant to the current case.  Indeed, a § 2 violation does not require proof that all members of the minority "think alike."  The

evidence establishes, moreover, that any division among Indians is far less prominent when applied to external factors affecting the tribes, such as relations with the state or federal government.  The court finds that cohesiveness among Indian people exists, specifically regarding outside influences toward Indians.  T.I p. 56-57.  The law, moreover, has historically recognized Indians as members of "distinct political communities."  See Morton v. Mancari, 417 U.S. 535, 554, 94 S. Ct. 2474, 41 L. Ed. 2d 290 (1974); Santa Clara Pueblo v. Martinez, 436 U.S. 49, 55, 98 S. Ct. 1670, 56 L. Ed. 2d 106 (1978).

### 5.  Partisanship and Low Voter Turnout

Defendants maintain that partisanship, rather than race, accounts for Indian voting behaviors.  While causation may be relevant to the totality-of-circumstances review, it is not relevant in the inquiry into the three Gingles factors.  See Goosby v. Town Bd. of Town of Hempstead, N.Y., 180 F.3d 476, 493 (2d Cir. 1999) (holding causation irrelevant to the three Gingles factors); Milwaukee Branch of the N.A.A.C.P. v. Thompson, 116 F.3d 1194, 1199 (7th Cir. 1997) (explanation for the defeat of black-preferred candidates should only be considered in the totality-of-circumstances inquiry); Lewis v. Alamance County, 99 F.3d 600, 616 n.12 (4th Cir. 1996) (causation relevant to the totality-of-circumstances inquiry, but not in the Gingles analysis); Uno, 72 F.3d at 983 (totality-of-circumstances inquiry may examine non-racial reasons for voting patterns).  Cf. Nipper v. Smith, 39 F.3d 1494, 1524 (11th Cir. 1994) (en banc).  Accordingly, partisanship has no bearing on the Gingles factors.

If partisanship is proper for the court to consider, however, the court finds that the evidence does not support that partisanship explains Indian voting patterns more than race.  For example, the slate of candidates supported by the Lacreek District Civil Rights Committee were

neither all Indian nor all Democrat.  The Committee endorsed a Republican candidate for county commissioner and an independent Indian candidate for Register of Deeds against the non-Indian Democratic incumbent.  Ex. 115, 117, 119, 350; T.IV 999-1000.

There is testimony that factors other than party affiliation are likely more important to Indian voters and that Indians would probably cross party lines to vote for a candidate who better represented them on important issues.  T.VI p. 1484, 1504.  For example, a non-Indian who is the Register of Deeds in Bennett County stated that she believed personal familiarity with a candidate was more important than party affiliation to Indian voters in Bennett County.  In her opinion more Indians voted for Republican Larry Long for attorney general in 2002 than his Democratic opponent, Ron Volesky, a Indian.  Long was a lifetime resident of Bennett County and many Indians in the community knew him.  Sterkel deposition (Docket 273) p. 8-9; Ex. 948.

Other evidence demonstrates that partisanship is not always the primary concern.  In the 2002 Democratic primary election for Bennett County Commission, Indians favored the three Indian candidates over all three Democratic incumbents by greater than a 4-to-1 margin.  Ex. 359 p. 57.  In the 1988 general election for State Senate District 28, Indians favored an independent Indian candidate, Paul Valandra, over his non-Indian Democratic opponent by a margin of more than 3-to-1.  Ex. 359, p. 27.  And in the 1994 Democratic primary election for State House District 27, Indians voted for the only Indian candidate, Richard Hagen, by a 2-to-1 margin over his closest non-Indian opponent.  Id. at 41.

Defendants note that Dr. Cole analyzed 22 interracial contests and found that a larger percentage of Indians voted for non-Indian candidates in 10 of these contests and Indian voters

only preferred Indian candidates in 12 of the 22 races, or 55 percent.  Ex. 359 p. 27, 40-41, 57.

The court finds that Indians need not single out Indian candidates for their support.  Indians,

like other voters, consider many factors when voting for a candidate and will not, therefore,

exclusively vote for Indian candidates.  The issue at hand is whether Indians can elect their

candidate of choice, not whether they can elect Indian candidates.

Defendants also argue that in a majority of the races analyzed by Dr. Cole, a greater

percentage of Indians voted for Democrats over Republicans than voted for Indians over non-

Indians.  Defendants contend that this demonstrates that party affiliation best explains Indian

voting patterns.  The court disagrees.  Neither party affiliation nor race conclusively explain

Indian voting patterns.  The court, therefore, does not adopt defendants' partisanship argument.

The record in the current case does not "indisputably prove that partisan affiliation, not

race, best explains the divergent voting patterns among minority and white citizens in the

contested counties."  Clements, 999 F.2d at 850.  Furthermore, minority voters have a right to

an equal opportunity to elect representatives of their choice, whatever the basis for those

choices.  42 U.S.C. § 1973(b).  In Goosby, the Second Circuit stated, "The Town's argument

implies that if blacks registered and voted as Republicans, they would be able to elect the

candidates they prefer. But they are not able to elect preferred candidates under the Republican

Party regime that rules in the Town.  Moreover, blacks should not be constrained to vote for

Republicans who are not their preferred candidates."  180 F.3d at 495-96.  Likewise, the court

will not accept defendants' argument that limits Indian preference to Democrats.

Defendants' argument that low voter turnout evidences a lack of Indian cohesion also

fails as a matter of law.  In Gomez v. City of Watsonville, the Ninth Circuit found that "the

district court erred by focusing on low minority voter registration and turnout as evidence that the minority community was not politically cohesive."  863 F.2d 1407, 1416 (9th Cir. 1988). The court refused to speculate as to the reason why some Indians appear apathetic.  Id.  It found there was no evidence that "lack of enthusiasm for [Indian] candidates was responsible for the low rates of voter registration among [Indians]."  Id.  "[I]f defendants could defeat a showing of political cohesion by showing little more than that many minority voters were apathetic, § 2 would be seriously weakened.  Low voter registration and turnout have often been considered evidence of minority voters' lack of *ability* to participate effectively in the political process." Id. at n.4.  The court adopts this rationale and finds that political cohesion exists despite evidence of low voter turnout.

After considering the statistical evidence, historic evidence, and current-day lay testimony, the court finds that plaintiffs have shown by a preponderance of the evidence that Indians in Districts 26 and 27 are politically cohesive.  The court finds that plaintiffs have satisfied the second Gingles factor.

### C.    Usual Defeat of Indian-Preferred Candidates

The third Gingles factor requires plaintiffs to demonstrate that "the white majority votes sufficiently as a bloc to enable it–in the absence of special circumstances, such as the minority candidate running unopposed–usually to defeat the minority's preferred candidate."  Gingles, 478 U.S. at 51.  The presence of racially polarized voting "will ordinarily be the keystone of a vote dilution case."  Buckanaga v. Sisseton Indep. Sch. Dist. No. 54-5, S.D., 804 F.2d 469, 473 (8th Cir. 1986).  Voting along racial lines "deprive[s] minority voters of their preferred representative . . . [and] allows those elected to ignore minority interests without fear of

political consequences, leaving the minority effectively unrepresented." Gingles, 478 U.S. at 47 n.14.  Unless the minority has substantial difficulty electing representatives of their choice, it is impossible to prove that a challenged electoral mechanism impairs their ability to elect.  Id. at 48 n.15.

The Supreme Court adopted the definition of racial polarization as existing "where there is a consistent relationship between the race of the voter and the way in which the voter votes, or to put it differently, where black voters and white voters vote differently."  Id. at 51 n.21. There is no simple test to determine the existence of legally significant racial bloc voting.  Id. at 58.  In inquiring into the existence of racially polarized voting, the court should ascertain: whether minority group members constitute a politically cohesive unit and whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates.  Id. at 56.  Political cohesiveness can be shown by evidence that a significant number of minority group members usually vote for the same candidates, and by a white bloc vote that "normally will defeat the combined strength of minority support plus white 'crossover' votes."  Id.   In order for white bloc voting to be legally significant, however, it had to be high enough to "normally defeat the combined strength of minority support plus white crossover votes."  Id. at 56.  Gingles, however, "does not require an absolute monolith" in the majority's bloc vote.  Sanchez, 97 F.3d at 1319.

The level of white bloc voting sufficient to defeat a minority preferred candidate varies according to a variety of factual circumstances.  Thus, no mathematical formula or simple doctrinal test is available to determine whether plaintiffs satisfied the third factor.  Id. at 57-58; Ruiz, 160 F.3d at 554.  The inquiry therefore focuses on statistical evidence to discern the way

voters voted.  Gingles, 478 U.S. at 57; Sanchez, 97 F.3d at 1315.  "The surest indication of race conscious politics is a pattern of racially polarized voting extending over time."  Buckanaga, 804 F.2d at 473.

The third Gingles factor considers not the size of the bloc but considers the bloc's effect on minority voters' ability to fully participate in the political process and to elect their representatives of choice.  Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ., 4 F.3d 1103, 1122 (3d Cir. 1993).  When determining whether a pattern of usual defeat exists, the court must conduct "a searching practical evaluation of the past and present reality [with] a functional view of the political process."  Gingles, 478 U.S. at 45.

In examining the third Gingles factor, the inquiry should center on districts with a "white majority."  Gingles, 478 U.S. at 50.  While this issue did not arise in Gingles because there were no majority black jurisdictions in the challenged plan, the Supreme Court decision in Johnson v. De Grandy, 512 U.S. 997, 114 S. Ct. 2647, 129 L. Ed. 775 (1994) is more instructive.  In De Grandy, a § 2 challenge was made to a plan that included both majority-minority districts and majority-white districts.  The Court described the challenge as one seeking "the chance for more success in place of some."  Id. at 1012-13.  The district court concluded that the third Gingles factor had been satisfied and the Supreme Court ratified this conclusion when it acknowledged the district court finding that there was a "tendency of non-Hispanic whites to vote as a bloc to bar minority groups from electing their chosen candidates *except in a district where a given minority makes up a voting majority*."  Id. at 1003-04, 114 S. Ct. 2647 (emphasis added) (citing De Grandy v. Wetherell, 815 F. Supp. 1550, 1572 (N.D. Fla.

1992), aff'd in part and rev'd in part sub nom. Johnson v. Grandy, 512 U.S. 997, 114 S. Ct. 2647 (1994).

This rationale was adopted by the Ninth Circuit Court of Appeals in Old Person, 230 F.3d at 1122.  In Old Person, the court recognized that Indian electoral success in majority-Indian districts was relevant to consider only in the totality of the circumstances inquiry with regard to proportionality and proportional representation.  Id. at 1122.  "To do otherwise would permit white bloc voting in a majority-white district to be washed clean by electoral success in neighboring majority-Indian districts."  Old Person, 230 F.3d at 1122.  See also Barnett v. City of Chicago, 141 F.3d 699, 702 (7th Cir. 1998) (polarization shown where minorities almost never win unless the district was majority-minority).

Furthermore, such an analysis makes logical sense.  Plaintiffs here are alleging that a supermajority of Indians (90 percent) have been packed into District 27.  If Indians vote cohesively as is required by the second Gingles factor, and they constitute 90 percent of the VAP of a district in a head-to-head contest, the minority-preferred candidate will always win.  Thus, plaintiffs could never satisfy the third Gingles factor, which requires proof that the minority's preferred candidate is usually defeated.

To ascertain the existence of white bloc voting in a particular contest, the court should determine: (1) the candidate who the Indian voters preferred; and (2) whether whites voted as a bloc to defeat the Indian preferred candidate.  Old Person, 230 F.3d at 1122.  In analyzing election contests, certain contests are more probative of bloc voting than others.  Endogenous elections between white and minority candidates are the most probative in determining the existence of legally significant white bloc voting.  See Gingles, 478 U.S. at 80-82; Blaine

County, 363 F.3d at 911.  The court gives greater weight to the most recent elections because they are more probative.  Uno, 72 F.3d at 990; Meek, 985 F.2d at 1482-83.

The only endogenous race in District 26 between an Indian and a white candidate during the last ten years is the 1998 general for State Senate.  Dr. Zax did not analyze this race, but it was analyzed by Dr. Cole.  He found:

| ENDOGENOUS INTERRACIAL CONTEST | | | | | |
|---|---|---|---|---|---|
| Contest | Method | White vote for Indian preferred candidate | Indian vote for Indian preferred candidate | Result | Source |
| 1998 General State Senate | BERA | 24% | 70% | Indian preferred candidate lost | Ex. 359, p. 26 |
| | HPA | 25% | N/A | | Ex. 359, p. 28 |

The Indian (and Indian-preferred) candidate lost.  The court finds that white voters voted sufficiently as a bloc (approximately 75 percent) and that the Indian-preferred candidate was defeated.[15]

---

[15] There were two endogenous elections during the last twelve years between white and minority candidates in District 27, where Indians constitute a majority of the VAP.  In each of these contests, whites and Indians preferred a different candidate.  In 1998, according to Dr. Cole's BERA analysis, the Indian-preferred candidate received 95 percent of the Indian vote and 16 percent of the white vote.  According to Dr. Cole's HPA analysis, the Indian-preferred candidate received 81 percent of the Indian vote and 25 percent of the white vote.  In 1994, according to the BERA analysis, the Indian-preferred candidate received 94 percent of the Indian vote and 37 percent of the white vote. And according to the HPA analysis, the Indian-preferred candidate received 79 percent of the Indian vote and 47 percent of the white vote.  Ex. 359, p. 26.  In each case the Indian (and Indian-preferred) candidate won.  As discussed earlier, the relevant inquiry here is whether the whites vote as a bloc to bar minorities from electing their candidates of choice in a district where a given minority make up a voting minority.  See De Grandy, 512 U.S. at 1003-04.  Because District 27 is a minority-majority district, the success of the Indian-preferred candidate is only relevant in the totality of the circumstances inquiry.

Second, the court next examines election contests between white candidates in endogenous District 26 races for the state senate and the state house.  Again, the court examines the more recent elections within the last twelve years because those elections are more probative.  Dr. Zax analyzed one such race, a state senate race in District 26.  Dr. Cole analyzed three state senate and six state house races fitting this criteria in District 26.  They found:

| ENDOGENOUS CONTESTS BETWEEN WHITE CANDIDATES ONLY | | | | | |
|---|---|---|---|---|---|
| Contest | Method | White vote for Indian preferred candidate | Indian vote for Indian preferred candidate | Result | Source |
| 2002 General State Senate Dist. 26 | EI | 34% | 82% | Indian preferred candidate lost | Ex. 948, p. 20 |
| | BERA | 31% | 88% | | Ex. 359, p. 30 |
| | HPA | 34% | 91% | | Ex. 359, p. 33 |
| 1996 General State Senate Dist. 26 | BERA | 29% | 93% | Indian preferred candidate lost | Ex. 359, p. 30 |
| | HPA | 28% | N/A | | Ex. 359, p. 33 |
| 1992 General State Senate Dist. 26 | BERA | 49% | 50% | Indian preferred candidate lost | Ex. 359, p. 30 |
| | HPA | 49% | N/A | | Ex. 359, p. 33 |
| 2002 General State House Dist. 26 | BERA | 17% | 67% | Indian preferred candidate (Heller) lost | Ex. 359, p. 47 |
| | HPA | 21% | 73% | | Ex. 359, p. 51 |
| 2000 General State House Dist. 26 | BERA | 31% | 61% | Indian preferred candidate (Jorgensen) lost | Ex. 359, p. 47 |
| | HPA | 32% | N/A | | Ex. 359, p. 51 |
| 1998 General State House Dist. 26 | BERA | 38% | 58% | Indian preferred candidate (Jorgensen) lost | Ex. 359, p. 47 |
| | | 24% | 72% | Indian preferred candidate (Bartlett) lost | |

| | | | | | |
|---|---|---|---|---|---|
| | HPA | 39% | N/A | Indian preferred candidate (Jorgensen) lost | Ex. 359, p. 51 |
| | | 25% | N/A | Indian preferred candidate (Bartlett) lost | |
| 1996 General State House Dist. 26 | BERA | 35% | 83% | Indian preferred candidate (Good) lost | Ex. 359, p. 48 |
| | | 25% | 71% | Indian preferred candidate (Risseeuw) lost | |
| | HPA | 35% | N/A | Indian preferred candidate (Good) lost | Ex. 359, p. 52 |
| | | 25% | N/A | Indian preferred candidate (Risseeuw) lost | |
| 1994 General State House Dist. 26 | BERA | 31% | 74% | Indian preferred candidate (Risseeuw) lost | Ex. 359, p. 48 |
| | HPA | 30% | N/A | Indian preferred candidate (Risseeuw) lost | Ex. 359, p. 52 |
| 1992 General State House Dist. 26 | BERA | 37% | 96% | Indian preferred candidate (Good) lost | Ex. 359, p. 49 |
| | | 2% | 51% | Indian preferred candidate (Riggs) lost | |
| | HPA | 35% | N/A | Indian preferred candidate (Good) lost | Ex. 359, p. 53 |
| | | 3% | N/A | Indian preferred candidate (Riggs) lost | |

In the state senate races, the Indian-preferred candidate lost all three contests.   Both experts

agree white voters voted sufficiently as a bloc and that the Indian-preferred candidate was

67

defeated in the 2002 state senate race.  The court agrees with this finding.  The white voters voted sufficiently as a bloc (at least 66 percent) and the Indian-preferred candidate was defeated.  With regard to the 1996 state senate race, the white voters voted sufficiently as a bloc (at least 71 percent) and the Indian-preferred candidate was defeated.  With regard to the 1992 state senate race, there was no Indian preferred candidate because the Indian vote was split evenly between the two candidates.

In the state house races, two candidates are elected in each context.  The Indian-preferred candidate lost all six races held between 1992 and 2002.  In all six races, the white voters voted sufficiently as a bloc (between 61 percent to 98 percent) for an opponent of the Indian-preferred candidate and the Indian-preferred candidate was defeated.  With regard to the 1994, 2000, and 2002 contests, only one house candidate was considered an Indian-preferred candidate because the Indian vote did not reflect a majority for a second candidate.[16]

_____

[16] There were six endogenous state senate contests between only Indian candidates during the last twelve years in District 27, where Indians constitute a majority of the VAP.  In four contests, whites and Indians preferred a different candidate according to the BERA analysis and in three contests, according to the HPA analysis.  In all six contests, the Indian-preferred candidate won.

There were seven endogenous house contests in which 14 candidates won between Indian and non-Indian candidates during the last 12 years in District 27.  An Indian-preferred candidate (one who received more than 50 percent of the Indian vote) existed in none of those contests. In those nine contests, Indians and whites preferred a different candidate in three contests according to both the BERA and HPA analysis.  All nine Indian-preferred candidates won.

There was one endogenous contest for state house in which two candidates won between Indian only candidates during the last 12 years in District 27.  Both Indian-preferred candidates received over 70 percent of the Indian vote.  Under both the BERA and HPA analysis, white voters preferred one Indian-preferred candidate and one non-Indian preferred candidate.  Both Indian-preferred candidates won.

As discussed in footnote 15, the success of an Indian-preferred candidate in majority-

Next, the exogenous races.  Exogenous races are less probative than the endogenous races and thus the court gives them less probative value.  See Sanchez, 97 F.3d at 1317. Dr. Zax and Dr. Cole both analyzed two exogenous interracial contests, which are entitled to more probative weight then white-white exogenous races.  Their results, based on voters within District 26, are summarized as follows:

| EXOGENOUS INTERRACIAL CONTESTS | | | | | |
|---|---|---|---|---|---|
| Contest | Method | White vote for Indian preferred candidate | Indian vote for Indian preferred candidate | Result | Source |
| 2002 Attorney General Election | EI | 29% | 68% | Indian preferred candidate lost | Ex. 948, p. 17 |
| | BERA | 26% | 91% | | Ex. 359, p. 58 |
| | HPA | 30% | 87% | | Ex. 355, p. 61 |
| 1998 Attorney General Election | EI | 30% | 66% | Indian preferred candidate lost | Ex. 948, p. 27 |
| | BERA | 27% | 87% | | Ex. 359, p. 59 |
| | HPA | 31% | 79% | | Ex. 359, p. 61 |

In both of these races, the Indian-preferred candidate lost.  The court finds that the white voters voted sufficiently as a bloc (at least 70 percent in the Attorney General race and at least 69 percent in the Governor's race) to defeat the Indian-preferred candidate.

Dr. Zax also analyzed the voting behavior of District 26 voters with regard to exogenous races between white candidates in 22 recent elections.  The results are summarized as follows:

**EXOGENOUS CONTESTS BETWEEN WHITE CANDIDATES ONLY**

---

Indian District 27 is only relevant in the totality of the circumstances inquiry.

| Contest | Method | White vote for Indian preferred candidate | Indian vote for Indian preferred candidate | Result | Source |
|---|---|---|---|---|---|
| 2002 General U.S. Senate | EI | 38% | 81% | Indian preferred candidate lost | Ex. 948, p. 19 |
| 2002 U.S. Rep. | EI | 37% | 80% | Indian preferred candidate lost | Ex. 948, p. 19 |
| 2002 General Governor | EI | 30% | 74% | Indian preferred candidate lost | Ex. 948, p. 19 |
| 2002 General Secretary of State | EI | 30% | 79% | Indian preferred candidate lost | Ex. 948, p. 19 |
| 2002 General State Auditor | EI | 45% | 80% | Indian preferred candidate won | Ex. 948, p. 19 |
| 2002 General State Treasurer | EI | 23% | 81% | Indian preferred candidate lost | Ex. 948, p. 19 |
| 2002 General School & Public Lands | EI | 45% | 74% | Indian preferred candidate won | Ex. 948, p. 19 |
| 2002 General PUC; 6-year term | EI | 38% | 81% | Indian preferred candidate lost | Ex. 948, p. 20 |
| 2002 General PUC; 4-year term | EI | 37% | 82% | Indian preferred candidate lost | Ex. 948, p. 20 |
| 2000 General President | EI | 24% | 61% | Indian preferred candidate lost | Ex. 948, p. 23 |
| 2000 General U.S. Rep. | EI | 16% | 49% | Indian preferred candidate lost | Ex. 948, p. 23 |
| 2000 General PUC | EI | 34% | 58% | Indian preferred candidate lost | Ex. 948, p. 23 |
| 1998 General U.S. Senate | EI | 56% | 79% | Indian preferred candidate won | Ex. 948, p. 27 |

| 1998 General U.S. Rep. | EI | 16% | 46% | Indian preferred candidate lost | Ex. 948, p. 27 |
|---|---|---|---|---|---|
| 1998 General Secretary of State | EI | 21% | 55% | Indian preferred candidate lost | Ex. 948, p. 27 |
| 1998 General Treasurer | EI | 51% | 67% | Indian preferred candidate won | Ex. 948, p. 27 |
| 1998 General School & Public Lands | EI | 48% | 51% | Indian preferred candidate won | Ex. 948, p. 27 |
| 1998 General PUC | EI | 61% | 60% | Indian preferred candidate won | Ex. 948, p. 27 |
| 1996 General President | EI | 33% | 67% | Indian preferred candidate lost | Ex. 948, p. 30 |
| 1996 General U.S. Senate | EI | 33% | 68% | Indian preferred candidate lost | Ex. 948, p. 30 |
| 1996 General U.S. Rep. | EI | 33% | 67% | Indian preferred candidate lost | Ex. 948, p. 30 |
| 1996 General PUC | EI | 33% | 67% | Indian preferred candidate lost | Ex. 948, p. 30 |

In these 22 contests, whites voted sufficiently as a bloc (more than 60 percent) against the Indian-preferred candidate in 16 contests and the Indian-preferred candidates lost in all 16 of these races. Thus, an analysis of racially-polarized white-white exogenous contests reveals legally significant white bloc voting.

Although Dr. Zax analyzed multiple ballot issues such as initiatives and referendums, the court gives no weight to these ballot issues.  Defendants have provided no evidence to suggest that these ballot issues touched on issues of heightened concern to the Indian community.  Thus, the court need not consider this evidence.  Old Person, 230 F.3d at 1126. Furthermore, the record is replete with more probative evidence, to which the court gives more weight.  Similarly, Dr. Cole analyzed several Bennett County elections.  The court gives no

weight to these contests because the voters in Bennett County make up only a small portion of the voters in Districts 26 and 27.  Because the results do not predict voter behavior within the disputed areas as a whole, the court gives these results no weight.  Dr. Cole also included election results from more than 12 years ago.  Because the configuration of District 26 was significantly different then, the court gives these results no weight.

Although the court does not accept Dr. Zax's conclusion regarding the third <u>Gingles</u> factor, the court nonetheless finds Dr. Zax's analyses sufficiently reliable to evaluate the third factor.  Furthermore, the court finds that his results, like Dr. Cole's, show that non-Indian voters in District 26 vote sufficiently as a bloc to enable them, particularly in the most probative elections and in the absence of special circumstances, usually to defeat the Indian-preferred candidate.  <u>See</u> <u>Barnett</u>, 141 F.3d at 702 (polarized voting where blacks were rarely elected in wards that did not contain black voting-age majority and whites were rarely elected in wards that were majority-minority).

The court rejects Dr. Zax's conclusion because he did not focus on whether white bloc voting was sufficient enough in a white-majority district to defeat Indian-preferred candidates and he did not give more weight to endogenous races and races between white and minority candidates.  Dr. Zax gave the same weight in his analysis to a ballot issue contest as he did to a recent interracial race for state senate.  This skewed his conclusion.

The court declines to reach the issue urged by defendants that an Indian vote of over 60 percent for a candidate is needed for a candidate to be identified as an Indian-preferred candidate and that over 60 percent of the whites must vote against the Indian-preferred candidate to prove that the whites sufficiently vote as a bloc to defeat the minority's preferred

72

candidate.  When the most probative election results are examined, even under this demanding standard, the third Gingles factor is met.  Using defendants' criteria, in the one endogenous contest between a white and an Indian candidate, which is the most probative of white bloc voting, the Indian (and Indian-preferred) candidate was defeated by white bloc voting in majority-white District 26.  In the three endogenous contests for the state senate between white candidates in majority-white District 26, the Indian voters expressed a preference for an Indian-preferred candidate in two races, the Indian-preferred candidate was defeated by white bloc voting in both contests.  In the third senate contest, which occurred in 1992, the Indian voters did not express a preference for a candidate.  In 7 out of 12 state house races between white candidates in District 26, which are the most probative white-white contests, see N.A.A.C.P. v. City of Niagra Falls, N.Y., 65 F.3d 1002, 1015 n.16 (2$^d$ Cir. 1995), the Indian-preferred candidate lost 100 percent of split-preference relevant elections in majority-white districts as a result of white bloc voting.  In two races, the second house candidate received less than 60 percent, but more than 50 percent, of the Indian vote.  In three races, the Indian voters did not express a preference for the second representative.  Thus, considering all endogenous races, in 10 out of 16 contests (63 percent), an Indian-preferred candidate received more than 60 percent of the Indian vote and then was defeated by white bloc voting at a rate greater than 60 percent.

Next, considering all 24 exogenous contests, including contests between both all white candidates and interracial candidates within District 26, Indians preferred a candidate by a vote of 60 percent or greater in 19 contests.  Whites voted as a bloc (in excess of 60 percent) against those 19 candidates in 14 contests.  Thus, considering all exogenous races, in 14 out of 24 contests (58 percent), an Indian-preferred candidate was defeated by white bloc voting.  In 10

out of 24 contests (42 percent), either there was no Indian-preferred candidate or the Indian-preferred candidate won.

In all categories listed above, even when using defendants' threshold, the rate at which Indian-preferred candidates are defeated by white bloc voting does not fall below 58 percent. Furthermore, in the contests that are most probative of white bloc voting, the percentages are above that threshold. Considering all this evidence in the aggregate, the court concludes that the white majority in District 26 "votes sufficiently as a bloc to enable it . . . usually to defeat the [Indian] preferred candidate." Gingles, 478 U.S. at 51. The court finds that this evidence is sufficient to establish "legally significant" white bloc voting within the meaning of the third Gingles factor. See 478 U.S. at 55.

### D.    Totality of the Circumstances

If a plaintiff satisfied the three Gingles factors, then the court must next consider the totality of the circumstances. Gingles, 478 U.S. at 79. "[I]n the final analysis [plaintiffs] must still show that the challenged electoral scheme provides minority voters less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." Harvell, 71 F.3d at 1390. Gingles references factors specified in the Senate Report that accompanied the 1982 amendments to the Voting Rights Act. Gingles, 478 U.S. at 44.

Section 2's legislative history indicates that "a variety of factors, depending upon the kind of rule, practice, or procedure called into question," are relevant in determining whether a plan results in discrimination:

1.      the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote or otherwise to participate in the democratic process;

2.       the extent to which voting in the elections of the state or political subdivision is racially polarized;

3.      the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4.      if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5.      the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6.      whether political campaigns have been characterized by overt or subtle racial appeals;

7.      the extent to which members of the minority group have been elected to public office in the jurisdiction.

Senate Report No. 77-417, 1982 U.S.C.C.A.N. 177, 206-07 ("Senate Report"); Gingles, 478 U.S. at 44-45.  Two additional factors that have had probative value as part of plaintiffs' evidence to establish a violation are "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group . . . [and] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting or standard, practice or procedure is tenuous."  Senate Report at 207.

Plaintiffs need not prove a particular number of the Senate factors or prove that a majority of them point one way or the other.  Instead, § 2 "requires the court's overall judgment, based on the totality of the circumstances and guided by those relevant factors in the particular case, or whether the voting strength of minority voters is . . . minimized or canceled out."  Id. at 207 n.118.  "The essence of a § 2 claim is that a certain electoral law, practice, or

structure interacts with social and historical conditions to cause an inequality in the

opportunities enjoyed by black and white voters to elect their preferred representatives."

Gingles, 478 U.S. at 47.

Although proof of the three Gingles factors is not itself conclusive, "lack of electoral

opportunity may be readily imagined and unsurprising when demonstrated under circumstances

that include the three essential Gingles factors."  De Grandy, 512 U.S. at 1012.  The other

factors listed in the Senate Report "are supportive of, but *not essential to*, to a minority voter's

claim."  Gingles, 478 U.S. at 48 n.15.

Section 2 does not require proof or allegations of racial motivation.  Id. at 43-44; Senate

Report at 193.  The ultimate determination of a § 2 violation is assessed based on the totality of

the circumstances.  De Grandy, 512 U.S. at 1018.

### 1. History of Discrimination

#### a. Voting

 The Eighth Circuit has recognized that "a history of discrimination against a minority is

important evidence of both discriminatory intent and discriminatory results."  Buckanaga, 804

F.2d at 474.

> "A history of pervasive, purposeful discrimination may provide strong
> circumstantial evidence," United States v. Marengo County Comm'n, 731 F.2d
> at 1567, (1) that the present day acts of elected officials are motivated by the
> same purpose, or by a desire to perpetuate the effects of that discrimination, (2)
> that the present day ability of minorities to participate on an even footing in the
> political process has been seriously impaired by the past discrimination, and (3)
> that past discrimination has also led to present socio-economic disadvantages,
> which in turn reduces participation and influence in political affairs.  Id

Id.  Here, there is substantial evidence that South Dakota officially excluded Indians from

voting and holding office.  See id.  As will be discussed in more detail to follow, South Dakota

officially excluded Indians from voting and holding office until the 1940s.  Id.  Even after state laws were repealed that expressly denied Indians the right to vote, as late as 1975 Indians were effectively denied the right to vote in certain county elections, id., Little Thunder v. South Dakota, 518 F.2d 1253, 1255-57 (8th Cir. 1975), and Indians in certain counties were denied the right to run for the office of county commissioner in violation of the equal protection clause until 1980.  United States v. South Dakota, 636 F.2d 241, 244-45 (8th Cir. 1980).  A summary of the laws that affected the voting rights of Indians in Dakota Territory and South Dakota follows.

The Act of Congress that created the Dakota Territory in 1861 denied Indians the right to vote by restricting suffrage in the first legislative election to free white men.  The Act limited suffrage and office-holding in the Territory to citizens of the United States and persons intending to become citizens.  Because virtually no Indians in the Territory were United States citizens, no Indians could vote. 1 JN 2.[17]

When the first territorial assembly met in 1862, it too limited the rights of suffrage and office-holding to free white men.  Ex. 355.  The assembly passed the Territory's first comprehensive election law in 1864, restricting the rights of suffrage and office-holding to "every free white male person above the age of twenty-one . . . who is a citizen of the United States, or who has declared upon oath his intention to become such."  1 JN 8.  The Territory's first civil code in 1866 contained a special provision that denied Indians the right to vote or

---

[17]Citations in the form "X JN Y" refer to the plaintiffs' judicial notice requests.  Thus a citation to 1 JN 2 refers to the second exhibit in the plaintiffs' first judicial notice request.

hold office.  This code was essentially redundant regarding voting because voting was restricted to free white men.  1 JN 15.

In 1866,  Congress enacted the Civil Rights Act that granted citizenship to "all persons born in the United States . . . excluding Indians not taxed."  The territorial assembly then struck the word "white" from the qualifications of electors but added the proviso that "no person shall have the right to vote by reason of the passage of this act, except such persons as are declared to be citizens of the United States by act of Congress of April 9, 1866."  It clearly did not intend to extend the franchise to Indians.  1 JN 19.

The first practical opportunity for Indians in the territory to obtain citizenship came in the 1868 Fort Laramie Treaty.  The Treaty offered a plot of land to every member of a signatory tribe who wished to take up farming and granted citizenship to any who could obtain a patent on the land by occupying it as a homestead for three years and making two hundred dollars of improvements on it.  Ex. 336.  Before any Indians could obtain citizenship under the Treaty, however, the territorial assembly reenacted the anti-Indian civil rights statute in 1871. 1 JN 23; 4 JN 16; 4 JN 1.  This statute limited voting and office-holding to male citizens or men who declared an intention to become citizens.  1 JN 24; 4 JN 4; 4 JN 12.

In 1887, Congress enacted the Dawes Act, which provided two new avenues to citizenship.  First, any Indian "who has voluntarily taken up . . . his residence separate and apart from any tribe of Indians . . . and has adopted the habits of civilized life" was automatically granted citizenship.  Second, any Indian "to whom allotments [of land] shall have been made under the provisions of this act, or under any law or treaty," was automatically granted citizenship even though he had not taken up residence apart from his tribe.  Under the Dawes

Act, the federal government held all allotments in trust for 25 years.  Indians did not pay taxes on the land while the government held title to it.  Ex. 337 § 5.

When South Dakota became a state in 1890, its new constitution continued to limit suffrage and office-holding to male citizens or men who declared an intention to become citizens.  Ex. 354.  During its first session, the new state legislature proposed amending the constitution to expressly deny the right to vote in state elections to any Indian "who sustains tribal relations, receives support in whole or in part from the government of the United States, or holds untaxable land in severalty."  South Dakota's voters did not approve this amendment. 1 JN 31.  This proposed amendment would have denied suffrage to Indians regardless of whether they completely abandoned their tribe.  Ex. 337 §§ 5-6.

Although the first proposed amendment was unsuccessful, several years later South Dakota amended its constitution to limit the franchise to citizens and "persons of foreign birth who shall have declared their intention to become citizens."  1 JN 37; 1 JN 39.  The state of South Dakota continued the Territory's statute that categorically denied Indians the right to "vote or hold office."  4 JN 23.  In 1903, the state again amended the civil rights statute by denying the right to vote and hold office to Indians who "maintain[ed] tribal relations."  4 JN 28.

In 1906, Congress passed the Burke Act.  This Act changed the point at which the government would award citizenship from the granting of the allotment to the granting of the title.  It did not, however, expressly revoke the citizenship of Indians whose allotments under the Dawes Act were still held in trust.  Ex. 338.

The inconsistencies of these federal acts and state amendments made it unclear whether certain Indians were citizens and whether, even if they were, they automatically gained the right to vote.  Opinions issued between 1908 and 1924 by the South Dakota attorney general demonstrate that South Dakota usually followed the state's anti-Indian civil right statute, irrespective of an Indian's citizenship status under federal law.  2 JN 7 (Aug. 28, 1908 att'y gen. opinion: Indians who severed tribal relations have the same right to vote as white persons but South Dakota barred establishment of voting precincts on reservations); 2 JN 8 (June 10, 1909 att'y gen. opinion:  Indians who severed tribal relations and adopted civilized life are voters regardless of whether they hold a patent in fee simple or trust or no patent at all);  2 JN 10 (May 10, 1910 att'y gen. opinion:  the fact that an Indian has an allotment is one indication that he has severed tribal relations, which entitles him to vote and hold office); 3 JN 5 State v. Nimrod, 138 N.W. 377 (S.D. 1912) (holding that an Indian who abandoned tribal relations and took land in severalty separate and apart from tribe and adopted civilized life became a citizen of the United States and South Dakota); 2 JN 22 (March 11, 1918 att'y gen. opinion referencing earlier opinions affirming the right of Indians to vote only if they severed tribal relations and adopted the habits of civilized life); 2 JN 26 (March 13, 1924 att'y gen. opinion enumerating three classes of Indians entitled to vote).

Prior to 1924, an Indian had the right to vote in South Dakota only by severing tribal relations, a matter determined by state officials on a case-by-case basis.  2 JN 9 (June 22, 1909 att'y gen. opinion: Indians who have severed tribal relations may vote but this is a question of fact that must be determined as to each Indian offering to vote); 2 JN 12 (May 9, 1912 att'y gen. opinion: the test to determine an Indian's eligibility to vote is whether the Indian has

severed tribal relations and adopted the habits of civilized life, which was a matter for proof in each separate case); 2 JN 24 (July 26, 1919 att'y gen. opinion: "the question as to whether an Indian who has not received a patent in fee is a citizen must be determined by the facts in each particular case").

In 1924, Congress passed the Indian Citizenship Act, which granted citizenship to "all non-citizen Indians born within the territorial limits of the United States."  Ex. 371.  Even though this law definitively granted citizenship to Indians, apparently it left open the question of whether Indians had the right to vote in South Dakota.  In 1940, the state's attorney in Winner, South Dakota, requested an opinion from the South Dakota Attorney General on that issue.  The Attorney General stated that the Indian Citizenship Act "nullified" the state law insofar as it conditioned Indian voting rights on severing tribal relations.  2 JN 35.

The anti-Indian civil rights statute nevertheless remained on the books, unamended, until 1951.  South Dakota was one of the last states in the nation to officially grant voting rights to all Indians.  1 JN 58 (Feb. 27, 1951 Act repealing portion of South Dakota code relating to certain disabilities of Indians); 4 JN 65; 4 JN 57; 4 JN 51; 4 JN 35.

Even after receiving the right to vote by law, many Indians were still denied the opportunity to vote because the law prohibited the creation of precincts where Indians could cast their ballots.  From the days of Dakota Territory, South Dakota law mandated persons to vote in the precincts where they reside and not anywhere else.  This prohibited all people from voting if his residence was not within an existing election precinct.  4 JN 4; 4 JN 12; 4 JN 39; 4 JN 46; 4 JN 53; 4 JN 59.

In 1890, the South Dakota Supreme Court held that county commissioners of organized counties had no authority to establish election precincts in bordering unorganized counties.  3 JN 2;  State ex rel. Dollard v. Board of County Comm'rs, 46 N.W. 1127 (S.D. 1890).  Soon thereafter, the legislature passed a law granting residents of unorganized counties the right to vote in state and national elections, except that "the provisions of this act shall not apply to any unorganized county within the boundaries of any Indian reservation."  1 JN 36.

Most of the counties within the boundaries on an Indian reservation did not become organized until 1909 to 1912, and three of the most populous reservation counties, Shannon, Todd, and Washabaugh (now part of Jackson County), did not become organized until the late 1970s and early 1980s.  2 JN 2 (March 30, 1990 letters from the att'y gen. indicating that people living on Indian reservations do not have the right to vote in adjoining or other precincts); 2 JN 13 (Feb. 16, 1912 att'y gen. opinion: there is no way to establish voting precincts in unorganized counties); 2 JN 21 (Dec. 28, 1917 att'y gen. opinion: election precincts cannot be established in unorganized counties within Indian reservations).  The law forbidding county commissioners from creating election precincts in unorganized reservation counties remained on the books until 1939.  4 JN 58; 4 JN 52; 4 JN 45; 4 JN 38; 4 JN 31.

Even in organized reservation counties, many Indians may not have had the opportunity to vote until the middle of the twentieth century.  The South Dakota Supreme Court held in 1897 that a person residing on federally controlled land was not a resident of the state and therefore, could not vote in a state election.  McMahon v. Polk, 73 N.W. 77 (S.D. 1897).  Opinions by the attorney general also stated that federally controlled land did not come within the general purview of the general laws of the state.  2 JN 4; 2 JN 6.  While the Attorney

General observed in 1918 that county commissioners of an organized county are "authorized and required" to establish voting precincts on Indian reservations, a 1932 Attorney General's opinion still opined that Indians were ineligible to vote if they resided upon land "under the exclusive jurisdiction of the federal government."  2 JN 23; 2 JN 29.  Thus, it would appear that Indians living on trust land in organized counties were ineligible to vote as late as 1932.

Defendants attribute the lack of political success of Indians in Districts 26 and 27 to the fact that tribal members look to their own tribal governments as their primary and most personal areas of political participation and not to the state.  Although this may indeed be true, it neither undermines nor excuses the continued discrimination in South Dakota that has impeded Indians' ability to vote and elect candidates of their choice.   Indians' connectedness to the tribe and tribal government does not justify any dilution of Indian voting strength under the current legislative plan.

Defendants further argue that the "special relationship of the Indian tribes and the United States is a significant reason that tribal members declined to participate in State political matters."   Any "special relationship" that may exist does not negate the effect of discrimination on Indians in South Dakota.  Furthermore, this case does not center on Indians' choice to get involved in state political matters.  The case focuses on whether Indians have an equal opportunity for involvement in such matters.  Even if a "special relationship" exists, the long history of discrimination against Indians has wrongfully denied Indians an equal opportunity to get involved in the political process.

The court also does not accept defendants' contention that the "enormous funding" tribes receive from the United States "makes participation in tribal government more attractive

than participation in state politics and thus acts as a detriment to such state government participation."  The amount of funding from the United States is irrelevant to the determination of vote dilution and does not eliminate the effects of past official discrimination by the state of South Dakota toward Indians.

Defendants' argument that Indians "avoid voting in state elections because they have other means by which they can express their political viewpoints" is also not relevant to the current issue.  The existence of such outlets does not undermine the effects of discrimination or any dilution resulting from the 2001 Plan.

The court agrees that tribal government elections have a higher turnout rate for Indians than state elections.  This bolsters the court's conclusion that a history of official discrimination by the state has negatively affected Indian involvement in state elections.

The court accepts defendants' argument that some Indians resist voting in state elections because they fear loss of their special status.  This subjective fear, however, does not undermine the long history of discrimination in South Dakota that has touched upon the right of Indians to be involved in the political process and does not eliminate any vote dilution that results from the 2001 Plan.

### b.    Discrimination in Representation

The Act of Congress that created the Dakota Territory in 1861 excluded all Indians from the basis for apportioning the territorial assembly.  1 JN 2.  South Dakota's constitution excluded "Indians not taxed" from the basis for apportioning the legislature.  It did not include Indians in the basis for apportioning the legislature until the voters approved a constitutional amendment in 1936.  1 JN 33; 2 JN 14; 1 JN 57.

Residents of unorganized counties had no right to vote for or hold any offices under state law until 1895.  The legislature then gave voters in unorganized non-reservation counties the right to vote for statewide and federal offices.  1 JN 36; 4 JN 58; 4 JN 52; 4 JN 45; 4 JN 38; 4 JN 31.

In 1923, the legislature gave voters in unorganized non-reservation counties the right to vote and run for highway board and school board.  1 JN 53.  In 1933, voters in unorganized non-reservation counties received the right to vote for members of the legislature but still could not vote for county officers.  1 JN 56; 4 JN 74; 4 JN 66.   The prohibition on voting and running for county office was not officially repealed until 1982, after the Eighth Circuit Court of Appeals found the prohibition on running for county offices unconstitutional in United States v. South Dakota, 636 F.2d 241 (8th Cir. 1980) and the prohibition on voting for county officials unconstitutional in Little Thunder v. South Dakota, 518 F.2d 1253 (8th Cir. 1975). On their face, these restrictions applied to Indians and non-Indians; however, the only unorganized counties after the 1910s were Shannon, Todd, and Washabaugh (now part of Jackson County), which were wholly within reservation boundaries and whose populations were overwhelmingly Indian.  The state justified the restrictions as appropriate because Indians did not pay county taxes.  United States v. South Dakota, 636 F.3d at 245 n.4.

South Dakota effectively denied Indians the right to serve as election workers.  In the 1880s, prior to Indians gaining citizenship in significant numbers, election workers were required to have the qualifications of electors.  Thus, only male citizens or persons who declared an intent to become a citizen could act as an election judge or clerk anywhere in the Territory.  4 JN 21; 4 JN 14; 4 JN 6; 4 JN 12.

After Indians began obtaining citizenship in the early 1900s, the legislature added that election workers "must be qualified electors in the precinct for which they are appointed." This limitation effectively denied most Indians the right to serve as election workers because county commissioners either could not or did not create precincts on Indian reservations until decades later. 4 JN 48; 4 JN 68; 4 JN 62.

### c.        Recent Electoral Processes

In addition to the discrimination documented in the statutes of South Dakota, the evidence at trial also documents recent efforts on the part of South Dakota political subdivisions to deny Indians the right to participate in the political process. In 1999, Day County officials denied Indians the right to vote in sanitary district elections. Several noncontiguous pieces of land owned by whites made up the district at issue, which was only 13 percent of the land around Enemy Swim Lake. All of the registered voters in the sanitary district were white. The district excluded the remaining 87 percent of the land, which was owned by the Sisseton-Wahpeton Sioux Tribe and about 200 of its tribal members. The United States sued the county and the sanitary district. The case was settled. As part of the settlement, the county and the district admitted that the district's boundaries unlawfully denied Indian citizens' right to vote. Ex. 345.

In 2003, members of the Crow Creek Sioux Tribe sued the Buffalo County Commission, alleging that the three county commission districts were not only dilutive, but also drawn and maintained for a discriminatory purpose. According to the 2000 census, Buffalo County had a population of approximately 2000 people, 83 percent of whom were Indian. The redistricting plan, which had been in use for decades, confined virtually all of the county's

Indian population to a single district containing approximately 1500 people.  White voters controlled the remaining two districts, which essentially gave them control over the county government.  County commissioners continued to maintain the plan even though state law required redistricting every 10 years.  The parties settled the case in 2004, with the county admitting that the plan was discriminatory.  Ex. 339-40 (Consent Decree, <u>Kirkie v. Buffalo County, S.D.</u>, Civ. No. 03-3011 (D.S.D. entered Feb. 12, 2004)).

Indians have also successfully challenged the dilutive election systems used for school board elections in Roberts and Charles Mix Counties.  <u>See</u> <u>Buckanaga</u>, 804 F.2d 469; <u>Weddell v. Wagner Cmty. Sch. Dist. 11-4</u>, Civ. No. 02-4056 (D.S.D. filed 2003) (Consent Decree).

Indians have also experienced barriers to political participation through voter registration.  For most of the twentieth century, South Dakota required voters to register in person at the office of the county auditor or one of her deputies.  Registrars were required "to question every person presenting himself for registration touching his residence and his other qualification as an elector of his voting precinct."  Ex. 341.

Limited financial resources and the distance of many county seats from Indian communities made traveling to the county seat a hardship for many Indians.  This hardship was magnified for residents of unorganized Todd, Shannon and Washabaugh Counties who had to travel to the county seat of the organized counties to which they were attached.  2 JN 39.

In 1963, the Corson County State's Attorney sought an opinion from the state attorney general as to whether state law would permit the county auditor to appoint a tribal clerk or other tribal officer as a special deputy to register Indian voters in their communities, noting that "Indian leaders were quite concerned because they believe many Indians have never been

registered and have never voted."  2 JN 39.   The attorney general opined that state law did not

allow the auditor to deputize tribal officials and did not allow deputies to register voters outside

of the county auditor's office.  2 JN 39.  State law, however, did authorize and require the tax

assessor to register property owners to vote while assessing the value of their land.  Taxpayers

were thereby automatically registered to vote while non-taxpayers, many of them Indian, had to

register to vote in person.  2 JN 39.

      South Dakota did not fully allow mail-in registration until 1973.  Ex. 342.

      In 1984, the Fall River County Auditor refused to register Indians who had attempted to

register as part of a last-minute voter registration drive on the Pine Ridge Reservation.  The

court intervened on the day before the election and issued an injunction to allow voters to cast

their ballots.  Ex. 343.  See American Horse v. Kundert, Civ. No. 84-5159 (D.S.D. 1984).

      In 1986, Indians sought court intervention after the Dewey County Auditor refused to

provide them with enough voter registration cards to conduct a voter registration drive on the

Cheyenne River Reservation.  The court ordered the auditor to supply the plaintiffs with 750

additional cards and extended the registration deadline.  Ex. 344.  See Fiddler v. Sieker, Civ.

No. 86-3050 (D.S.D. 1986).

      Lay witnesses also described problems they encountered in obtaining registration cards

from their county auditor.  Theresa Two Bulls testified that during a registration drive on Pine

Ridge, Fall River County officials only gave them 50 registration cards at a time.  After filling

those 50 cards, they had to take them back to Fall River, a 45-minute drive away.  They also

required signature by a notary public, and only a few people were notaries public.

Two Bulls' testimony is credible and probative of voter discrimination experienced by voters in Districts 26 and 27.  Two Bulls grew up in Oglala, South Dakota, on the Pine Ridge Reservation and currently lives in Pine Ridge.  She is a member of the Oglala Sioux Tribe and served as tribal secretary for eight years and a school board member for one.  She served as vice president of the tribe in 2000.  She has been involved in several voter registration drives on the Pine Ridge Reservation during the past 20 years and is currently a candidate for the state senate.  The court finds that her experience and knowledge make her credible on the issue of voter discrimination.  T.II p. 340, 346.

Sandi Flye, a member of the Oglala Sioux Tribe, testified about voter discrimination.  Flye lives in Bennett County and has worked as a poll watcher.  She has run for school board and has participated in recent voter registration drives.  She testified that she went to the Bennett County auditor's office to obtain registration cards.  Susan Williams, the county auditor, only allowed her to pick up ten cards and instructed Flye to return any unused cards.  Later Flye learned that the law did not limit the number of cards distributed to someone.  The court finds that Flye is a credible, reliable witness and finds her testimony relevant and probative of voter discrimination.  T.IV p. 915-20.

Robert Fogg testified similarly to Flye.  Fogg has lived in Bennett County since 1998.  Although he is not an enrolled tribal member, he was involved in Indian voter registration drives in Bennett County in 2002.  He also testified that Williams would release only ten voter registration cards at a time.  Fogg later learned that registration cards were available on the Internet.  Although Williams eventually accepted the cards, she initially did not want to accept the computer printed cards.  Fogg witnessed erroneous rejections of registration cards, which

89

registration cards were later accepted after further explanation.  The court finds that Fogg's testimony is consistent with the testimony of other witnesses and is relevant and probative on the issue of voter discrimination.  T.IV 975-79.

Charlene Black Horse, a resident of Pine Ridge and a tribal member, also testified about registration difficulties.  Black Horse has been involved in tribal elections since 1980.  She started out as the election clerk and then became a voting board member of the tribal elections.  She has been involved in recent Indian voter registration drives.  Black Horse testified that she had difficulty getting registration cards from the Fall River County auditor, Sherill Dryden.  Dryden limited the number of cards they could take to approximately 20.  The court finds that Black Horse's testimony is consistent with other testimony the court believes and that her testimony is relevant and reliable on the issue of voter registration.  T.V 1160-66.

These witnesses all testified that the reception they received from the auditors ranged from unhelpful to hostile.  There is evidence of negative reactions to recent voter registration drives.  In 1978, a coalition of Indian and civic organizations sponsored a voter registration drive that focused on members of the state's nine Indian tribes.  Shortly before the election, allegations surfaced that some Indians who might be convicted felons were registering as voters and that the tribes were illegally using federal money to finance the registration effort.  Agents from the South Dakota Division of Criminal Investigation and the FBI investigated the allegations on the Pine Ridge and Rosebud Reservations; however, no charges were filed.  Officials with the statewide Indian Voter Registration Drive labeled these investigations as politically motivated and intimidating to Indian people.  Ex. 12 p. 26-27; Ex. 61, 63.

Black Horse was involved in this 1978 registration drive.  She testified that she believed that the allegations were racially motivated.  "We always feel that because we're always being intimidated by somebody.  And when you grow up there, that's just how you live with things."  T.V p. 1171.  Subsequent to the 1978 drive, the legislature amended the law relating to voter registration to make it more difficult.  Ex. 12 p. 26.

Similar problems occurred in 2002.  Just prior to the election, allegations of Indian voter fraud plagued another Indian voter registration drive.  Ex. 53, 105, 356 p. 29-30.  Susan Williams, the Bennett County auditor, publicly announced that Indians involved in voter registration were engaged in voter fraud.  T.IV p. 1042.  Although investigations occurred on Pine Ridge and Rosebud, no charges were filed for registering or attempting to register Indian voters illegally.  Ex. 53, 105.  In fact, South Dakota's Attorney General, Mark Barnett, investigated the charges, and said there was no basis for the claimed episode of widespread Indian voter fraud.  T.I p. 40; Ex. 356 p. 30.  These investigations and allegations intimidated Indian voters.  Dr. McCool opined that "those persistent claims that if Indians are registering and voting there must be fraud is part of an effort to create a racially hostile and polarized atmosphere.  It's based on negative stereotypes, and I think it's a symbol of just how polarized politics are in the state in regard to Indians and non-Indians."  Ex. 356 p. 30; T.IV p. 1043; T.I p. 40-41.

Following the 2002 election, the legislature again passed laws that added additional requirements to voting.  One such law required providing photo identification prior to voting.  SDCL 12-18-6.3; SDCL 12-19-2.  Representative Van Norman stated that when passing these measures, "the legislature was retaliating because the Indian vote was a big factor in new

91

registrants and a close senatorial race." T.V p. 1279.  During legislative debate on House Bill 1010, which would have made it easier for Indians to register, Representative Ted Klaudt commented: "The way I feel is if you don't have enough drive to get up and drive to the county auditor . . . maybe you shouldn't really be voting in the first place."  The context of his statement referenced Indian voters. Ex. 372.  Representative Stanford Adelstein stated, "Having made many efforts to register people . . . I realize that those people we want to vote will be given adequate opportunity.  I, in my heart, feel that this bill . . . will encourage those who we don't particularly want to have in the system."  Alluding to Indian voters, he stated, "I'm not sure we want that sort of person in the polling place.  I think the effort of registration . . . is adequate."  Ex. 372.

### d.      Access to Polling Places

Lack of access to polling places continues to be a problem.  Ex. 356 p. 34-37.  A 1982 state attorney general opinion indicates that confusion over whether precincts and polling places could be located on Indian land remained unresolved.  2 JN 43.

In 1986, Alberta Black Bull and other Indian residents of the Cheyenne River Sioux Reservation brought a successful § 2 suit against Ziebach County because of its failure to provide sufficient polling places for school district elections.  Ex. 347.  In 2002, access to polling places was an issue in a case brought by members of the Yankton Sioux Tribe against the Wagner Community School District.  Ex. 346.  In 2002, Indian residents in Bennett County unsuccessfully petitioned the county commissioners to move two polling places to Indian housing areas to increase convenience for Indian voters.  Their request was denied.   Ex. 102. The Bennett County Auditor Williams admitted that having to travel 40 miles round trip, as

some voters in Bennett County must do, could be a "serious impediment" to voting, particularly for those without transportation.  T.VI p. 1630-31.

**e.**      **1975 Amendments to the Voting Rights Act**

Indians have experienced discrimination relating to the 1975 amendments to the Voting Rights Act.  In 1975, Congress amended the Act to include American Indians, to expand the geographic reach of the special preclearance provisions of § 5, and to require certain jurisdictions to provide bilingual election materials to language minorities.  See An Act to Amend the Voting Rights Act of 1965, Pub. L. No. 94-73, 89 Stat. 400 (1975).  As a result of the amendments, Shannon and Todd Counties in South Dakota became subject to preclearance. 41 Fed. Reg. 784 (Jan. 5, 1976).   Eight counties in the state, Todd, Shannon, Bennett, Charles Mix, Corson, Lyman, Mellette, and Washabaugh (now known as Jackson), were required to conduct bilingual elections because of their significant Indian populations.  41 Fed. Reg. 30002 (July 20, 1976).

William Janklow, a non-Indian and attorney general of South Dakota, was displeased with the extension of § 5 and the bilingual election requirement.  In a formal opinion addressed to the secretary of state, he derided the 1975 law as a "facial absurdity" and condemned the Act as an unconstitutional federal encroachment that rendered state power "almost meaningless." Janklow quoted, with approval, Justice Black's dissent in South Carolina v. Katzenbach, 383 U.S. 301, 328, 86 S. Ct. 803, 15 L. Ed. 2d 769 (1966), complaining that § 5 treated covered jurisdictions as "little more than conquered provinces."  He opined that he hoped Congress would soon repeal "the Voting Rights Act currently plaguing South Dakota."  Janklow advised the secretary of state not to comply with the preclearance requirement.  "I see no need to

93

proceed with undue speed to subject our State's laws to a 'one-man veto' by the United States

Attorney General."  2 JN 42.

State officials followed his advice.  From the date of the amendment's coverage in 1976

until 2002, South Dakota enacted over 600 statutes and regulations that affected elections or

voting in Shannon and Todd Counties, but submitted fewer than 10 for preclearance.  Quick

Bear Quiver v. Nelson, Civ. No. 02-5069 (D.S.D. 2002) (Docket 1).  Elaine Quick Bear Quiver

and several other members of the Oglala and Rosebud Sioux Tribes in Shannon and Todd

Counties brought suit against the state in August 2002 to force compliance with § 5.  This

Court entered a consent order in December 2002 in which the state admitted failure to comply

with § 5.  Quick Bear Quiver v. Nelson, Consent Order (Docket 30).  The state's first

submission in April 2003, began a process of submission that is projected to last up to three

years.  Quick Bear Quiver v. Nelson, Order re Plan Formulation (Docket 45).

Susan Williams, Bennett County Auditor, testified that she did not become aware of the

requirement that Bennett County appoint Indian language translators until the Department of

Justice told her prior to the 2002 election.  T.VI p. 1634-35.  Prior to 2002, Bennett County was

not in compliance with this requirement of the Voting Rights Act.

#### f.      Redistricting and Representation

In 1975, the Task Force on Indian-State Government Relations found that Indians on

reservations were sufficiently numerous and geographically compact to form a majority in at

least one legislative district.  Ex. 18 p. 171.  The Task Force's report also alleged that the use of

multi-member districts diluted Indian voting strength by "stacking" or submerging large

concentrations of Indians within even larger concentrations of non-Indians.  Ex. 18 p. 167-69.

The following year, further controversy developed over the right of Indians in Shannon and Todd Counties to vote in elections for county officials in Fall River and Tripp Counties. After the Eighth Circuit ruled that these residents were entitled to vote for county officials, the Tripp County Commissioners challenged the validity of Todd County's attachment in state court. The South Dakota Supreme Court upheld the validity of the attachment but allowed the county to redistrict to put all reservation voters in a single district. Because the plan was based on registered voters rather than total population, however, it violated the one-person-one-vote standard, and the county could not obtain § 5 preclearance. The issue was ultimately resolved in the early 1980s, but the controversy left many Todd County residents effectively unrepresented for a number of years. Ex. 249-56.

In 1991, the state legislature established two single-member house districts (District 28A and 28B) in the area of the Cheyenne River and Standing Rock Sioux reservations. District 28A was a majority-Indian district. In 1996, the state legislature abolished the two single-member house districts and replaced them with a multi-member at-large house district for District 28. District 28 as a whole was a majority-white district. This legislative action occurred after an Indian won the Democratic primary in 1994 in majority-Indian District 28A. T.V p. 1249-52. South Dakota continued to conduct at-large elections for the two house seats until it was enjoined from doing so after the South Dakota Supreme Court ruled that the 1996 redistricting plan violated the state constitution. In re Certification of a Question of Law (Emery v. Hunt), 615 N.W.2d 590 (S.D. 2000). Subsequent to that decision, Tom Van Norman was elected from District 28A to the state House of Representatives. He was the first Indian

elected to the state legislature from the area of the Cheyenne River and Standing Rock Sioux Reservations.  T.V p. 1253-54.

### g.    Other Evidence of Official Discrimination

The first laws enacted by the Dakota Territory in 1862 relating to Indians praised the "indomitable spirit of the Anglo-Saxon," and described Indians as "red children" and the "poor child" of the prairie.  1 JN 1; 1 JN 41; 3 JN 4.  Colombe v. Wilson, 135 N.W. 668, 671 (S.D. 1912).  In fact, the South Dakota Supreme Court stated:  "It is a matter of common knowledge that Indians have but little appreciation of the value of or use of money or property allotted to them by the government; and it has been and is the policy of the government to keep the Indians under their control and care, as wards of the nation, until they are sufficiently advanced in civilization to duly appreciate the necessity of securing and holding property for themselves and their children, and to prevent them from being imposed upon or advantage taken of them by their shrewder white neighbors."  Id.

Four years later, the territorial assembly described Indians as the "revengeful and murderous savage."  1 JN 13; 1 JN 17 (memorials to various military men describing Indians as "our implacable enemies, hell hounds, and wild, turbulent, and hostile people").  The territorial assembly and state legislature sent numerous resolutions and memorials to Congress, urging it to remove the Indians from the land to allow for white settlement.  1 JN 6; 1 JN 14; 1 JN 17; 1 JN 20; 1 JN 26; 1 JN 28; 1 JN 29; 1 JN 30; 1 JN 41; 1 JN 38; 1 JN 32.

Indians were prohibited from entering ceded lands without a permit between 1862 and 1877.  1 JN 3; 4 JN 8.  Until the 1910s, it was a crime in South Dakota to harbor or keep on one's premises or within any village settlement of white people any reservation Indians "who

96

have not adopted the manners and habits of civilized life."  It was also illegal to induce or encourage such Indians to camp, remain, or hunt in or near "any village or settlement of white people."  1 JN 12; 4 JN 2; 4 JN 10; 4 JN 17; 4 JN 24; 4 JN 29; 4 JN 36; 4 JN 43.

Jury service was initially restricted to "free white males."  Following the Civil War, the restriction changed to "male citizens of this state, having the qualifications of electors."  The state compiled jury lists from the tax rolls, which excluded many Indians from jury service even after obtaining citizenship.  1 JN 4; 1 JN 18; 4 JN 5; 4 JN 13; 4 JN 19; 4 JN 20; 4 JN 33; 4 JN 40; 4 JN 47; 4 JN 54; 4 JN 60; 4 JN 61; 4 JN 67.

Indians could not legally marry whites in South Dakota until 1957.  1 JN 5; 1 JN 46; 4 JN 34; 1 JN 60; 4 JN 50; 4 JN 56; 4 JN 63; 4 JN 69; 4 JN 70; 4 JN 71.   It was unlawful to sell, barter, or give firearms to any Indian or "half-breed" who had not fully renounced tribal relations.  4 JN 27; 1 JN 34; 1 JN 40.  It was a crime to provide educational instruction in any language, including traditional Indian languages, other than English between 1921 and 1955.  1 JN 52; 1 JN 59; 4 JN 64; 4 JN 73.

Prior to Congress passing the Indian Citizenship Act in 1924, Indian children could not attend the state's public schools without paying tuition unless their parents had severed their tribal relations.  After the Indian Citizenship Act, Indian children were denied state school privileges if they lived on federal land.  2 JN 11; 2 JN 15; 2 JN 17; 2 JN 18; 2 JN 19; 2 JN 25; 2 JN 27; 2 JN 28; 3 JN 6.  School Dist. No. 20 of Pennington County v. Steele, 195 N.W. 448 (S.D. 1923) (child who lived on United States land where federal Indian school was located did not reside in school district within which land was situated and was not entitled to attend school without paying tuition); 3 JN 7.  Rockwell v. Ind. Sch. Dist. of Rapid City, 202 N.W. 478 (S.D.

1925) (residents of Indian school lands were not residents of school district, county, or state and therefore, were not entitled to be admitted to high school); 2 JN 30.   Attorney general opinions evidence that whites in South Dakota resisted educational integration until at least 1948.  2 JN 34; 2 JN 37.  Indians were similarly denied access to the state's mental institutions.  2 JN 16; 2 JN 31; 2 JN 32; 2 JN 36.

More recently, Indian parents have complained about racial harassment and discrimination in the Winner school district.  Ex. 7; T.IV p. 860-63.  According to the former director of education for the Rosebud Sioux Tribe, Sherry Red Owl-Neiss, Indian children are being "pushed out" of school in Tripp County through the discriminatory use of attendance and discipline policies, a phenomenon that she attributes to racism: "It comes from the cultural conflict and the underlying racism that exists not just in the school, but in the community there."  T.IV p. 864-65.  As support for this position, Red Owl-Neiss cited the district's refusal to bus Indian children to school and the school board's refusal to meet privately with the Rosebud Sioux Tribal Education Committee to discuss the effect of discipline policies on Indian children.  While the school district denies that racism is a problem in the school, the court finds there is a perception among Indian people that racism does exist within the Tripp County School District. The court accepts Red Owl-Neiss's testimony as credible and probative of the issue of discrimination in schools.  Red Owl-Neiss is a member of the Rosebud Sioux Tribe and grew up on the Rosebud and Cheyenne River reservations.  She has master's degrees in education and educational administration and currently works for Sinte Gleska University. Previously, she was the director of education for the Rosebud Sioux Tribe where she administered and implemented the Tribal Code of Education and monitored elementary and

secondary schools on the Rosebud reservation.  The court concludes that Red Owl-Neiss's

education, experience, and background make her a credible and probative witness on

discrimination in schools.  T.IV p. 865-67.

Indian parents in Martin have also complained about the mistreatment of Indian

children, particularly those with darker skin, by teachers in the Bennett County school district.

T.IV p. 899-900.  Rebecca Three Stars, a resident of Martin and a member of the Oglala Sioux

Tribe, ran for the Bennett County School Board in 1998, 1999, and 2000 because, in her view,

the all-white Board did not adequately respond to those complaints.  The Board denies that it

mistreats Indian students and denies that it failed to adequately respond to complaints.  The

court finds, based on a preponderance of the evidence, that there is a perception among Indians

that the Board does not adequately respond to Indian complaints.  T.IV p. 899.

Numerous reports and volumes of public testimony document the perception of Indian

people that they have been discriminated against in various ways in the administration of

justice.  Ex. 11, 13, 41, 272, 379, 380.  In the 2000 report of the South Dakota Advisory

Committee to the United States Commission on Civil Rights, the Commission concluded that

Indians perceive "that the administration of justice at the Federal and State level is permeated

by racism," that many Indians "have lost confidence in our democratic institutions and have no

reason to expect reforms," that "Native Americans do not fully participate in local, state, and

federal elections," and that "despair is not too strong a word to characterize the emotional

feelings of many Native Americans who believe they live in a hostile environment."  Ex. 13 p.

37-39.  Thomas Hennies, Chief of Police of Rapid City, testified at the hearing.  He stated that

"I personally know that there is racism and there is discrimination and there are prejudices

among all people and that they're apparent in law enforcement."  Ex. 13 p. 26.  Don Holloway, the Pennington County sheriff, testified at the hearing that prejudice and the perception of prejudice in our community were "true or accurate descriptions."  Ex. 13 p. 27.  The court accepts the findings in the Committee's report and considers the testimony contained therein not for the truth of the matter asserted, but as evidence of the perception of discrimination.

Witnesses at trial relayed their own personal stories about law enforcement in South Dakota.  Belva Black Lance, who works for the tribal housing authority, stated that the police frequently stop her when she leaves the reservation.  Once she was stopped twice in one day. She testified that she does not "leave the reservation much because of that."  When she bought a new car, she registered it in Mellette County, which is off the reservation, and has not been stopped since.  T.III p. 691-92.

A sheriff's deputy in Bennett County stopped Monica Drapeaux at 7 a.m. for "swerving" while riding in a car with tribal plates.  T.III p. 581.  Upon seeing her in the vehicle, he just gave them a warning.  Id.  Law enforcement have stopped Representative Van Norman numerous times.  He testified that many Indians "fear going off the reservation to the store at certain places because they think they're going to get harassed by police unfairly."  T.V p. 1269-70.

Representative Bradford testified about being the victim of what he considered to be racial profiling.  Police stopped him off the reservation after seeing his license plates were from Shannon County, which is on the reservation.  He testified that he has been ticketed in Bennett County more than any other county in the state.  T.IV 1075-77.

Defendants contend that plaintiffs failed to "present significant evidence showing a history of <u>official</u> discrimination in District 26 or 27 that touched the right of Indians to register, vote, or otherwise participate in the democratic process."  Docket 311 ¶ 128.  Although defendants cite testimony of people stating that they never witnessed discrimination in these districts, the court finds plaintiffs' evidence of discrimination more persuasive.  Indeed, the record is replete with evidence of official discrimination in South Dakota as previously documented.  The court finds the evidence of discrimination against Indians to be more credible than the evidence that there is no racial discrimination in South Dakota.  T.VI p. 1746, T.VIII p. 2191, 2246.

### h.      Unofficial Discrimination

Indians in South Dakota have also been subject to discrimination in lending.  In 1993, Blackpipe State Bank, located in Martin, South Dakota, agreed to settle a lawsuit filed against it entitled <u>United States of America v. Blackpipe State Bank</u>, Civ. 93-5115.  Ex. 23.  In the Consent Decree, Blackpipe State Bank denied liability, but agreed to end the explicit policy previously contained in its Community Reinvestment Act statement of refusing to make secured loans subject to tribal court jurisdiction and agreed to pay $125,000 to persons who were adversely affected by its lending decisions. <u>Id</u>.  One of its customers, Monica Drapeaux, testified about her inability to obtain several loans at Blackpipe State Bank, even though other banks located farther away readily loaned her the money.  Tr. III, p. 586-88.  Blackpipe State Bank refused her request for loans despite her being a successful business woman in Martin with strong financial assets, but loaned money to non-Indians with weaker financial credentials.

Drapeaux is a member of the Yankton Sioux Tribe and grew up in Winner and Martin, South Dakota.  She maintains residence in Martin.  She ran an insurance business from 1980 until 2000, and owns a motel in Martin.  She was a member of the Martin Commercial Club for 25 years.  She has also owned an H&R Block franchise, interests in several other motels, and was the executive director of the Lakota Fund.  The court accepts Drapeaux's testimony as credible, especially because it is corroborated by the terms of the Consent Decree in the Blackpipe State Bank case.  Her background and extensive business experience make her a credible witness on the issue of lending discrimination.  Ex. 20-24; T.III p. p565-66, 571-75, 586-89.

Other tribal members who testified recounted numerous incidents of being mistreated, embarrassed or humiliated by whites.  Elsie Meeks stated that her first exposure to the non-Indian world and exposure to the fact "that there might be some people who didn't think well of people from the reservation" occurred when she and her sister enrolled in a predominantly white school in Fall River County.  "[M]y sister and I were riding the bus, and somebody behind us said . . . the Indians should go back to the reservation.  And I mean I was fairly hurt by it . . . it was just sort of a shock to me."  T.V p. 1353.

Meeks testified that a "disconnect between Indians and non-Indians" still remains in South Dakota today.  There is little personal or social interaction between Indians and non-Indians, and fear and distrust exists between the communities.  "[W]hat most people don't realize is that many Indians, they experience this racism in some form from non-Indians nearly every time they go into a border town community. . . . [T]hen their . . . reciprocal feelings are

102

based on that, that they know, or at least feel that the non-Indians don't like them and don't trust them."  T.V p. 1372-74.

The court accepts Elsie Meeks' testimony as credible and probative on the issue of discrimination perceived against Indians.  She is a member of the Oglala Sioux Tribe, grew up primarily on the Pine Ridge Reservation, and currently lives there.  She attended schools both on and off the reservation.  She is the executive director of First Nations Oweesta Corporation, which is a national Indian organization that helps tribes and Indian communities start community development financial institutions.  Prior to that, she was the executive director of the Lakota Fund.  She owns a grocery store in Wanblee, South Dakota, and has received awards for her business activities.  She ran for lieutenant governor in 1998 with gubernatorial candidate Bernie Hunhoff.  She has served on the board of the South Dakota Rural Enterprises Initiative.  The court concludes that Meeks' experience, education, knowledge, and background make her a credible, probative, and reliable witness on the issue of discrimination against Indians.  T.V p. 1350-51, 1153, 1158-61.

Craig Dillon was one of the first Indians to play on the varsity football team at Bennett County high school.  After practice, team members went to the mayor's son's house for "fun and games."  The mayor "interviewed" Dillon in his office to see if he was "good enough" to be his son's friend.  Dillon said that "I guess I didn't measure up because . . . I was the only one that wasn't invited back to the house after football practice after that."  No other team members met with the mayor separately.  He described the experience as "pretty demoralizing."  T. IV p. 1048-49.

Drapaeux testified that she did not want to attend high school in Winner, South Dakota, because of the racial tension that existed.  Non-Indians often called Indians "prairie niggers" and made other derogatory comments.  Years later when she bought a business in Martin, the Commercial Club was not hospitable to her.  Indian businesses do not join the club, she said, "because they don't feel welcome to do so."  T.III p. 568-69, 576-78.

While growing up in Parmalee, South Dakota, Lyla Young had no significant contact with whites.  The first real contact she had with whites was when she attended high school in Todd County.  The Indian students lived in a segregated dorm at the Rosebud boarding school.  They were bussed daily to the high school, bussed back to the dorms for lunch, and then bussed to school for the afternoon.  There was very little contact between Indian and white students.  Indian students were called, "GI's," which stood for government issue.  Young testified that she did not like being called GI.  "I just withdrew.  I had no friends at school.  Most of the girls that I dormed with didn't finish high school. . . . I didn't associate with anybody."  Her parents advised her to not say anything, to ignore it, and to not cause trouble.  "So that's what we did.  We just withdrew and we never talked to them."

Young testified that even today, she has very little contact with the white community.  "I don't want to.  I have no desire to open up my life or my children's life to any kind of discrimination or harsh treatment.  Things are tough enough without inviting more. . . . The feeling that when you walk in a room, you can feel how they look at you. . . . Walking in a room, I don't push myself forward because I don't want to be pushed back in the back, so I just stay away.  This was a big job for me to come here today. . . . I'm the only Indian woman in here, and I'm nervous.  I'm very uncomfortable."  T. III p. 662-65, 672.

104

Belva Black Lance first came into contact with whites at the age of six when she attended public school in Todd County.  "We were treated very mean.  One of the teachers normally had a ruler and would hit your hands if you said something wrong, or we couldn't talk our language.  If they didn't understand, we would be in trouble.  We wouldn't be able to go out and play."  Black Lance testified that she does not like to leave the reservation today.  "I'm kind of like afraid.  Because when we leave the reservation, it seems like we left a safe area and we have to go into an area where it's prejudiced . . . It's normal for us to experience that in the state of South Dakota."  T.III p. 689-91.

Arlene Brandis, a Rosebud tribal member, recalled walking to and from school in Tripp County.  "Cars would drive by and they would holler at us and call us names . . . like dirty Indian, drunken Indian, and say why don't you go back to the reservation."  Brandis testified that things have not changed.  White families in Winner do not sit near her family at high school sports events, which she believes is because she and her husband are Indian.  T.III p. 743, 746.

Beginning in the 1930s, Martin, South Dakota, conducted a homecoming ceremony involving Indian dresses and headdresses.  It began when the Indian high school coach, John Artichoke, approached tribal elders to borrow costumes for the pageant.  Eventually the school purchased its own costumes and stored them in glass cases at the bank so people could observe them when not in use.  During the ceremony, girls dressed in authentic tribal regalia.  One high school boy is designated the medicine man and another the big chief.  Each wears a headdress.  The girls sit on the stage and the big chief goes through a variety of actions to check them over,

including lifting them and peering at their teeth.  Eventually the big chief chooses a princess.  T.III p. 598-600; T.VI 1493-97.

Although some people in the community thought the ceremony was beautiful and honored the Indian culture, others found it offensive.  Two Indian high school girls approached the Bennett County school board in 1993, stating that they found the ceremony offensive and wanted it to stop.  Drapeaux, a school board member at that time, moved to change the homecoming ritual.  Her motion died for lack of a second.  The town held a public forum on the issue in 1995, and many white people in Martin did not want to change the ceremony.  The ritual was finally abolished in 1996.  The Bennett County paper reported the story with the headline, "Homecoming is Being Changed to Satisfy Indian Objections."  T.III p. 600-604; Ex. 92-93.

The first Senate factor is the extent of any history of discrimination "that touched the right of members of the minority group to register, to vote, or otherwise to participate in the democratic process."  Senate Report at 206.  "Without a doubt a history of discrimination against a minority is important evidence of both discriminatory intent and discriminatory results.  A history of pervasive, purposeful discrimination may provide strong circumstantial evidence, . . . (1) that the present day acts of elected officials are motivated by the same purpose, or by a desire to perpetuate the effects of that discrimination, (2) that the present day ability of minorities to participate on an even footing in the political process has been seriously impaired by the past discrimination, and (3) that past discrimination has also led to present socio-economic disadvantages, which in turn reduces participation and influence in political affairs."  Buckanaga, 804 F.2d at 474.

Based on the wealth of evidence and testimony in this case, the court concludes that there is a long and extensive history of discrimination against Indians in South Dakota that touches upon the right to register and to vote, and affects their ability to participate in the political process on an equal basis with other citizens.  Indeed, Indians faced voting discrimination in both the Dakota Territory and the state of South Dakota, ranging from outright vote denial to more subtle restrictions on the right to vote. The effects of this history are ongoing.  Accordingly, the court finds defendants' arguments unpersuasive on the issue of whether a history of discrimination touched upon Indians right to register, vote, or participate politically.  Such arguments, even if true, neither undermine the effects of this discrimination nor justify the vote dilution that results from the 2001 Plan.  The court finds that plaintiffs have satisfied the first Senate factor.

### 2.        The Extent of Racially Polarized Voting

The second Senate factor is the extent to which voting is racially polarized.  Senate Report at 206.  This factor is one of the most important considerations in the totality of the circumstances analysis.  United States v. Blaine County, 363 F.3d 897, 903 (9th Cir. 2004); Clark II, 88 F.3d at 1397.

Dr. Cole's results demonstrate the severity of the racial polarization in District 26.  In the only interracial election that he analyzed, the 1998 general election for state senate, only 24 percent of non-Indians crossed over to vote for the Indian-preferred candidate.  Using Dr. Cole's definitions, voting was polarized in 11 out of 12 (92 percent) of the endogenous contests between white candidates only analyzed by Dr. Cole and was polarized in both 2002 elections.  Ex. 359 p. 26, 30, 47-49.

In District 27, polarization was less severe but still apparent.  From 1992 through 2002, voting was polarized in 2 out of 2 (100 percent) interracial general senate elections and 2 out of 5 (40 percent) interracial general house elections.  In each polarized house race, one of the two house seats was won by an Indian-preferred candidate and one of the seats was won by a non-Indian-preferred candidate.  Voting was polarized in 1 out of 2 (50 percent) interracial primary house elections.  There was one contest involving Indian-only candidates, namely the general election for the house in 2002.  The contest was racially polarized.  Voting was polarized and the minority-preferred candidate was defeated by white block voting in 1 out of 2 (50 percent) endogenous general elections where vote totals were available for the nine county region affected by the lawsuit.  Ex. 359 p. 26-27, 36-37, 40-42, 55.

Dr. Cole's analysis further shows that white crossover voting is approximately 43 percent when there are no Indian candidates.  When an Indian is in the race, white crossover voting for the Indian candidate decreases to 22 percent.   Ex. 359; T.II p. 553-54.

Dr. Zax's analyses also demonstrate racial polarization.  In District 26, the 2002 general senate race, which was the only endogenous election analyzed by Dr. Zax, voting was racially polarized.  Ex. 948 p. 20, 55.  In his opinion, voting was racially polarized in 8 out of 10 (80 percent) of the 2002 elections analyzed.  Ex. 948 p. 19-20.  In District 27, voting was racially polarized in the one exogenous election analyzed (the 2002 general senate race), but the Indian-preferred candidate won.  Voting was racially polarized in 5 out of 10 exogenous races analyzed in District 27 in 2002.  Ex. 948 p. 34-35, 68-69.  The statistical results demonstrate a high level of racial polarization in District 26 and racial polarization in District 27.

Dr. McCool's report also demonstrates extensive racial polarization.  He described a widespread "us versus them" mentality among Indians and non-Indians in the political arena. He concluded that "mutual distrust and fear" characterize recent elections, which resulted in racial bloc voting on both sides of the color line.  Ex. 356 p. 49-55.

Dr. Lawson testified that South Dakota has a history of social, political, and economic discrimination against Indians.  Struggles between Indians and non-Indians are not just in the past but continue today in areas such as Indians' place in society and culture, civil rights, sovereignty, and general issues of Indian affairs.  T.VIII p. 2112-13.

Lay testimony further supports the conclusion that there is racial polarization.  The former director of education for the Rosebud Sioux Tribe, Red Owl-Neiss, testified that in her experience, whites tend to vote as a bloc and will not vote for Indian candidates.  She stated that county and school board elections are racially charged.  T.IV p. 869.  Short Bull, formerly a state senator, testified that whites tend to vote as a group or a bloc.  Lyla Young agreed.  T.II p. 515; T.III p. 676.  Representative Bradford testified that voting is racially polarized and that Indian voters have almost no chance to elect their preferred candidate in District 26.  T.IV p. 1067-69. The Bennett County auditor, Susan Williams, agreed that there was an Indian versus white mentality in recent elections in Bennett County.  T.VI p. 1642.

During the 2002 election for Bennett County Commission, three Indians won the Democratic primary.  The Bennett County Democratic Party subsequently recruited a slate of three whites to run as independents in the general election against the party's own elected candidates.  T.IV p. 943-44; T.V p. 1208-15.

During the 1998 gubernatorial election, gubernatorial candidate Bernie Hunhoff chose tribal member Elsie Meeks to run with him on the Democratic ticket.  After she agreed to run with him, Gary Nelson, the chair of the Democratic Party in Bennett County, contacted courthouse officials to verify whether she paid property taxes.  Others called her campaign headquarters and complained that "we don't understand why Bernie has her on the ticket when we can't go to her reservation and vote."  T.V p. 1365, 1215-19.

Meeks testified that she took her candidacy very seriously.  She went door to door, attended local meetings, was on the radio, and "wherever there was a venue that we could introduce ourselves we tried to be there."  The reception she received depended on her location.  "When I was in Sioux Falls and a lot of the East River communities, I felt very welcome.  I think people were excited that Bernie took the sort of risk he did in bringing in an unknown and somebody that was from a reservation."  The white response to her candidacy in towns bordering reservations, however, was more hostile.  She testified that ranchers near the Standing Rock Reservation "said to me that they really liked Bernie, but that they were very skeptical of him running with an Indian" because of land issues and property tax issues.  She did not get significant white support from her home community near the edge of the Pine Ridge Reservation because of "this whole notion that . . . Indians shouldn't be allowed to run on the statewide ticket and this perception by non-Indians that . . . we don't pay property tax . . . that we shouldn't be allowed [to run for office.]"  T.V p. 1363-64, 1366-67.

Additional evidence of polarization is found in the 2000 South Dakota Advisory Committee to the United States Commission on Civil Rights report on discrimination in the state's justice system.  Ex. 13.  Then-governor William Janklow called the report "garbage."

110

Janklow refused repeated attempts by Meeks and other members of the Commission to set up meetings to discuss the report.  T.V p. 1371-72; Ex. 31, 33-34, 36-38, 41, 43.

The court concludes that substantial evidence, both statistical and lay, demonstrates that voting in South Dakota is racially polarized among whites and Indians in Districts 26 and 27.

### 3.    Use of Voting Procedures for Discriminatory Purposes

The third Senate factor is "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single-shot provision, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group."  Senate Report at 206.

In some non-statewide elections, South Dakota law provides for a majority-vote requirement, anti-single-shot provisions, multi-member districts, and at-large elections.  SDCL 2-2-37, 7-8-1, 7-8-4, 7-8-10, 9-8-4, 9-9-1, 9-9-3, 9-13-6.1, 9-13-25, 9-13-26, 9-13-27, 13-8-2. Multi-member districts are used to elect members of the state House of Representatives in Districts 26 and 27, but a majority is not required and bullet voting is allowed.  T.V p. 1242-43, 1245; T.VI p. 1554.  Candidates do not have to pay a filing fee to run for office.  Id.  Some voter registrars have adopted practices and procedures that may hinder efforts to register Indian voters, such as limiting the number of voter registration cards given to registration volunteers. Ex. 356 p. 22-25.

The court acknowledges that voters are often placed in the wrong precinct as a result of listing a post office box or general delivery address on voter registration cards where many people share post office boxes.  Being placed in the wrong precinct, however, does not appear

to be a discriminatory practice to impede Indian ability to vote.  T.VI p. 1522-24, 1615-16, 1687-92; Ex. 1005-08, 1010-14.

Plaintiffs allege that some of the precincts in Districts 26 and 27 are large and that some polling places are inconveniently located and uncomfortable for Indians.  Ex. 356 p. 34-37. County commissioners determine the number of election precincts in a county and the number of polling places within a precinct.  The rural nature of Districts 26 and 27 makes it difficult to prevent some people from having lengthy drives to polling places.  But this affects all people living in rural areas in these districts, not just Indian voters.  T.VI p. 1608-10, 1683, 1712.

South Dakota has a relatively short deadline, 15 days prior to the election, for voter registration.  South Dakota has collaborated with a literary council to simplify ballot language and pursuant to federal law has provided interpreters at elections in Districts 26 and 27.  South Dakota ranks third in the nation for voter turnout and sixth in the nation for the percentage of voting age population that registered to vote in 2002.  T.VI p. 1527-28, 1532-36, 1556-57; Ex. 448, 694, 840-42.  Furthermore, South Dakota does not require voters to identify their race on voter registration cards.  T.VI p. 1531-32.  Indians have conducted numerous successful registration drives.  T.II p. 344-45; T.IV p. 826, 839-40, 846.

The court finds that South Dakota has taken measures to simplify voting procedures and promote access to the political process.  These laws and practices decrease the opportunities for discrimination.  Such evidence, however, is outweighed by the use of multi-member house districts in Districts 26 and 27.  This factor weighs slightly in favor of plaintiffs.

### 4.      Access to Candidate Slating Process

The fourth Senate factor is whether members of the minority group have been denied access to a candidate slating process.  Senate Report at 206.  Where such processes exist, the ability of minority group members to participate in the slating organization and receive its endorsement may be of "paramount importance."  <u>United States v. Marengo County Comm'n</u>, 731 F.2d 1546, 1569 (11th Cir. 1984).

South Dakota does not have a formal slating process for the legislature in Districts 26 and 27.  There is evidence, however, that political parties in the relevant districts have essentially acted as informal slating organizations in the past.  For example, the chairman of the Democratic central committee in Bennett County actively campaigned against his own party's nominees for county commissioner in the 2002 general elections after Indian candidates unseated the incumbent, non-Indian Democrats in the primary election.  Ex. 356 p. 51; T.V p. 1208-15.

The court finds that although there is no formal candidate slating process, the evidence indicates that the county political party structure has hindered Indians from running for and getting elected to public office.  Although there is some evidence relating to this factor that favors plaintiffs, it does not add significant weight to plaintiffs' contention that a slating process is used to discriminate against Indians.

### 5.      Socioeconomic Disparities

The fifth Senate factor is "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political

process." Senate Report, 1982 U.S.C.C.A.N. at 206. The Senate Report explains the rationale

and the nature of the inquiry for this factor:

> disproportionate educational, employment, income level and living conditions
> arising from past discrimination tend to depress minority political participation.
> Where these conditions are shown, and where the level of black participation in
> politics is depressed, plaintiffs need not prove any further causal nexus between
> their disparate socio-economic status and the depressed level of political
> participation.

Id. at 206 n.114. "[P]olitical participation by minorities tends to be depressed where minority

group members suffer effects of prior discrimination such as inferior education, poor

employment opportunities, and low incomes." Gingles, 478 U.S. at 69.

Under this factor, plaintiffs are not required to prove that racial discrimination or

disparities caused, in whole or in part, depressed levels of minority political participation.

Marengo County, 731 F.3d at 1569. Rather, the burden is on "those who deny the causal nexus

to show that the cause is something else." Id. See Whitfield, 890 F.2d at 1431. The disparities

are the effects of discrimination to which the Senate factor refers. Harvell, 71 F.3d at 1390;

Gomez, 863 F.2d at 1416 n.4 ("depressed registration rates may often be traceable in part to

historical discrimination"). A court must specifically address evidence of discrimination

against Indians and "any lingering effects of discrimination as evidenced by economic and

social disparity between Indians and whites and the effect of this discrimination and disparity

upon Indian political participation." Buckanaga, 804 F.2d at 474-75.

Summary File 3 from the 2000 census contains socioeconomic data produced by the

United States Census Bureau. It consists of detailed tables of social, economic, and housing

characteristics compiled from a sample of approximately 19 million housing units that received

the Census 2000 long-form questionnaire. It assigns respondents to racial categories using the

114

single-race method only.  Ex. 358 p. 22.  Summary File 3 shows that Indians in Districts 26 and 27 bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process.

Of the Indians in South Dakota aged 25 years and over, 29.1 percent had not finished high school, whereas 14.3 percent of their white counterparts had not finished high school.  In Districts 26 and 27, 31.9 percent of Indians 25 years of age and over had not finished high school, while 15.9 percent of their white counterparts were without a high school diploma.  Ex. 358 p. 22-23, 25 sub-ex. 14, 20.  Only 8.5 percent of Indians in South Dakota aged 25 years or older had a bachelor's degree or higher, which is less than half of the 22.3 percent rate achieved by whites.  In Districts 26 and 27, 8.2 percent of Indians in the same age group had a bachelor's degree or higher,  less than half of the 18.1 percent rate achieved by whites.  Ex. 358 p. 23, 25 sub-ex.14, 20.

The high school drop-out rate among Indians in South Dakota aged 16 to 19 was 23.8 percent, more than four times the 5.8 percent high school drop-out rate for whites.  The high school drop-out rate of 22.1 percent among Indians aged 16 to 19 in Districts 26 and 27 was more than four times the 5.1 percent rate for whites.  Ex. 358 p.23, 25 sub-ex. 14, 20.

The unemployment rate for persons 16 and over stood at 23.6 percent for Indians in South Dakota and 3.2 percent for whites.  The unemployment rate for persons of the same age group in Districts 26 and 27 stood at 31 percent for Indians compared to 2.3 percent for whites.  Ex. 358 p.23, 25 sub-ex. 14, 20.

Sixty-one percent of Indian households were renters, more than twice the 29.4 percent rate for white households.  In Districts 26 and 27, 56 percent of Indian households were tenants,

115

more than double the 25.1 percent rate for white households.  Ex. 358 p. 23, 26 sub-ex. 14, 20.

Over four percent of Indian households were without complete plumbing, compared to less than

one half of 1 percent of white households (0.4 percent).  Indian households without complete

plumbing in Districts 26 and 27 numbered 7.8 percent, compared to less than 1 percent (0.9

percent) of white households.  Ex. 358 p.23, 26 sub-ex. 14, 20. The median home value for

Indian home owners was $38,700, less than half the $80,500 median value of white owner-

occupied housing.  Ex. 358 p. 23 sub-ex. 14.

Fifty-one percent of Indian households reported incomes below $20,000 in 1999,

compared to less than one-fourth (24.4 percent) of white households.  In Districts 26 and 27, 52

percent of Indian households reported income below $20,000 in 1999, compared to the 32.9

percent of white households.  Ex. 358 p. 23, 26 sub-ex.14, 20.  The median family income of

Indians in South Dakota was $19,237, which is 43 percent of the $44,932 median income of

white families.  Ex. 358 p. 23-24 sub-ex. 14.  The Indian per capita income of $6,799 was only

36 percent of the $18,837 per capita income for South Dakota's white population.  Ex. 358 p.

24 sub-ex. 14.  Over 28,000 Indians in South Dakota (48 percent) lived below the poverty line

in South Dakota while 64,392 whites did.  There were 13,526 Indians (54.41 percent) living

below the poverty line in Districts 26 and 27, while 16,896 whites (15.6 percent) were below

the poverty line.  Ex. 358 p. 24, 26 sub-ex. 14, 20.

Approximately 21 percent of Indian households in South Dakota lacked telephones,

compared to 1.8 percent of all white households.  Approximately 25.9 percent of Indian

households in Districts 26 and 27 lacked telephones, compared to 1.7 percent of white

households.  Ex. 358 p. 24, 26 sub-ex.14, 20.  Indian households in South Dakota without

access to vehicles numbered 17.9 percent versus 5.4 percent of white households.  Indian households in Districts 26 and 27 without access to vehicles numbered 19.3 percent versus 3.2 percent of white households.  Ex. 358 p. 24, 26 sub-ex. 14, 20.

The ten counties in South Dakota with the highest poverty rates were counties which encompass all or part of a current or former Indian reservation, ranging from 57 percent in Buffalo County to 27 percent in Charles Mix County.  Ex. 358 p. 24 sub-ex. 15-16.  Eight of the ten counties with the lowest median household income levels were counties which encompass all or part of a current or former Indian reservation.  Ex. 358 p. 24 sub-ex. 15, 17.

Significant socioeconomic disparities exist in the areas of education, employment, income and housing.  Indians lag behind whites in virtually every measure of social well being. Ex. 358 p. 26-27.  The court finds that this factor favors plaintiffs.  Indians bear the effects of discrimination in many areas, including education, employment, and health.  The court finds that such disparities hinder political participation.

Defendants cite numerous factors to explain tribal members' economic condition, including exhibiting "less materialis[m] than non-tribal members," placing land in trust, which adversely affects productivity, practicing "measured separatism," and failing to live up to their contracts.  Docket 311 ¶ 109-111.  Even assuming for purposes of argument that these factors partially explain the economic condition of tribal members, they do not negate the conclusion that socioeconomic disparities have negatively impacted Indian participation in the political process.  Defendants have not carried the burden of proving that other factors caused depressed political participation among Indians.

Political involvement also reveals significant disparities.  Turnout rates for Indians in Districts 26 and 27 are generally lower than turnout rates for their white counterparts.  Dr. Zax's report indicates that Indian turnout rates in District 26 were usually 20 percentage points lower than those of whites between 1996 and 2000.  In District 27, Dr. Zax concluded that Indian turnout rates were usually more than 20 percentage points lower than those of whites.  Ex. 948 p. 31. This disparity virtually disappeared, however, in the 2002 election.  Ex. 948 p. 16.

It is difficult to determine disparity in voter registration because South Dakota does not require applicants for registration to identify their race.  T.VI p. 1531-32.  According to the 2000 Census, dual-race Indians are 95 percent of the population in Shannon County, 86.8 percent of the population in Todd County, and less than 4 percent of the population in Haakon and Jones Counties.  Ex. 358 sub-ex. 2.  According to the 2000 census, there were 6,819 persons of voting age in Shannon County as of April 1, 2000.  According to the state's May 22, 2000, registration data, which is the date closest in time to the census data, there were 5,160 active registrations in Shannon County.  This yields a registration estimate of 75.6 percent.  Ex. 358 sub-ex. 2; ex. 348.

There were 5,072 persons of voting age and 3,840 active registrations in Todd County.  This yields a registration estimate of 75.7 percent.  Ex. 348, ex. 358 sub-ex. 2.  There were 1,632 persons of voting age and 1,557 active registrations in Haakon County.  This yields a registration estimate of 95.4 percent.  Ex. 358 sub-ex. 2; Ex. 348.  There were 880 persons of voting age and 844 active registrations in Jones County.  This yields a registration estimate of 95.9 percent.  Ex. 358 sub-ex. 2; Ex. 948.

118

These statistics support Dr. Zax's estimates that there was nearly a 20-point disparity in registration rates between Indians and non-Indians in 2000.

Dr. McCool identified a number of factors that had "prevented, reduced or hindered Indian political participation," including "past and present discrimination, resistence to Indian voter registration, a hostile political and social environment, limited reading comprehension and understanding of election laws and precinct boundaries by tribal members, and extreme poverty." Ex. 356 p. 55. Dr. McCool attributed low Indian turnout to "the prevailing polarized political atmosphere, where Indians feel a distress and feel an atmosphere of hostility." Indians are the poorest people in South Dakota, and such poverty significantly impacts political participation. "One of the predominant themes in political science . . . literature is the impact of the socio-economic status on political participation." All of the predicted limitations apply to Indians in South Dakota. "People living on a day-to-day basis wonder if they can heat their home. Those are not the kinds of people who are the most predisposed to go out and engage in a great deal of political campaigning or activity." T.I p. 50-51.

Lay witness testimony supports Dr. McCool's conclusions. Alice Young, an Oglala tribal elder, testified that a racially hostile atmosphere at the polls discouraged her from voting. She described white poll workers as unfriendly: "They never spoke to me or greeted me or anything . . . I felt that they were being unfriendly towards me because I was Indian because I saw them greeting other people who were white. But when I'd approach them they wouldn't say hello or anything." As a result, Young quit voting for awhile. She testified that other Indians were equally uncomfortable at the polls as she was. T.IV p. 825-27. Young testified that having Indians working at the polls makes a great difference. She is a member of the

119

Lacreek District Civil Rights Committee and volunteered as a poll watcher during the 2002 general election in Martin, South Dakota.  "[W]hen the Indians came in . . . their faces were tense like they were uncomfortable to come there but when they saw us sitting there . . . their expression changed and they seemed to relax and be more at ease because we'd speak up and say hi, whoever it was, and greet them by name. . . . I know it made a big difference for us to sit there."  Young could not recall ever before having Indian poll watchers.  T.IV p. 827-28.

Sandi Flye, a member of the Oglala Sioux tribe, was a poll watcher at the Lacreek polling place in 1998.  Three white women also worked as poll watchers.  None of them spoke to her during the eight hours she was there.  T.IV p. 917.  Red Owl-Neiss testified that one reason for depressed political participation among Indians is that "they don't feel comfortable when they do go into the polling places when there's not Indians in the room."  T.IV p. 890.

Susan Williams, the Bennett County auditor, agreed that Indians in Bennett County were historically the victims of discrimination that has present day effects, including isolation of the Indian community and racial tension between Indians and non-Indians.  T.VI p. 1639-40.

Defendants' expert Dr. Lawson agreed that the depressed socio-economic status of Indians negatively impacts their political participation.  He also agreed that lack of telephones to communicate and lack of transportation makes it difficult for the Indian community to "get out the vote" and get to the polls on election day.  T.VIII p. 2116-18.

Evidence that South Dakota ranks among the highest in the nation for white voter registration and turnout bolsters the conclusion that inequality in socioeconomic arenas have negatively influenced Indian political participation.  In light of this evidence, the court finds that Indians in South Dakota bear the effects of discrimination in such areas as education,

120

employment and health, which hinders their ability to participate effectively in the political process.  The court, therefore, concludes that this factor weighs in favor of plaintiffs.

### 6.       Racial Appeals in the Political Process

Racial appeals have characterized some political campaigns in South Dakota.  During the 2002 primary election for Bennett County offices, Indians were accused of "trying to take over the county politically, . . . [and] trying to take land back and put it in trust."  Media outlets across the state ran numerous articles about alleged voter fraud prior to the general election.  None of the allegations were actually proved to be true.  T.IV p. 1002; Ex, 53, 105.  Bennett County's local newspaper ran a large, front page headline announcing, "LOCAL VOTER FRAUD LOOKED AT BY FBI," despite the fact that no fraudulent activity was alleged to have occurred in Bennett County.  Ex. 105; T.IV p. 1001, 1003-04.  Similar voter fraud allegations made the headlines in 1978.  Ex. 59-63, 247.

Meeks opined that Indians "needed to have greater interaction and visibility with the state at large."  After Democratic nominee Hunhoff chose her as his running mate, the campaign prepared a press release that identified her as a business woman from Interior and noted, near the bottom of the page, that she was a tribal member.  The following day the front-page headline in the state's largest newspaper neither mentioned her name nor her position but stated, "HUNHOFF PICKS INDIAN WOMAN AS RUNNING MATE."  Meeks testified that the headline surprised her.  "I did think it was a bit odd . . . you know, I was pretty accomplished in economic development or small business development, and that's what I thought I brought to the table."  T.V p. 1360-63; Ex. 373.

The court finds that there is some evidence of racial appeals in political campaigns in South Dakota.

### 7. Indian Elected Officials

The seventh Senate factor is the extent to which Indians have been elected to public office in the jurisdiction.  Senate Report at 207.  This is one of the two most important Senate factors to consider.  Clark II, 88 F.3d at 1397; Gingles, 478 U.S. at 51 n.15.  The lack of success among Indian candidates "is a strong factor tending to show vote dilution."  Sanchez, 97 F.3d at 1319.

"The election of a few minority candidates does not necessarily foreclose the possibility of dilution of the [minority] vote."  Id. at 1397.  See id. (fact that blacks had been elected as aldermen and election commissioner had "limited relevance"); Marengo County, 731 F.2d at 1572 (election of small number of minority officials does not compel finding of no dilution).  Defendants' reliance on the fact that several Indians in the affected areas have been elected to office "overstate[s] the political reality."  Clark II, 88 F.3d at 1398.

Defendants admit that between 1982 and 2002 not a single Indian candidate was elected to the legislature from the area which is now included in District 26.  No evidence in the record refutes this finding.  Ex. 349.

Defendants claim that District 27 has never elected "a full slate of tribal members to the South Dakota legislature."  They note that Representative Bradford is not an enrolled member of any Indian tribe and is not generally perceived to be an Indian.  Docket 311 ¶ 153, 156; T.V p. 1388, 1419.  As support for this, defendants cite testimony by Meeks that Bradford is not an enrolled tribal member, by Brett Healy, the former executive director of the Democratic Party

122

in South Dakota that Bradford is not an Indian, by Susan Williams, the Bennett County auditor, that Bradford is not Indian and not perceived by people in the community as Indian, and by Senator Brown that he does not think Bradford is an Indian.  T.V p. 1388, 1235; T.VI p. 1605-06; T.VIII p. 2174.

The court finds, however, that Representative Bradford is an Indian, contrary to defendants' repeated argument.  In United States v. Driver, the court articulated a test for determining whether the law identifies a person as an Indian.  755 F. Supp. 885, 888 (D.S.D. 1991).  Tribal enrollment is not dispositive.  Id.  Representative Bradford satisfies the test. First, he has some Indian blood because his mother is of Indian ancestry.  Id.  Second, he is widely recognized as an Indian.  He has received assistance reserved only for Indians, including Indian Health Services benefits and educational funding for Indians.  Id.  Finally, he "enjoys the benefits of tribal affiliations [and] is socially recognized as an Indian" because he lives on the reservation and participates in Indian social life.  Id. at 889; T.IV p. 1060-63, 1095-96. Thus, District 27 has elected a full slate of Indians.  Defendants acknowledge, moreover, that the Indian-preferred candidate does not have to be Indian.  T.VII p. 1829-31; T.IV p. 908.

Defendants also point out that several Indians have been elected to the legislature from the majority-Indian District 27 and its predecessor, and that all five members of the county commission in majority-Indian Shannon County are Indian.  The court finds this evidence to be unpersuasive because the election of Indians in majority-Indian districts, such as District 27 and Shannon County,  is unremarkable and not probative of whether there is dilution in neighboring majority-white districts.

Additionally, defendants listed 27 names of Indian people who held office in Bennett County from 1912 to 2003. Ex. 951.  The court finds that electing fewer than thirty Indians in nearly 100 years in a majority-Indian county does not demonstrate a long history of Indians being elected to office.  Several positions listed, moreover, were appointed, which detracts from their probative value.  Furthermore, county-wide elections are not at issue and therefore, have less relevance.  Clark I, 21 F.3d at 97.

The court finds that defendants' evidence of Indians working as county employees is neither relevant nor probative of any issues in this case.  Bennett County's employment of Indians has no bearing on whether the current Plan dilutes Indian voting strength or whether Indians have an equal opportunity to become involved in the political process.  Ex. 952.

The court concludes that the election of no Indian candidates to the area which is now included in District 26 between 1982 and 2002 is highly probative evidence and the seventh Senate factor weights in favor of plaintiffs.

### 8.    Unresponsiveness

The Senate Report recognized that "a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group" might have some probative value in evaluating the totality of the circumstances under § 2.  Senate Report at 207.  "If the officials are unresponsive it suggests that they are willing to discriminate against minorities and need not be accountable to minority interests."  Marengo County, 731 F.2d at 1572.  "[U]nresponsiveness is not an essential part of plaintiff's case."  Senate Report at 207 n.116

124

Defendants argue that South Dakota is responsive to Indian needs.  Although there is some evidence of responsiveness, the court finds that South Dakota is largely unresponsive to the needs of Indians.  The creation of the Task Force on Indian-State Government Relations in 1973 demonstrated tribal-state cooperation.  It was able to get several bills through the legislature that equalized the treatment of tribes compared to other political entities in the state.  For example, the bills defined what an Indian tribe is, allowed for the transfer of surplus state property to Indian tribes as was done for municipalities, and provided license plates to the tribes on the same basis as municipalities.  Ex. 268 p. 43-44.  After 1974, however, the task force was "basically in a phase-out mode" and the legislature refused to re-fund it.  T.II p. 506.

In 1975, the legislature passed Senate Concurrent Resolution No. 7, which petitioned Congress to provide leadership in solving the problems that existed on Indian reservations in South Dakota.  This damaged the relationship between tribes and the state government.  The tribes strongly opposed the resolution because the state "was breaking faith with them because . . . they should try to work things out through this task force."  Thereafter, "trying to improve the working relationship between Indian tribes and state government has never really been on the front burner of the legislature."  Short Bull testified that today "we don't really see meaningful things come through [the legislature] that improves the situation for Indian people." T. II p. 509-11; Ex. 269 p.12.

The current legislators elected from District 26 are Senator John Koskan and Representatives Cooper Garnos and Kent Juhnke.  All three are non-Indian.  Since they took office under the 2001 Plan, all three legislators have repeatedly voted against legislation that was of particular concern to, and supported by, Indians.  Ex. 377; Legislative History; T.IV p.

1077-80.  During the 2004 legislative session, Representatives Bradford and Valandra sponsored House Bill (HB) 1295 to repeal the prohibition on objects dangling from a vehicle's rear-view mirror.  The dangling objects law was viewed by Indians as a pretext for stopping drivers solely on the basis of their race.  Representatives of the South Dakota Highway Patrol, the South Dakota Sheriffs, and the ACLU spoke in favor of the original bill and representatives of First Voices, the Department of Public Safety, the South Dakota Sheriffs, and the ACLU spoke in favor of the amended version.  After the bill was drastically modified or "hoghoused" in the House Transportation Committee, Representative Juhnke was one of only 19 legislators to vote against a weakened version on the floor.  House Journal (HJ) 340, 441; Senate Journal (SJ) 473, 531.

Representative Bradford sponsored HB 1226.  Its original purpose was to direct the Department of Game, Fish and Parks to negotiate with Indian tribes regarding management of Bear Butte State Park.  Bear Butte is recognized to be a place of religious significance to Indians.  Representatives of the Rosebud Sioux Tribe and the South Dakota chapter of the Sierra Club testified in favor of the bill; no one testified in opposition.  After it was hoghoused in the House of Agriculture and Natural Resources Committee, Representatives Juhnke and Garnos voted in favor of tabling it on the house floor.  HJ 344, 391.

Representative Bradford sponsored HB 1227, which would have repealed the requirement of a notary public to administer an oath to a voter when voting by absentee ballot. Representative Bradford was concerned about the lack of availability of notaries on the reservations.  In the House State Affairs Committee, Representative Garnos voted in favor of deferring this bill to the 36th legislative day, which would effectively kill it.  He then voted in

126

favor of hoghousing the bill to render it much less beneficial to the Indian population.  HJ 326, 527.

Representative Valandra sponsored HB 1306, which would have provided a process to refund certain motor fuel taxes to tribal members.  A representative of the Rosebud Sioux Tribe testified in favor of the bill.  In the House Taxation Committee, Representative Juhnke helped to defeat the bill by voting to table it until the 36th legislative day.  HJ 486.

Representatives Bradford and Valandra sponsored House Concurrent Resolution 1021, which urged the governor to ensure the availability of state funds to provide for motor fuel tax refunds to members of the Oglala Sioux Tribe.  Representative Juhnke helped to defeat this bill by voting against it on the house floor.  HJ 833.

During the 2003 legislative session, Representative Bradford sponsored HB 1210, a bill to allow for the construction of a nursing home facility on an Indian reservation under certain circumstances.  Representatives from the governor's office and First Voices, two individuals, two South Dakota state representatives and two senators testified in favor of the bill.  This bill had special significance during this session because it was an issue that was very important to the late Senator Richard Hagen, a former Indian legislator from District 27.  Representative Juhnke was one of only nine legislators to oppose the bill in the floor vote.  HJ 546, SJ 704.

During the 2003 legislative session, Representatives Bradford and Valandra sponsored HB 1223, which would have required law enforcement officials to collect and maintain certain statistics regarding traffic stops in an effort to identify whether racial profiling was occurring.  Two individuals, three South Dakota state representatives, and representatives of First Voices, the South Dakota Democratic Party and the ACLU testified in favor of the bill.  Representative

Garnos helped block the bill by voting to defer it to the 41st legislative day in the House State Affairs Committee.  HJ 472.  In 2001, a similar bill was sponsored by Representatives Valandra and Bradford, HB 1211.  In the House State Affairs Committee, Representative Juhnke helped stop the bill by voting to defer it to the 41st legislative day.  HJ 403.

Representatives Valandra and Bradford sponsored HB 1211, which would allow the housing of prisoners from other jurisdictions on Indian reservations.  A representative from First Voices spoke in favor of the bill.  Both Representatives Garnos and Juhnke voted against it.  HJ 401, 486.

The Secretary of State, a defendant in this case, requested HB 1009, which would have increased voter access to absentee ballots.  The Secretary, a representative of South Dakota County Officials, and two individuals testified in favor of the bill.  Senator Koskan and Representative Juhnke both opposed the bill in the floor vote.  HJ 76, 122; SJ 32, 411.

The Secretary of State also requested HB 1010, which would have allowed Internet voter registration.  He presented the bill in committee and a representative of South Dakota County Officials spoke in favor of the bill.  Representative Juhnke voted against the bill on the house floor.  HJ 77, 171; SJ 328.

During the 2002 legislative session, all three District 27 legislators sponsored House Concurrent resolution 1015, which encouraged state and local law enforcement agencies to acquire and to use video cameras at all traffic stops, again in an effort to identify racial profiling.  Representative Juhnke and Senator Koskan were among the 26 legislators who voted against the resolution.  HJ 575; SJ 509.

All three District 27 legislators sponsored House Concurrent Resolution 1016, encouraging local law enforcement agencies to adopt community policing practices. Representative Juhnke was one of 26 legislators to vote against this resolution on the house floor.  HJ 576, SJ 509.

During the 2001 Special Session of the legislature, Representative Bradford offered an amendment to Senate Bill 1, the redistricting legislation, that was identical to Cooper's Illustrative Plan C.  Representatives Bradford, Valandra, and Van Norman voted in favor of the floor amendment, and Representatives Garnos and Juhnke voted against it.  HJ 18.

During the 2001 legislative session, all three District 27 legislators sponsored Senate Bill 204, which would permit tribal identification cards in lieu of other identification when applying for a driver's license.  Three South Dakota State Representatives and a representative of the South Dakota Department of Commerce and Regulation testified in favor of the amended bill in committee.  Representative Koskan was one of only seven legislators to vote against the bill.  HJ 762, 796; SJ 431, 481.

Representatives Valandra and Bradford sponsored HB 1180 to allow for the sale of surplus property to tribal subdivisions.  Three South Dakota State Representatives, one individual, and a Bureau of Administration representative testified in favor of the bill; no one testified in opposition.  The bill was hoghoused in the House State Affairs Committee, and Representative Koskan was one of only eight legislators to vote against a weakened version of the bill.  HJ 402, 448; SJ 671, 701.

Representatives Valandra and Bradford sponsored HB 1210, which would have provided for the appointment of delegates from state tribal governments to the Legislature.

129

Two South Dakota State Representatives spoke in favor of the bill and no one spoke in opposition.  Representative Juhnke helped to block the legislation by voting, in the House State Affairs Committee, to table it.  HJ 520.

During the 2004 legislative session, Senator Michael LaPointe, an Indian appointed to fill the unexpired term of the late Senator Hagen, and Representative Valandra sponsored Senate Bill 211, which established a commission to study compliance with the federal Indian Child Welfare Act (ICWA).  Representatives of the Cheyenne River, Lower Brule, Sisseton, Rosebud, Oglala, and Standing Rock Sioux Tribes, the governor's office, the ACLU, and the South Dakota Peace and Justice Center spoke in favor of the original bill.  After the bill was amended, Representatives of the Sisseton-Wahpeton Sioux Tribe and First Voices spoke in opposition to the amended version.  Senator Koskan supported the amended version of the bill, which the tribes opposed, on the senate floor after it was hoghoused in the Senate Judiciary Committee.  Representative Garnos supported the amended version in the House State Affairs Committee and he and Representative Juhnke supported it in two floor votes.  SJ 333, 375; HJ 696, 742, 743.

Both Representatives Bradford and Van Norman testified that, in their opinion, the legislature as a whole and the legislators from District 26 in particular are not responsive to Indian concerns.  Representative Bradford from District 27 testified that Indians in District 26 frequently contact him for constituent services.  He opined that Indians in District 26 would rather contact him than one of their own representatives because "everybody knows you. You're one of us and everybody knows you."  T.IV p. 1078.

Representative Van Norman said "that just about every bill I have has been bottled up in house and blocked on party lines.  Anything to do with Indians instantly is, in my experience treated in a different way unless acceptable to all."  Referencing repeated attempts to pass legislation that would require law enforcement to collect information about stops, Van Norman said, "four times, four years, all shot down on party lines in committee."  Van Norman testified that "when it comes to issues of race or discrimination, people don't want to hear that.  In fact, one of the members of the Committee on House Transportation said I was being racist by even introducing that bill requiring statistics on who was pulled over."  T.V p. 1264-65, 71.

Dr. McCool echoed this testimony.  He indicated that there is a widespread perception among Indians that state and local governments are generally unresponsive to their concerns.  Ex. 356 p. 45.

In 2002, during debate on HB 1292, which would have required state law enforcement officers to collect data on racial profiling, Representative John Teupel stated that he would be "leading the charge to end racial profiling, to reduce alcoholism and poverty on the reservations and to support Native American voting rights when Indians decide to be citizens of the State by giving up tribal sovereignty and paying their fair share of the tax burden."  Ex. 374.  This evidence demonstrates a significant lack of responsiveness on the part of elected officials to Indian concerns.

Defendants have offered evidence of state and federal expenditures in Shannon and Todd counties to support their contention that the state is responsive to Indian concerns.  They note that Indians receive a disproportionately high amount of monetary benefits from the state and local governments.  T.V p. 1429-41; T.VI 1733-56; Ex. 424, 432-33, 466, 866, 1004, 1031.

The court finds this evidence unpersuasive.  First, the evidence is underinclusive: it does not include state and federal expenditures in the parts of Districts 26 and 27 that lie outside of Shannon and Todd Counties.  Second, it is overinclusive because it does not indicate how much of the state and federal expenditures in Shannon and Todd Counties go to non-Indians.  Third, defendants have not provided any basis for comparison to other counties or populations.  The total amount of expenditures reveals little about responsiveness.  Fourth, while defendants contend that Indians receive a disproportionately high amount of state and local benefits, the evidence largely relates to federal expenditures and only some state expenditures.  T. VIII p. 2060-63, 2143-2155.

Defendants argue that the South Dakota legislature, including representatives from District 26, has been responsive to the particularized needs of Indians in Districts 26 and 27. T.VIII p.2159-65, 2181-82, 2210-12, 2216-28; Ex. 1016-19.  The court recognizes that the legislature has been responsive to certain Indian interests.  Much of the testimony cited, however, relates to measures that broadly affect both Indians and non-Indians.  As a result, this evidence is less probative of responsiveness to specific Indian concerns.  Exhibits 1017-19, moreover, report South Dakota's budget.  This is not probative of what funding directly addresses Indian needs or funds specific Indian interests.

The Senate Report indicates that although a showing of unresponsiveness might have some probative value, a showing of responsiveness on the part of elected officials would have very little.  Senate Report at 207 n.16; Marengo County, 731 F.2d at 1572.  For that reason, defendants' proof of some responsiveness does not negate plaintiffs' proof by other, more objective factors, that minority voters nevertheless do not have equal access to the political

132

process.  Senate Report at 207 n.16; <u>Clark II</u>, 88 F.3d at 1400 ("the finding of responsiveness has limited relevance"); <u>Harvell</u>, 71 F.3d at 1391 (finding of responsiveness was "insufficient to counter the other factors" that supported dilution).

The court finds that this factor weighs in plaintiffs' favor.  Defendants' evidence of limited responsiveness does not counter the overwhelming evidence of unresponsiveness by the legislature on legislative issues of particular interest to Indians.  The court finds defendants' evidence of some responsiveness to be of little probative value and relevance.  Furthermore, evidence about funding received by counties in Districts 26 and 27 does not negate the substantial evidence presented by plaintiffs that Indians do not have equal access to the political process.

### 9.    Tenuousness

The Senate Report also recognized that "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedures is tenuous" might have some probative value in evaluating the totality of the circumstances under § 2.  Senate Report at 207.  "[T]he tenuousness of the justification for a state policy may indicate that the policy is unfair."  <u>Marengo County</u>, 731 F.2d at 1571.

The Senate Report made clear, however,  that "even a consistently applied practice premised on a racially neutral policy would not negate a plaintiff's showing through other factors that the challenged practice denies minorities fair access to the process."  Senate Report at 207 n.117.  Although the weight, in addition to the tenuousness, of the state's interest is a legitimate consideration in the totality of the circumstances analysis, "proof of a merely non-tenuous state interest . . . cannot defeat liability."  <u>Clark II</u>, 88 F.3d at 1401.

Plaintiffs did not allege that the policy underlying the 2001 Plan was tenuous but did rebut the defendants' assertion that non-tenuous policies support the Plan. Defendants argue that the current configuration of districts is fair, that the people in Districts 26 and 27 did not want to change them, and that low voter turnout necessitates a district with a high percentage of Indians. T.VIII p. 2180-81, 2235-36; Ex.401. The evidence indicates that nothing before the legislature supports defendants' claim that it was necessary to create a district that is over 90 percent Indian. No statistical analysis or other data supports the conclusion that this high percentage was needed to make it possible to elect Indian-preferred candidates. Rather, Mr. Bezpaletz, chief of research analysis for the Legislative Research Council, warned the Legislative Redistricting Committee about packing early in the 2001 redistricting process. He stated that in his view, a district could be up to 65 percent minority without violating the rule against packing. Ex. 401 Tab 1 (Meeting 7/24/01 p.2); T.IV p. 1084.

Representative Bradford also expressed concerns to the committee about packing District 27 with Indians. Bradford testified that he believes the percentage of Indians in the district is higher than necessary to provide Indian voters an opportunity to elect candidates of their choice. Ex. 401 Tab 1; T.IV p. 1067, 1083-84.

The redistricting committee received almost no input from residents on the Pine Ridge and Rosebud Reservations. The meetings that were held at Wolf Creek school on Pine Ridge and Sinte Gleska College at Rosebud were poorly attended. Committee members did not hand out proposed redistricting maps at the meetings. A person could only view the redistricting maps by going to the Legislative Research Council in Pierre and viewing the maps in a three-ring binder. People could not copy or distribute the maps. The committee's chairman knew of

134

no legal authority to support the committee's decision not to distribute the maps.  T.VIII p. 2244-45, 2192-95; T.V p. 1423.

The court finds the policies advanced by defendants to justify the current district lines to be insupportable.  See Bush, 517 U.S. at 912.  Thus, this consideration is not favorable to defendants.

### 10.    Proportionality

Another consideration relevant to a § 2 analysis is whether the percentage of minority voters in a district is roughly proportional to the percentage of minority voters in the voting-age population.  De Grandy, 512 U.S. at 1000.  Proportionality "links the number of majority-minority voting districts to minority members' share of the relevant population"  Id. at 1014 n.11.

Although proportionality indicates that minority voters have an equal opportunity to participate in the political process and elect representatives of their choice, the degree of probative value assigned to proportionality and disproportionality varies with other facts.  Id. at 1020 n.17.  Indeed, "the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish a violation."  Gingles, 478 U.S. at 46.  Proportionality is not, therefore, dispositive, but is a relevant factor in the totality of the circumstances analysis.  Stabler v. County of Thurston, Neb., 129 F.3d 1015, 1022 (8th Cir. 1997).  "There is no reason why the Native American minority in this case should continue to bear the burden of under-representation under the current scheme while the white majority enjoys over-representation."  Id.

The 2001 redistricting plan lacks proportionality.  Indians constitute approximately 9 percent of South Dakota's total population and approximately 7 percent of the state's VAP. The 2001 Plan contains 105 legislative seats, four of which are majority Indian.  For Indian voters to achieve proportionality in relation to their approximate share of the total population, the 2001 Plan would have to contain 9 (105 x .09 = 9.45) majority-Indian seats.  For Indian voters to achieve proportionality in relation to their approximate share of the voting-age population, the 2001 plan would need 7 majority-Indian seats (105 x .07=7.35).  Ex. 358 p. 14. The 2001 Plan provides Indians only 44 percent (4/9) of the power they would have in the legislature in a plan that achieved proportionality according to total population and only 57 percent (4/7) of the power in a plan that achieved proportionality according to VAP.

This lack of proportionality is even greater in the State Senate.  The Senate is comprised of 35 members, only one of whom is elected from a majority-Indian district.  For Indian voters to achieve proportionality in the senate in relation to their approximate share of the total population, the 2001 Plan would have to contain 3 (35 x .09 = 3.15) majority-Indian seats, and to achieve proportionality in relation to their approximate share of the VAP, the 2001 Plan would have to contain 2 (35 x .07 = 2.45) majority-Indian seats.  The 2001 Plan provides Indians with only 33 percent (1/3) of the power they would have in the state senate in a plan that achieved proportionality according to total population and only 50 percent (½) of the power in a plan that achieved proportionality according to VAP.

There is also a lack of proportionality with respect to the state house.  The house is comprised of 70 members, three of whom are elected from majority-Indian districts.  For Indian voters to achieve proportionality in the house in relation to their approximate share of the total

population, the 2001 Plan would have to contain 6 (70 x .09 = 6.3) majority-Indian house seats. For Indian voters to achieve proportionality in relation to their approximate share of the VAP, the 2001 Plan would have to contain 5 (70 x .07 = 4.9) majority-Indian house seats.   The 2001 Plan provides Indians with only 50 percent (3/6) of the power they would have in the state house in a plan that achieved proportionality according to total population and only 60 percent (3/5) of the power in a plan that achieved proportionality according to VAP.

Additionally, Cooper's report shows that, according to the census data, Indians are rapidly increasing both their absolute numbers and share of the population in South Dakota. Between 1990 and 2000, the state's Indian population grew at a rate of between 23 percent and 35 percent, while the state's white population grew at a rate of only 5 percent and 6.4 percent. From 1990 to 2000, Indians grew from 7.27 percent of the state's population to 9.01 percent. Ex. 358 p. 10 sub-ex. 4.  Population estimates from the census bureau show this trend continuing into this decade.  Ex. 358 p. 11 sub-ex 6; T.I p. 269.  The court finds that plaintiffs have presented evidence of disproportionality.  The court therefore finds that this factor favors plaintiffs.

### 11.    Indian Candidacies

The fact that few Indians have run for legislative office is evidence that the existing system is discriminatory.  "The lack of black candidates is a likely result of a racially discriminatory system."  McMillan v. Escambia County, Fla., 748 F.2d 1037, 1045 (5th Cir. 1984).

Only one Indian candidate has run for the legislature from District 26 since 1982.  Ex. 359 p. 24-25.  Elsie Meeks, a resident of District 26, testified that she would consider running

for office agin, but not for a seat in District 26.  She "would have to campaign in Winner,

Martin, White River, Kadoka, Philip.  And I know enough about those communities to think I

would have a very difficult time getting elected. . . . I would be surprised if I would get more

than 20 percent of that vote."  T.V 1367-68.

Brett Healy, the former chairman of the South Dakota Democratic Party, testified that

"it's difficult to get a Native American candidate outside of heavily Native American districts

to consider running for office in part because of the abuse that they might undergo [and] . . . the

perception . . . that even white Democrats aren't going to vote for an Indian candidate."  T.V

1219-20.

Dr. McCool noted that "perhaps the greatest factor explaining the low Indian turnout in

state and local elections is the feeling that they cannot win."  Ex. 356 p. 45.  In contrast,

numerous Indians have run for offices where they perceive a fair chance of being elected, such

as legislative offices in District 27 and county offices in Shannon and Todd counties where

Indians are the majority.  The court finds that the evidence demonstrates that there are few

Indians who run for office in majority white districts.  This factor weighs in favor of plaintiffs.

## 12.    Voter Apathy and Low Turnout

Defendants' repeated attempts to attribute lack of Indian political success to voter

apathy do not save the 2001 Legislative Plan. "Both Congress and the courts have rejected

efforts to blame reduced [minority] participation on 'apathy.'"  Marengo County, 731 F.2d at

1568.  Indeed, "speculation regarding reasons for low minority turnout is inappropriate."

Harvell, 71 F.3d at 1387.

The Fifth Circuit stated that the "presence of voter apathy is not a matter for judicial notice," and that the evidence of socioeconomic differences between the minority and the majority voters dictated against a finding that minority voter apathy resulted in lower political participation.  Teague, 92 F.3d at 294-95.  A court should approach a claim "that certain persons lack a substantial interest in the electoral process" with skepticism for "all too often, lack of a 'substantial interest' might mean no more than a different interest, and fencing out from the franchise a sector of the population because of the way they may vote is constitutionally impermissible."  Little Thunder, 518 F.2d at 1256.

In Marengo County, the Eleventh Circuit concluded that the District Court erred in attributing lack of black success at the polls to apathy:

> This explanation is unsupported by the evidence and the controlling law.  The evidence reveals racially polarized voting; a nearly complete absence of black elected officials; a history of pervasive racial discrimination that has left Marengo County blacks economically, educationally, socially, and politically disadvantaged; polling practices that have impaired the ability of blacks to register and participate actively in the electoral process; election features that enhance the opportunity for dilution; and considerable unresponsiveness on the part of some public bodies.  Some of the factors are neutral, but nothing substantial weighs in favor of the defendants.  The record compels a finding that, as of the time of trial, Marengo County's at-large system resulted in an abridgement of black citizens' opportunity to participate in the political process and to elect representatives of their choice.

731 F.2d at 1574.  See Harvell, 71 F.3d at 1388 (a number of socioeconomic factors can explain low voter turnout).

The same factors exist in South Dakota and have resulted in the same denial of access to the political process of Indians.  The Eighth Circuit found that the district court "improperly assumed that lack of motivation caused lower turnout" at the polls.  Whitfield, 890 F.2d at 1431.  It recognized that even though blacks were "working strenuously" to register black

139

voters and encourage participation, voter turnout remained low.  Id.  Black turnout, however, did not decrease as dramatically as white turnout, which evidenced to the court that "black voters are not apathetic.  We believe that other factors contribute to a lack of political participation."  Id. at 1431-32.

The court finds a similar situation before it today.  Voter turnout and participation among Indians remains low, despite recent and successful efforts to register Indians and increase voter turnout.  Nevertheless, the level of Indian turnout in District 26 in the 2002 election increased dramatically from previous elections.  This evidences that Indian voters are not apathetic and that other factors contribute to the historic lack of participation.

Accordingly, the court finds that as a matter of law, voter apathy and similar arguments are not a defense to plaintiffs' claims.  "Indeed, there are so many possibilities for explaining the low turnouts that selecting any one in this case is purely impermissible speculation." Harvell, 71 F.3d at 1388.

Defendants blame the inability of Indians to elect their preferred candidates to a lack of interest in state politics and internal division among tribes.  They claim that Indians have a greater interest in tribal government and fear that voting in state and county elections will erode their tribal sovereignty.  See Docket 311 ¶ 101-103; T.II p. 372, 517-18; T.IV p. 909; T.V p. 1182; T.VIII p. 2111.  The record, however, refutes these claims.  Ex. 83, 132, 144, 147, 148-50, 159, 162, 168-71, 181-82, 184, 186-88, 190, 198, 206, 218, 276, 378.

Many Indians who testified underscored the value and necessity of participating in state and federal elections.  Alice Young, an Oglala tribal elder, testified to her belief that voting is her privilege and duty "as a citizen of the United States, as a citizen of the world.  I feel that I

140

have a right to vote just as anybody else does." T.IV p. 826.  Red Owl-Neiss said that "[P]art of being an American citizen is the right to vote.  And a lot of people died for that right to vote and in order to honor those people I think it's really important that our children participate in that." T.IV p. 864.  Red Owl-Neiss disagrees that a fear of losing tribal sovereignty explains why some Indians do not vote.  She believes a better explanation is that Indian voters do not "feel any ownership or that their vote is going to make a difference."  T.IV p. 889-90.

Betty Red Owl, who served on the tribal council at Rosebud for 12 years, worked on voter registration drives in 1998 and 2002 in connection with Lakota Dakota Vote.  Lakota Dakota Vote was designed to register tribal members in state and federal elections.  "In 1998 we registered a little more than 12,000 people on all the reservations."  T.IV p. 840.  Red Owl said that some Indians have not registered and voted because "they don't think it does them any good to vote."  Others "don't understand the federal and state political thing.  We're trying to teach them a little bit about how important it is to vote."  T.IV p. 842.

Nevertheless, Indian registration and voting are increasing.  There was a large increase in Indian voting in 1998 and 2002.  Indians provided rides to the polls on election day, "and as long as they had a ride to go do it, they would go and vote."  T.IV p. 843.

Meeks thinks it is very important for Indians to participate in local and state elections.  "The state makes a lot of decisions that affect Native Americans.  They're reservations, and I think it's very important that their voice is heard in Pierre and that their perspective is represented."  T.V p. 1377.

Clausen said that an Indian presence on an elected board means that the non-Indian members "have to look at the Native American right in the eye while they're making these

decisions" that affect Indians.  Even if the Indian is outvoted, "he still is there every time."

Experience demonstrates that non-Indian elected officials "have been treating the issues that

deal with Native Americans in a lot more positive fashion."  T.IV p. 1006-07.  Throughout

South Dakota's history, Indians have made repeated and persistent efforts to participate in the

political process at all levels of government despite facing outright discrimination and informal

barriers in exercising their right to vote.  Ex. 356 p. 15-16, 19-20, 54. Susan Williams, Bennett

County Auditor, acknowledged that Indians want to participate in state and local elections and

elect representatives of their choice.  T.VI p. 1637.

Dr. McCool testified:

> Indians are trying to register; they are trying to participate.  They want to vote, but their efforts are thwarted by local officials, so they take them to court and they win.  So we see this is part of a pattern, Indian people trying to participate.  They run into difficulties and resistance, and often times they have to resort to a lawsuit. . . . U.S. v. South Dakota in 2000 . . . [is] part of a history of lawsuits over several decades where Indians are attempting to participate in the political process.  They are encountering difficulties, they are going to court, they are winning cases.  Clearly evincing a persistent effort on the part of Indians to engage in the political process.
>
> I think what history demonstrates is a continual effort on the part of Indians to participate as they become more aware of how the system operates, how it affects them, how important state and local government is to them.  I see Indian people becoming much more involved in the state and local government, and they repeatedly encounter resistance and opposition in their efforts to vote and participate in elections.  But they are persistent, and they keep trying.

T.I p. 35, 38.

Dr. Lawson agreed that the Sioux people no longer focused politically just on tribal

government.  "I think there's a growing number of tribal members who see the importance of

political participation at every level."  He noted that Indians "are least likely to vote when they

see that the vote doesn't make any difference, [that] it wouldn't make any difference."  T.VIII p. 2132, 2109.

Accordingly, the court finds that voter apathy does not account for the inability to elect Indian preferred candidates in the affected areas.  Voter apathy cannot justify any dilution that results from the current Plan.

After reviewing each of the Senate factors and the other relevant circumstances in this case, the court concludes that under the totality of the circumstances, the South Dakota 2001 Plan results in unequal electoral opportunity for Indian voters.  The court finds that plaintiffs have satisfied the three <u>Gingles</u> factors and that the totality of the circumstances evidence that Indians in Districts 26 and 27 have been denied an equal opportunity to access the political process.  The current legislative Plan impermissibly dilutes the Indian vote and violates § 2 of the Voting Rights Act.  Defendants must afford Indians in both Districts 26 and 27 a realistic and fair opportunity to elect their preferred candidates.

## V.  Remedy

Having established that the existing plan violates the Voting Rights Act, plaintiffs are entitled to a full and complete remedy for the unlawful dilution of their voting strength. Because redistricting remains primarily in the domain of the states, the state government should ordinarily have the first opportunity to propose a remedy for a § 2 violation.  <u>Voinovich</u>, 507 U.S. at 156; <u>Chapman v. Meier</u>, 420 U.S. 1, 27, 95 S. Ct. 751, 42 L. Ed. 2d 766 (1975).

It is no defense to claim that any remedy that might be imposed would consider race and therefore be unconstitutional.  Remedying a violation of § 2 "by definition employs race." <u>Clark II</u>, 88 F.3d at 1408.  The remedy cannot, however, subordinate traditional political

143

concerns to race any more than reasonably necessary.  Id.; Bush, 517 U.S. at 979.  These concerns, however, are better addressed at the remedial phase of the litigation where the state will have the first opportunity to draw district lines.  Sanchez, 97 F.3d at 1329.

Accordingly, it is hereby

ORDERED that judgment be entered for the plaintiffs on the issue of vote dilution in violation of § 2 of the Voting Rights Act of 1965.

IT IS FURTHER ORDERED that defendants shall have 45 days from the date of this order to file remedial proposals consistent with this opinion for consideration by this court, and to brief the issue of whether defendants should be permanently enjoined (and the scope of such injunction) from enforcing the 2001 Plan in any further elections.  Plaintiffs shall then have 30 days to file any objections to defendants' remedial proposals and to respond to defendants' brief on the permanent injunction issue.  Defendants shall then have 10 days to respond to plaintiffs' brief.

Dated September 15, 2004.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

144