UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| ALFRED BONE SHIRT; BELVA BLACK LANCE; BONNIE HIGH BULL; and GERMAINE MOVES CAMP,<br><br>    Plaintiffs,<br><br> vs.<br><br>JOYCE HAZELTINE, in her official capacity as Secretary of the State of South Dakota; SCOTT ECCARIUS, in his official capacity as Speaker of the South Dakota House of Representatives; SOUTH DAKOTA HOUSE OF REPRESENTATIVES; ARNOLD BROWN, in his official capacity as President of the South Dakota Senate; and SOUTH DAKOTA SENATE,<br><br>    Defendants. | CIV. 01-3032-KES<br><br><br><br>REMEDIAL ORDER |

    Plaintiffs filed suit on December 26, 2001, alleging that South Dakota's 2001 legislative redistricting plan ("the 2001 plan") violates their rights under §§ 2 and 5 of the Voting Rights Act of 1965 (VRA). Complaint (Docket 1). On January 29, 2002, a three-judge panel heard plaintiffs' § 5 claim and held that defendants violated § 5 by failing to preclear the Plan. See Bone Shirt v. Hazeltine, 200 F. Supp. 2d 1150 (D.S.D. 2002). On September 15, 2004, after a trial to the court, this court found that § 2 was violated because Indian

voting strength was diluted by the packing of District 27 with a 90 percent supermajority of Indians.  Bone Shirt v. Hazeltine, 336 F. Supp. 2d 976 (D.S.D. 2004).   This court also found that the state government should have the first opportunity to propose a remedy for the § 2 violation and ordered defendants to file remedial proposals with the court by November 1, 2004.

On November 1, 2004, defendants requested that this court certify to the South Dakota Supreme Court the question of whether the state legislature could constitutionally engage in legislative apportionment in a year other than the year after a decennial census.  This court agreed and certified to the South Dakota Supreme Court the question of whether the state legislature could reapportion Districts 26 and 27 and other affected areas in response to the federal district court finding a violation of § 2 of the Voting Rights Act, and it notified defendants that they would have 30 days after the Supreme Court acted to either adopt a new apportionment plan or submit remedial proposals to this court.  On June 29, 2005, the South Dakota Supreme Court found that the South Dakota Legislature is authorized under the South Dakota Constitution to reapportion Districts 26 and 27 and other affected areas in response to the federal district court's finding that § 2 of the Voting Rights Act of 1965 was violated.  Bone Shirt v. Hazeltine, 700 N.W.2d 746 (S.D. 2005). Even though the South Dakota Supreme Court held that the South Dakota Legislature had the power to reapportion, on July 29, 2005, defendants

informed the court that they "respectfully declined to submit a new apportionment plan or a remedial proposal to the Court." (Docket 358).

"'When a federal court declares an existing apportionment scheme unconstitutional, it is therefore appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan.'" Williams v. City of Texarkana, Ark., 32 F.3d 1265, 1268 (8th Cir. 1994) (quoting Wise v. Lipscomb, 437 U.S. 535, 540, 98 S. Ct. 2493, 2497, 57 L. Ed. 2d 411 (1978)). If the state legislature does not propose a remedy, however, the district court must fashion a remedial plan. Williams, 32 F.3d at 1268. Because the South Dakota state legislature has refused to fashion a remedial plan, the court will fashion the remedial plan.

The court may fashion its own remedy or use a remedy proposed by plaintiffs. Westwego Citizens for Better Gov't v. City of Westwego, 946 F.2d 1109, 1124 (5th Cir. 1991). In fashioning a remedy, the paramount principle that must be applied is that the court must act to correct the constitutional violation that has been found. As the Supreme Court held in Reynolds v. Sims, 377 U.S. 533, 585, 84 S. Ct. 1362, 1393, 12 L. Ed. 2d 506 (1964), "once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be

justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan."

Second, the court is held to a stricter standard than the state legislature in redistricting: "[U]nless there are persuasive justifications, a court-ordered reapportionment plan of a state legislature must avoid use of multimember districts, and, as well, must ordinarily achieve the goal of population equality with little more than *de minimis* variation." Connor v. Finch, 431 U.S. 407, 414, 97 S. Ct. 1828, 1833, 52 L. Ed. 2d 465 (1977) (quoting Chapman v. Meier, 420 U.S. 1, 26-27, 95 S. Ct. 751, 766, 42 L. Ed. 2d 766 (1975)).  Third, court-ordered redistricting plans should not violate the Voting Rights Act, either § 2 or § 5.  See McDaniel v. Sanchez, 452 U.S. 130, 148, 101 S. Ct. 2224, 2235, 68 L. Ed. 2d 724 (1981).  Finally, to the extent that an existing plan does not violate the Constitution or federal law, the legislative judgments reflected in the plan must be adhered to.  Upham v. Seamon, 456 U.S. 37, 41-42, 102 S. Ct. 1518, 1521, 71 L. Ed. 725 (1982).

### 1. Correct the Violation

For the reasons that follow below, the court concludes that plaintiffs' Remedial Plan 1[1] will be adopted as the remedy.  A diagram of Remedial Plan 1 follows:

---

[1] Plaintiffs' Remedial Plan 1 is the same as plaintiffs' Illustrative Plan E during trial.



Remedial Plan 1 reconfigures District 27 to consist of Bennett, Haakon, Jackson, and Shannon counties.  Under Remedial Plan 1, District 27 encompasses all of the Pine Ridge Reservation and all of its off-reservation trust lands.  Native Americans comprise 73 percent of the total population and 65.56 percent of the voting-age population in District 27, which elects one senator and two representatives at large.  District 26 is reconfigured to encompass Todd, Mellette, Tripp, and Gregory counties and includes the entire Rosebud Reservation and nearly all of its off-reservation trust lands. District 26A, a single-member house district, consists of Mellette and Todd

5

counties and includes all of the current Rosebud Reservation. Native Americans constitute 80.88 percent of the total population and 74.36 percent of the voting-age population in District 26A.

Remedial Plan 1 also makes changes to District 21 for purposes of achieving population equality. District 21 consists of Jones, Lyman, Buffalo, Brule, and Charles Mix counties. District 21 is majority-white under the 2001 plan and remains majority-white under Remedial Plan 1. Because plaintiffs were successful on the merits of their claim, they are entitled to an injunction to preclude further elections under the 2001 plan.

**2.   Population Equality and Multi-Member Districts**

With regard to the goal of population equality, defendants have not suggested that Remedial Plan 1 violates the one-person one-vote principles of Reynolds. The total population of the state of South Dakota is 754,844. The population norm for a Senate seat if absolute population equality were to be achieved is 21,567. Remedial Plan 1 contains a maximum deviation of 1.24 percent in Senate District 21, 4.07 percent in Senate District 26 and (1.86) percent in Senate District 27. While the overall deviation of Remedial Plan 1 is 9.71 percent, this deviation is justifiable here because it is determined entirely by Districts 28B and 30, both of which lie outside the area

at issue here and are unchanged from the 2001 plan.[2] In the absence of any suggestion from defendants to the contrary, the court finds these numbers to be within the permissible range for compliance with the Fourteenth Amendment's one-person one-vote standard.

Remedial Plan 1 uses single-member districts in the affected areas except where they are not necessary to remedy the § 2 violation. This balances the Supreme Court's preference for single-member districts, see Chapman v. Meier, 420 U.S. 1, 21, 95 S. Ct. 751, 42 L. Ed. 2d 766 (1975), with the legislature's policy of using multi-member districts for the state house of representatives. In the absence of an objection from either plaintiffs or defendants, the court finds the use of single-member districts for District 26 and multi-member house districts for District 27 appropriate under the facts of this case.

---

[2] A court-ordered reapportionment plan to remedy a violation of the one-person one-vote principle must ordinarily achieve the goal of population equality with little more than *de minimis* deviation, absent "persuasive justification." Connor, 431 U.S. at 414, 97 S. Ct. at 1833. This court is constrained by Upham, 456 U.S. at41-43, however, to use as much of the 2001 plan as is not violative of the Constitution or federal statutes. Districts 28B and 30 were not challenged by plaintiffs, but they are the portions of the map that determine the upper and lower limits of the population deviation. The court finds that utilizing the portions of the 2001 plan which were not challenged or affected by the court's decision constitutes "persuasive justification" for a 9.71 percent population deviation.

### 3.     Compliance with Sections 2 and 5 of the Voting Rights Act

A violation of § 2 is established "if, based on the totality of the circumstances, it is shown that . . . [members of a protected minority group] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  42 U.S.C. § 1973(b).  This court found the 2001 plan to constitute a "packing" violation.  A "packing" violation occurs where a district contains "an unnecessarily high proportion of [minorities] with a resulting 'waste' of [minority] votes."  Ketchum v. Byrne, 740 F.2d 1398, 1407-08 (7th Cir. 1984).  The challenge in this case arises from remedying a "packing" violation without then "fracturing" the minority vote.  A "fracturing" problem occurs when the minority would be placed in districts to "constitute a sizeable, but politically ineffective" voting group.  Id. at 1408.  Remedial Plan 1 reduces the over-concentration of Indian voters in the former District 27, while leaving District 27 with an effective majority, and it creates an additional single-member house district in which the Indian voters will have an opportunity to elect a representative of their choice.

A commonly used correction in the remedial phase has been to create districts where the minority threshold is 65 percent, essentially adding 5 percent each for minority communities with young populations, low voter registration, and low voter turnout.  Id. at 1416. When voting-age-population

8

(VAP) figures are used, a district with a 60 percent nonwhite majority provides a sufficient cushion for an effective remedy. Jeffers v. Tucker, 847 F. Supp. 655, 660 (E.D. Ark. 1994) (three-judge court). A 58 percent minority VAP district with no white incumbent is the equivalent in practical political terms to a 60.55 percent minority VAP district with a white incumbent. Id.

Remedial Plan 1 uses VAP statistics and as a result, without evidence to the contrary, a 60 percent Indian majority would provide a sufficient cushion for an effective remedy. Furthermore, the evidence reflects that in District 27 there would be two Indian-preferred incumbents, namely Senator Two Bulls and Representative Bradford, no white incumbents, and one open house seat. In District 26A, there would be one Indian incumbent, Representative Valandra, and one white incumbent, Representative Jensen. Under Remedial Plan 1, Indians constitute 65.56 percent of the VAP in District 27 and 74.36 percent of the VAP in single-member District 26A. Thus, without considering the added benefit of Indian incumbents, Districts 27 and 26A have sufficient minority VAP to comply with Jeffers.

Even if the court considers a correction based on data in the record, Remedial Plan 1 constitutes an effective majority. Defendants' statistical expert, Dr. Jeffrey Zax, opined that the average Indian turnout in the state legislative contests was 35.60 percent. The average white turnout in those

contests was 65.64 percent. Applying those turnout rates to the Indian and white VAP in Districts 26A and 27 shows the following:

| Table 1 | | | | |
|---|---|---|---|---|
| | | **VAP** | **Turnout %** | **Voters** |
| Dist. 26A | Indian | 4774 | .3560 | 1700 |
| | White | 1646 | .6564 | 1080 |
| Dist. 27 | Indian | 8253 | .3560 | 2938 |
| | White | 4336 | .6564 | 2846 |

Thus, Districts 26A and 27 have a sufficient number of Indians to constitute a politically effective voting group.

The resolution of the Executive Board of the South Dakota Legislature dated July 21, 2005, implies that because District 27 has never elected a full slate of tribal members, the District as constituted is barely adequate. Although the current representatives are not all enrolled tribal members, this statement is a misleading use of phraseology. The Executive Board ignores the fact that two of the three current legislators, Senator Teresa Two Bulls[3] and Representative Paul Valandra, are Indians and enrolled tribal members. The third legislator, Representative Jim Bradford, while not an enrolled tribal member, has been found by this court to be an Indian person. Bone Shirt v.

---

[3]Prior to Senator Two Bulls, Senator Dick Hagen was elected as the Senator from District 27. He was also an Indian and an enrolled tribal member.

Hazeltine, 336 F. Supp. 2d 976, 1042 (D.S.D. 2004).  Furthermore, based on the evidence at trial, this court concluded that Representative Bradford was an Indian-preferred candidate in his race.

The Executive Board also concluded that the 2001 districting scheme was necessary because voter turnout and voter registration were lower among Indians than comparable black populations and it had no evidence to indicate any future dramatic increase.  Defendants cited no legal authority that had ever adopted such an unusually high supermajority of almost 90 percent.  Furthermore, the data available on the South Dakota Secretary of State's website indicates that in heavily Indian populated South Dakota counties, particularly those at issue in this lawsuit, voter registration and turnout rates have increased dramatically in recent election cycles.[4]  In addition, according to the evidence at trial, the Indian population has significantly increased during the last decade, while the white population has remained stagnant, or in most cases, declined.  While the Indian voter registration and turnout rates are lower than white rates, as the statistics above indicate, when using actual

---

[4] See http://www.sdsos.gov/Elections/ for comparisons of voter registration and turnout rates for Bennett, Todd, and Jackson counties.  For example, in 1994, Todd County had a 65.8 percent voter registration rate as a percentage of VAP compared to 84.7 percent statewide and a turnout rate of 47.1 percent compared to 73.7 percent statewide.  http://www.sdsos.gov/1994/94reg.htm.  In 2004, voter turnout in this same county was 65.17 percent compared to 78.63 percent statewide, an increase of almost 20 percentage points in one decade.  http://www.sdsos.gov/2004/04countyvoterturnout.htm.

voter turnout rates as applied to the VAP of Indians and whites, an effective majority of Indians exists under Remedial Plan 1. Thus, Remedial Plan 1 complies with § 2 of the Voting Rights Act.

Remedial Plan 1 also complies with the nonretrogression standard of § 5. Under the 1991 plan, which is the benchmark for determining retrogression because it is the last legally enforceable plan, Indians in Shannon and Todd counties had a realistic opportunity to elect three members of the state legislature. Under Remedial Plan 1, they have a realistic opportunity to elect four members. Thus, Remedial Plan 1 is not retrogressive and complies with § 5 of the Voting Rights Act.

### 4. Adherence to State Legislative Judgments

The court must also consider "the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution[.]" Upham, 102 S. Ct. at 1521 (quoting White v. Weiser, 412 U.S. 783, 794-795, 93 S. Ct. 2348, 2354, 37 L. Ed. 2d 335 (1973)). South Dakota's redistricting principles as recognized by the South Dakota state legislature include population equality, protecting communities of interests through compact and contiguous districts, respect for geographical and political boundaries, and protection of minority voting rights consistent with

the United States Constitution, the South Dakota Constitution, and federal statutes.  SDCL 2-2-32.  Similar principles have been recognized as traditional redistricting principles by the United States Supreme Court.  <u>See, e.g.</u>, <u>Miller v. Johnson</u>, 515 U.S. 900, 916, 115 S. Ct. 2475, 132 L. Ed. 2d 762 (1995) (identifying "respect for political subdivisions and communities defined by actual shared interests" as traditional districting principle); <u>Shaw v. Reno</u>, 509 U.S. 630, 651-52, 113 S. Ct. 2816, 125 L. Ed. 2d 511 (1993) (identifying population equality as a traditional districting principle); <u>Miller</u>, 515 U.S. at 916 (identifying compactness and contiguity as traditional districting principle).

In adopting Remedial Plan 1, the court maintains all of the 2001 plan except for Districts 21, 26 and 27.  In doing so, the court attempts to choose a plan that does "not preempt the legislative task nor 'intrude upon state policy any more than necessary.'"  <u>Upham</u>, 102 S. Ct. at 1521 (quoting <u>White</u>, 93 S. Ct. at 2354).  In order to remedy the packing violation and still maintain appropriate population equality, the court finds it necessary to not only redraw the boundaries for Districts 26 and 27, but also the adjoining District 21.  The court chooses Remedial Plan 1 instead of Remedial Plan 2 in an effort to impact as few districts as possible in the 2001 plan, thereby not intruding "upon state policy more than necessary."  <u>Id.</u>

Remedial Plan 1 uses whole counties in the affected areas as the basic boundaries for district lines and follows current and historical reservation boundaries.  See Miller, 515 U.S. at 916 ("respect for political subdivisions and communities defined by actual shared interests" are traditional districting principles).  The new District 27 consists of four counties and includes the entire Pine Ridge Reservation and all of its off-reservation trust lands.  The new District 26 consists of four counties and includes the entire Rosebud Reservation and all of its off-reservation trust lands, except those located in Lyman County.  The new single-member District 26A includes all of the current Rosebud Reservation.  And the new District 21 consists of five counties.  The 2001 plan, on the other hand, split Bennett County in half, creating a bridge to connect two non-contiguous Indian reservations and thereby created the former District 27.  Furthermore, former District 27 did not include the entire Pine Ridge Reservation.  Part of the Pine Ridge Reservation and most of the Rosebud off-reservation trust lands were placed into former District 26.  The remainder of the Rosebud off-reservation trust lands located in Gregory County were placed into former District 21.  Remedial Plan 1 respects the political boundaries of both state government and the tribes.

Remedial Plan 1 also respects geographic boundaries.  The new District 26 has the Missouri River as its primary eastern boundary, the White

River as the primary northern boundary, and the Nebraska border as the southern boundary.  The new District 27 has the Cheyenne River as a large part of its northern boundary and the Nebraska border as the southern boundary.  The new District 21 is bounded by the White River and the Missouri River on the south and county lines on the north.  While the new District 21 includes counties both east and west of the Missouri River, so did the former District 21.

Under Remedial Plan 1, the new Districts 26, 27, and 21 are compact and contiguous.  See Miller, 515 U.S. at 916 (compactness and contiguity are traditional districting principles).  The districts outlined in Remedial Plan 1 do not look much different and perhaps are more contiguous and compact than those under the 2001 plan.  The districts are comprised of adjacent counties and are highly regular in appearance.  Although the districts are large, this is a result of low population density.

When drawing district lines, the court needs to be mindful of complying with the Fourteenth Amendment's limitations on the use of race in the redistricting process.  The constitution does not require regularity of shape. See Bush v. Vera, 517 U.S. 952, 963, 116 S. Ct. 1941, 1953, 135 L. Ed. 2d 248 (1996).  Districts, however, that look like a "bug splattered on a windshield" or a "Rorschach ink-blot test," see Shaw v. Reno, 509 U.S. at 635, 113 S. Ct. at 2820, or a "jigsaw puzzle" or "a sacred Mayan Bird," see Bush,

15

517 U.S. at 973-74, 116 S. Ct. at 1958-59, or are so irregular in shape on their face that they can be understood only as an effort to "separate voters into different districts on the basis of race," see <u>Shaw</u>, 509 U.S. at 649, 113 S. Ct. at 2828, are "the product of [presumptively] unconstitutional racial gerrymandering" subject to strict scrutiny.  See <u>Bush</u>, 517 U.S. at 976, 116 S. Ct. at 1960.  Districts 21, 26, and 27 in Remedial Plan 1 are compact, contiguous, and are drawn along county lines and reservation lines.  They incorporate natural geographic borders and meet the one-person one-vote standard.  They certainly do not resemble any of the bizarre shapes referenced by the United States Supreme Court in <u>Bush</u> or <u>Shaw</u>.  Thus, Remedial Plan 1 complies with the Fourteenth Amendment.  After considering all the policies and preferences of the state of South Dakota and the requirements of the federal Constitution, this court finds that Remedial Plan 1 is the appropriate plan to be adopted as the remedy.  Accordingly, it is

ORDERED that defendants are hereby enjoined from conducting elections pursuant to the 2001 plan.

IT IS FURTHER ORDERED that the court adopts plaintiffs' proposed Remedial Plan 1 to replace the 2001 plan.

IT IS FURTHER ORDERED that plaintiffs' motion to shorten response time (Docket 355) is denied as moot.

Dated August 18, 2005.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE